ACCEPTED
04-15-00534-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
12/18/2015 4:46:17 PM
KEITH HOTTLE
CLERK

NO. 04-15-00534-CV

_____

IN THE FOURTH COURT OF APPEALS AT SAN ANTONIO

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/18/15 4:46:17 PM
KEITH E. HOTTLE
Clerk

_____

PATRICIA JO KARDELL, MARTIN MURPHY SNOWDEN, MICKEY
DARRELL SNOWDEN AND MARY DELILLA SNOWDEN,

Appellants,

v.

SWIFT ENERGY OPERATING, LLC,

Appellee.

_____

Appealed from the 218th Judicial District Court of
La Salle County, Texas

_____

**APPELLANTS' BRIEF**

_____

Gilbert Vara, Jr.
State Bar No.: 20496250
&
Richard J. Karam
State Bar No.: 11097500
THE LAW OFFICE OF GILBERT VARA, JR.
&
LAW OFFICES OF RICHARD J. KARAM
*The Ariel House*
8118 Datapoint Dr.
San Antonio, Texas 78229-3228
Telephone: (210) 614-6400; Telecopy: (210) 614-6401
Emails: gilbert@varalaw.com & rjkaram@aol.com
Attorneys for Appellants,
Patricia Jo Kardell, Martin Murphy Snowden,
Mickey Darrell Snowden, and Mary Delilla Snowden

*APPELLANTS REQUEST ORAL ARGUMENT*

## IDENTITY OF PARTIES & COUNSEL

**Appellants:**          **Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden**

Trial and Appellate Counsel: Richard J. Karam
Law Offices of Richard J. Karam
*The Ariel House*
8118 Datapoint Drive
San Antonio, Texas 78229-3228
Telephone: (210) 614-6400
Telecopy:   (210) 614-6401
Email:      rjkaram@aol.com

Lead Appellate Counsel:      Gilbert Vara, Jr.
The Law Office of Gilbert Vara, Jr.
*The Ariel House*
8118 Datapoint Drive
San Antonio, Texas 78229-3228
Telephone: (210) 614-6400
Telecopy:   (210) 614-6401
Email:      gilbert@varalaw.com

**Appellees:**          **Elaine V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shella Acker (Reinke) Bonner, Edwin Scott Acker**

Trial Counsel:          Wilson Calhoun
Law Office of Wilson Calhoun
719 Shoreline Blvd., Suite 404
Corpus Christi, Texas 78401
Telephone: (361) 882-3300
Telecopy:   (361) 888-5404
Email:      Wilson@wcalhoun.com

Lead Appellate Counsel:      Audrey Mullert Vicknair

i

Law Office of Audrey Mullert Vicknair
802 N. Carancahua, Suite 1350
Corpus Christi, Texas 78401-0022
Telephone: (361) 888-8413
Telecopy:   (361) 888-6207
Email:       avicknair@vicknairlaw.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES & COUNSEL ........................................................... i

INDEX OF AUTHORITIES ...........................................................................v

STATEMENT ON ORAL ARGUMENT ......................................................vii

STATEMENT OF THE CASE ..................................................................... .viii

ISSUE PRESENTED.....................................................................................x

ISSUE NUMBER ONE
Whether the motion for summary judgment filed by the Mabel Snowden
Heirs, supported by competent summary judgment evidence, required the
trial court to properly construe the referenced conveyances in the
Correction Warranty Deed in order to validate the grantor's intent..............x

STATEMENT OF FACTS...............................................................................1

*Nature Of The Appeal* .................................................................................1

*Procedural History* ..................................................................................... 2

*Substantive Facts* ......................................................................................5

Murphy Partition Deeds and Estate Plan ....................................................5

Conveyance/Re-Conveyance of Snowden Ranch Royalty Interests.............. 8

This Court of Appeals previously interpreted the 1948 Murphy Estate
Partition Deeds, including the 1948 Snowden NPMD, and the 1953
Declaration and Agreement .......................................................................13

The instant Royalty Interest Dispute is Limited to Mabel Snowden Heirs
and Johnie Acker Heirs ..............................................................................15

STANDARDS OF REVIEW .......................................................................16

SUMMARY OF THE ARGUMENT ............................................................ 17

ISSUE NUMBER ONE (RESTATED)
Whether the motion for summary judgment filed by the Mabel Snowden Heirs, supported by competent summary judgment evidence, required the trial court to properly construe the referenced conveyances in the Correction Warranty Deed in order to validate the grantor's intent............18

ARGUMENT AND AUTHORITIES ......................................................18

*The Mabel Snowden Heirs Met Their Burden of Proof* ..............................18

1. Documents are Unambiguous ................................................. 20

2. *Winslow v. Acker:* The declaration of rights in this prior appeal constitutes Res Judicata and/or Collateral Estoppel to the issues in the instant appeal ....................................................................21

3. Attorneys' Fees - Declaratory Judgment.............................. 28

CONCLUSION AND PRAYER .................................................... 28

CERTIFICATE OF SERVICE .................................................... 30

APPENDIX ..................................................................31

# INDEX OF AUTHORITIES

## CASES

*Altman v. Blake,*
712 S.W.2d 117 (Tex.1986)...........................................................................27

*Amstadt v. U.S. Brass Corp.,*
919 S.W.2d 644 (Tex.1996) ...................................................................... 21

*Barr v. Resolution Trust Corp.,*
837 S.W.2d 627 (Tex.1992) ...................................................................... 21

*Bonniwell v. Beech Aircraft Corp.,*
663 S.W.2d 816 (Tex.1984) ...................................................................... 21

*Cathey v. Booth,*
900 S.W.2d 339 (Tex.1995) ......................................................................16

*City of Keller v. Wilson,*
168 S.W.3d 802 (Tex.2005) ...................................................................... 17

*Comm'rs Court of Titus County v. Agan,*
940 S.W.2d 77 (Tex.1997) ................................................................. 16, 17

*Harris v. Windsor,*
156 Tex. 324, 294 S.W.2d 798 (Tex.1956) ...............................................24, 25

*Hausser v. Cuellar,*
345 S.W.3d 462
(Tex.App.–San Antonio 2011, pet. denied).................      ....................22, 23

*Johnson v. Brewer & Pritchard, P.C.,*
73 S.W.3d 193 (Tex.2002)........................................................................17

*Julia Authelia Winslow v. Edwin V. Acker,*
781 S.W.2d 322 (Tex. App–San Antonio 1989, writ denied) ......15, 19, 22, 27

*Luckel v. White,*
819 S.W.2d 459 (Tex.1991) ..................................................................20

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,*
289 S.W.3d 844 (Tex.2009) ...............................................................17

*Myrad Properties, Inc. v. La Salle Bank Nat. Ass'n,*
300 S.W.3d 746 (Tex.2009) ............................................................ 25

*Neel v. Killam Oil Co., Ltd.,*
88 S.W.3d 334 (Tex.App.—San Antonio 2002, pet. denied) .......................23

*Nelson's Legal Investigating & Consulting v. Myrick,*
No. 04-11-00158-CV, 2011 WL 6090082
(Tex.App.—San Antonio Dec. 7, 2011, no pet.) (mem. op.) .................... .... 17

*Provident Life & Accident Ins. Co. v. Knott,*
128 S.W.3d 211 (Tex.2003) ........................................................... 17

*Stewart & Title Guar. Co. v. Aiello,*
941 S.W.2d 68 (Tex.1997) ........................................................ .20

## TEXAS STATUTES

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004 (West 2007) .......................... 28
TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2007) ......................... 28

## TEXAS RULES

TEX. R. APP. P. 4 (e)................................................................ 30
TEX. R. APP. P. 9.5 (a).............................................................. 30
TEX. R. APP. P. 166a (c) ...........................................................17
TEX. R. APP. P. 39.1 (c) ...........................................................vii
TEX. R. APP. P. 39.1 (d)...........................................................vii
TEX. R. APP. P. 39.1 (e) ..........................................................vii

vi

## STATEMENT ON ORAL ARGUMENT

The court of appeals should grant oral argument for the following reasons:

a. Oral argument would give the court a more complete understanding of the facts presented in this appeal as the presentation would illustrate the purpose and scope of the numerous conveyances. *See* TEX. R. APP. P. 39.1 (c).

b. Oral argument would significantly aid the court of appeals in deciding this case as the presentation would allow direct answers to the use and limits of prior incorporated conveyances in a deed. TEX. R. APP. P. 38.1 (e), 39.1 (d).

## STATEMENT OF THE CASE

***Nature of the Case:*** The dispute emanates from a series of deeds commencing in 1948 when the parties' common ancestor, J.E. Murphy, put into effect an estate plan where his descendants would share, to some extent, royalties produced on each of their respective lands.

On December 1, 2009, Swift Energy Operating, LLC, Lessee, and Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell, Snowden, and Mary Delilla Snowden, as Lessor, ("the Mabel Snowden Heirs"), executed a certain Oil, Gas & Mineral Lease, ("Swift Lease"). The Swift Lease provided a 25% royalty to the mineral estate owners.

The Mabel Snowden Heirs contend that Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker, George, Shella Acker Reinke, and Edwin Scott Acker, ("the Johnie Acker Heirs"), are entitled to only an undivided 1/5th of 1/8th royalty interest (or 1/5th x 12.5% royalty) under the Swift Lease, or, stated differently, 2.5% out of the 25.0% royalty interest.

The Johnie Acker Heirs, contend that they are entitled to 1/5th of 1/4th royalty interest (or 1/5th x 25% royalty) under the Swift Lease, i.e., 5% out of the 25% royalty interest.

Inexplicably, Swift Energy Operating, LLC, withheld 7-1/2% of the royalties under the Swift Lease, rather than the 2.5% in dispute.

***Trial Judge:*** Honorable Donna S. Rayes, 218th Judicial District Court, LaSalle County, Texas

***Judgment:*** On May 30, 2013, the Mabel Snowden Heirs filed their Motion for Summary Judgment with attached

exhibits. (CR 17-276)

On May 31, 2013, the Johnie Acker Heirs filed their motion for summary judgment with exhibits. (CR 277-331) On June 20, 2013, Swift Energy filed its response to the respective motions for summary judgment filed by the Snowdens and the Ackers. (CR 447-593) On June 20, 2013, the Mabel Snowden Heirs filed their response to the motion for summary judgment filed by the Johnie Acker Heirs which Swift Energy corrected in a June 25, 2013 filing. (CR 594 & 600) On July 2, 2013, the Johnie Acker Heirs filed supplemental briefing regarding their motions for summary judgment. (CR 604) On July 3, 2013, the Mabel Snowden Heirs filed their response to the supplemental briefing. (CR 608)

On October 22, 2013, in a letter ruling filed on October 25, Judge Stella Saxon granted the motion for summary judgment filed by the Johnie Acker Heirs. (CR 613) On April 3, 2014, the trial court entered its Order granting the motion for summary judgment filed by the Johnie Acker Heirs and denying the motion for summary judgment filed by the Mabel Snowden Heirs. (CR 640) On July 21, 2015, Judge Donna S. Rayes entered final judgment for the Johnie Acker Heirs. (CR 654) On August 19, 2015, the Mabel Snowden Heirs filed their joint notice of appeal. (CR 673)

## ISSUE PRESENTED FOR REVIEW

## ISSUE NUMBER ONE

Whether the motion for summary judgment filed by the Mabel Snowden Heirs, supported by competent summary judgment evidence, required the trial court to properly construe the referenced conveyances in the Correction Warranty Deed in order to validate the grantor's intent.

TO THE HONORABLE COURT OF APPEALS:

Appellants, Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden, ("the Mabel Snowden Heirs"), submit their Appellants' Brief and respectfully show:

## STATEMENT OF FACTS[1]

### *Nature Of The Appeal*

This appeal concerns the construction of a certain "Correction Warranty Deed" and the intent of the grantor when considered together with the provisions of other specific documents referenced therein.

The Mabel Snowden Heirs maintain that the trial court must consider and incorporate all provisions of the documents expressly referenced in the Correction Warranty Deed, as well as the circumstances surrounding the execution of the Correction Warranty Deed, in order to correctly interpret it and the grantor's intent. In doing so, the proper construction to be given the Correction Warranty Deed clearly would show that the grantor did not intend to re-convey more property to the grantee than what was originally received by the grantor. Furthermore, the intent and purpose of the Correction Warranty Deed is, and was, to describe the interest being re-

---

[1] The Index for the Clerk's Record has incorrect filing dates and typographical errors. References in Appellants' Brief shall be to the file-stamped pleadings and not the Index.

1

conveyed in terms of a "non-participating royalty interest" rather than a "mineral interest" with reservations.

The Johnie Acker Heirs maintain, to the contrary, that the Correction Warranty Deed should be read without regard to the referenced prior 1965 deed that it corrected in order to grant them more than what was originally given to Mabel Snowden.

This Court of Appeals, in a previous related case involving the same parties, interpreted these same mineral conveyances. Consequently, the intent and character of the interests being conveyed is clear as to the conveyances referenced in this appeal. Accordingly, this Court should reverse the summary judgment granted in favor of the Johnie Acker Heirs and render summary judgment in favor of the Mabel Snowden Heirs.

## Procedural History

On June 21, 2012, Swift Energy filed Plaintiff's Original Petition in Interpleader.[2] (CR 001-010) On July 30, 2012, the Mabel Snowden Heirs filed their original answer, original counterclaim, and cross-action in interpleader. (CR 017-047) On July 30, 2012, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Sheila Acker (Reinke) Bonner, and

---

[2] Various parties, who are not parties to this appeal, filed original answers. (CR 011, 012, 016, 055)

Edwin Scott Acker, ("the Johnie Acker Heirs"), filed their original answer and cross-claim. (CR 048-053)

On May 30, 2013, the Mabel Snowden Heirs filed their Motion for Summary Judgment with attached exhibits. (CR 056-276; App. 14) On May 31, 2013, the Mabel Snowden Heirs filed their first amended original answer, first amended original counterclaim, and first amended cross-action in interpleader. (CR 332-362) On May 31, 2013, the Johnie Acker Heirs filed their motion for summary judgment with exhibits. (CR 277-331; App. 16) On June 18, 2013, the Johnie Acker Heirs filed their original answer to the Mabel Snowden Heirs first amended cross-claim (CR 363-364) and their response to the motion for summary judgment filed by the Mabel Snowden Heirs. (CR 365-46; App. 15)

On June 20, 2013, Swift Energy filed its response to the respective motions for summary judgment filed by the Mabel Snowden Heirs and the Johnie Acker Heirs. (CR 447-593 App. 17) On June 20, 2013, the Mabel Snowden Heirs filed their response to the motion for summary judgment filed by the Johnie Acker Heirs. (CR 594-599; App. 18) On June 25, 2013, Swift Energy filed its correction. (CR 600-603; App. 19)

On July 2, 2013, the Johnie Acker Heirs filed supplemental briefing regarding their motions for summary judgment. (CR 604-607; App. 20) On

July 3, 2013, the Mabel Snowden Heirs filed their response to the supplement. (CR 608-612; App. 21)

On October 22, 2013, in a letter ruling filed on October 25, Judge Stella Saxon granted the motion for summary judgment filed by the Johnie Acker Heirs. (CR 613; App. 22) On March 18, 2014, counsel for the Johnie Acker Heirs filed an affidavit of authentication of business records concerning attorneys' fees. (CR 614-628 & 629-637; App.23) On April 3, 2014, the trial court entered its Order granting summary judgment for the Johnie Acker Heirs and denying the motion for summary judgment filed by the Mabel Snowden Heirs. (CR 640-649; App. 2)

On May 1, 2015, the Johnie Acker Heirs filed a notice of non-suit of their claims against the following defendants: Lola Mae Akers, Dean Edward Burkett, Francis Madison Woodall, Johnny Lee Woodall, Bonnie Lee Skidmore, Pamela Boss, Deeann Burkett Wilson, Caron Marie Corum, Brian Hunger, Lourene Yvonne Woodall Vance, Sharon L. Williams, and Daniel Wilson. (CR 650-651) On May 4, 2015, the trial court granted the non-suit. (CR 639)

On July 21, 2015, Judge Donna S. Rayes entered final judgment. (CR 654-672; App. 1) On August 19, 2015, the Mabel Snowden Heirs filed their joint notice of appeal. (CR 673-698) On August 25, 2015, the Clerk's Record

4

was requested by the Mabel Snowden Heirs and it was filed on August 26. (CR 699-705; 706)

***Substantive Facts***

**Murphy Partition Deeds and Estate Plan**

J. E. Murphy, now deceased, had five (5) children: (i) Mabel M. Snowden, (ii) Johnie Lorene Acker, (iii) Edna Mae Jones, (iv) Julia Authelia Akers, (v) Emmett Granvel Murphy. The Mabel Snowden Heirs are the children of Mabel M. Snowden. The Johnie Acker Heirs are the heirs of Johni Lorene Acker.

J. E. Murphy owned four (4) separate ranches prior to his death. Upon his death, his 5 children owned undivided interests in each of the ranches, including the entire mineral estate. In accordance with the estate planning wishes of J. E. Murphy, all 5 children executed 4 deeds on October 21, 1948 partitioning the surface estates of the 4 ranches to his 4 children excluding Mabel M. Snowden. In lieu of conveying a ranch to Mabel M. Snowden, she received cash of equal value since Mabel M. Snowden had previously acquired a ranch in 1945 in Dimmit and La Salle Counties. (CR 71-88; App. 3) (CR 089-094; App. 4)

Each of the four separate surface deeds to the four children, ("1948 Murphy Estate Partition Deeds"), provides as follows:

5

" ... the parties (the 5 children) shall continue to own and hold in common all of the oil, gas, and other minerals in the same undivided proportion .... it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate ... shall have the exclusive right to execute ... mineral lease(s) ... and receive, as (his/her) separate property, such bonuses, oil payments, and rentals as may be paid under said .. mineral leases ...    <u>except</u> that (he/she) shall reserve in each .... mineral lease ... a base one-eighth (1/8) royalty interest for the benefit of (herself/himself) and the other four children .. in the same proportion they now own same." (CR 71-88; App. 3)

Six days thereafter, on October 27, 1948, Mabel M. Snowden executed a Non-Participating Mineral Deed, ("1948 Snowden NPMD"), in connection with her existing ranch in Dimmitt and LaSalle Counties, (the "Snowden Ranch").  In furtherance of the estate planning design of J. E. Murphy, the 1948 Snowden NPMD conveyed an undivided four-fifths (4/5) interest in and to 1/8th of the royalty from all oil, gas and minerals in and under the Snowden Ranch to the 4 siblings of Mabel M. Snowden.  The 1948 Snowden NPMD specifically contained a reservation identical in substance as the 1948 Murphy Estate Partition Deeds, to-wit:

"It is further agreed that Grantees [the other four siblings] shall have <u>no interest in any bonus money or oil payment above the one-eighth (1/8th) royalty</u> received by the Grantors in any future lease or leases given on said land and that it shall not be necessary for the Grantees to join in any such lease or leases so made; that Grantees shall receive under such lease or leases four-fifths (the same being one-fifth (1/5th) to each Grantee) part of all the oil, gas and other minerals taken and saved under any such lease or leases and he or she shall receive the same out of the royalty provided for in such lease or leases, but Grantees shall have no part in the

annual rentals paid to keep such lease or leases in force until drilling is begun." (CR 095-100; App. 5) (emphasis added)

Mabel M. Snowden thereby conveyed only a <u>fixed</u> 1/5th of 1/8th royalty to each of her four siblings, including Johnie Lorene Acker, in the Mabel Snowden NPMD. (CR 095-100; App. 5)

In 1953, the five siblings wanted confirmation from each other as to the estate planning intent of their father and, in particular, their respective rights as surface owners to the mineral estate on their lands. (CR 101-106; App. 6) Accordingly, on December 9, 1953, Johnie Lorene Acker and Mabel Mullen Snowden, as well as the other siblings, executed a recordable declaration and agreement, ("Declaration & Agreement"), confirming to each other as follows:

> "[We] hereby declare, that in making the division of the property in the Estate of J. E. Murphy, deceased, it was the intention of said parties to grant to the party receiving the surface, the right to receive all rentals from oil, gas and mineral leases then on said land so granted and to receive all bonuses and rentals on leases that might thereafter be made by the party to whom the surface was conveyed by Special Warranty Deed, provided, however, that the Lessor in said oil, gas and mineral lease, so executed by him or her, should reserve, in each oil, gas and mineral leases so executed, a <u>basic</u> one-eighth (1/8) royalty interest ..... for the benefit of the Lessor and the other children of J. E. Murphy, deceased, and those claiming under said children or child .......
> (CR 101-106; App. 6) (emphasis added).

**Conveyance/Re-Conveyance of Snowden Ranch Royalty Interests**

On or about December 31, 1953, Mabel M. Snowden sought to borrow money against the Snowden Ranch. (CR 107-110; App. 7) As a condition of the loan, the bank required that Mabel M. Snowden own at least three-fifths (3/5ths) of the mineral interest in the Snowden Ranch. (CR 107-110; App. 7) At that time, she only owned $1/5^{th}$ of $1/8^{th}$ royalty interest together with all rights to the minerals and production over and above the 4/5ths of $1/8^{th}$ royalty conveyed to her siblings. Consequently, at Mabel M. Snowden's request, Johnie Lorene Acker and Virginia Gertrude Akers Murphy, (being the surviving wife of Emmett Granvel Murphy and sole devisee under his Last Will and Testament), conveyed to Mabel M. Snowden their respective one-fifth (1/5) of said 1/8 royalty interests in the Snowden Ranch by Royalty Deed dated December 31, 1953, so that Mabel M. Snowden then owned a total of three-fifths (3/5) of said base (or basic) royalty interest in the Snowden Ranch together with all rights to the minerals and production therefrom over and above the remaining 2/5ths of $1/8^{th}$ royalty in favor of her other siblings, ("1953 Royalty Deed"). (CR 107-110; App. 7)

When Mabel M. Snowden paid the note to the bank, she re-conveyed the same royalty interest back to Johnie Lorene Acker on March 25, 1965 by

instrument, ("1965 Mineral Deed"), that provided:

[Mabel M. Snowden] granted and conveyed to Johnie Lorene Acker an ....

> "undivided one-fifth (1/5th) interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in and to the land hereinafter described, the mineral interest hereby conveyed being all of the interest conveyed by Johnie Lorene Acker to Mabel M. Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas." (CR 111-114; App. 8)

The royalty interest of Virginia Gertrude Akers Murphy was, by agreement, retained by Mabel M. Snowden as part of the Mabel M. Snowden estate. (CR 111-114; App. 8)

In or about 1980, a title search was conducted on the Snowden Ranch by a prospective oil and gas lessee. (CR 115-120; App. 9) In that process, it became desirable to express the re-conveyance to the Johnie Acker Heirs in terms of a non-participating royalty interest, ("NPRI"), rather than a mineral interest with reservations. (CR 115-120; App. 9) Consequently, Mabel M. Snowden and Johnie Lorene Acker agreed to correct and clarify the 1965 Mineral Deed to express the conveyance in terms of an NPRI. (CR 115-120; App. 9)

Therefore, on or about June 24, 1980, (but effective as of March 25, 1965), a Correction Warranty Deed was prepared and executed that stated, in pertinent part:

"in place of and as a Deed of Correction" to the March 25, 1965 deed "wherein by error or mistake, Grantors conveyed to Grantee an undivided one-fifth (1/5th) mineral interest in and to all of the oil, gas and other minerals, when in truth and fact Grantor should have conveyed an undivided non-participating 1/5th of the whole and entire royalty interest, ...." (CR 115-120; App. 9)

On December 1, 2009, the Mabel Snowden Heirs executed an oil and gas lease with Swift Energy, (the "Swift Lease"), which provided a 25% royalty to the mineral estate owners. (CR 121-159; App. 10) When Swift circulated a division order to the mineral owners, the Johnie Acker Heirs asserted that they were enitled to 1/5th of ¼ (25%) of the royalties under the Swift Lease rather than 1/5th of 1/8th as set forth in the 1948 Snowden NPMD. The claim caused Swift to suspend royalty payments and the institution of the present interpleader lawsuit.

In the lawsuit, the Johnie Acker Heirs, contend that the 1965 Mineral Deed, as corrected in 1980, entitles them to 1/5 share of the 25% royalties under the Swift Lease, not just the 1/5 of 1/8th (12.5% of the royalties) as provided in the original 1948 Mabel Snowden NPMD. (CR 111-114; App. 8) (CR 115-120; App. 9)

The Mabel Snowden Heirs, on the other hand, maintain that the 1948 Mabel Snowden NPMD and the succeeding conveyances, all of which were incorporated into the 1980 Correction Deed, express the clear intent to

10

convey only an undivided 1/5th of 1/8th royalty interest (1/5th x 12.5% royalty) to each of the siblings and their heirs, including the Johnie Acker Heirs, while reserving to the surface owner, the Mabel Snowden Heirs, all royalty and incidents of the mineral estate above that amount. (CR 115-120; App. 9)

The Mabel Snowden Heirs' interpretation has clear support under the 1948 Murphy Estate Partition Deeds, the 1948 Snowden NPMD, and subsequent conveyance documents:

First, the 1980 Correction Warranty Deed, the 1965 Mineral Deed, and the 1953 Royalty Deed each refer back to the interests conveyed by the 1948 Snowden NPMD. (CR 115-120; App. 9) (CR 111-114; App. 8) (CR 107-110; App. 7) (CR 095-100; App. 5) The 1948 Snowden NPMD restricts the conveyance to the four siblings to only a portion of the mineral interest, that being an undivided one-fifth (1/5th) of one-eighth (1/8th) royalty, reserving all other aspects of the mineral estate to the Mabel Snowden Heirs. (CR 095-100; App. 5)

Second, the 1980 Correction Warranty Deed clearly states in relevant part:

> "This Deed is made in place of and as a Deed of Correction of [the 1965 Mineral Deed] wherein by error or mistake, Grantors conveyed to Grantee an undivided 1/5th mineral interest in and to all of the oil,

11

gas and other minerals, when in truth and fact Grantors should have conveyed an undivided non-participating 1/5th of the whole and entire royalty interest, and this instrument ..., <u>in all other respects confirming said former Deed</u> ....." (CR 115-120; App. 9) (emphasis added)

Consequently, when reading the 1965 Mineral Deed together with the

the 1980 Correction Warranty Deed results in the following construction:

Mabel M. Snowden conveys to Johnie Lorene Acker:

"an undivided non-participating one-fifth (1/5) of the whole and entire royalty interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in and to the land hereinafter described, the mineral interest hereby conveyed ***being all of the interest conveyed by Johnie Lorene Acker to Mabel M. Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas.***" (CR 111-114; App. 8) (emphasis added)

Third, it is irrefutable that the December 31, 1953 Deed from Johnie

Lorene Acker to Mabel M. Snowden, conveyed "all of the interest previously

conveyed by Mabel M. Snowden to Johnie Lorene Acker ... by Deed dated

October 27, 1948 .... (i.e. the 1948 Snowden NPMD)" (CR 107-110; App. 7)

Fourth, the 1948 Snowden NPMD makes it absolutely clear that

Johnie Lorene Acker and the other siblings received no interest in any "oil

payment above the one-eighth (1/8th) royalty received by the Grantors in

any future lease or leases." (CR 095-100; App. 5) None of the other heirs

contested this fact and indeed the subject Final Judgment entered in this

12

case resolves any issues concerning same.

Fifth, the Declaration and Agreement executed by the parties on December 9, 1953 makes it absolutely clear that the siblings and their heirs are to receive only an undivided 1/5th of "a basic one-eighth (1/8) royalty interest" from the other siblings' mineral estate. (CR 101-106; App. 6)

Accordingly, the "*whole and entire royalty interest*" language contained in the 1980 deed must be construed with reference to the 1965 Mineral Deed and constitutes a reference to the entire base (or basic) 1/8th royalty, as consistently set forth in the family's series of deeds and declarations in 1948, 1953 and 1965 describing the royalty held in common by the five Murphy siblings and their heirs and assigns. (CR 095-100; App. 5) (CR 101-106; App. 6) (CR 107-110; App. 7) (CR 111-114; App. 8) (CR 115-120; App. 9)

**This Court of Appeals previously interpreted the 1948 Murphy Estate Partition Deeds, including the 1948 Snowden NPMD, and the 1953 Declaration and Agreement**

In 1988, a lawsuit was filed to determine the intent and terms of the shared family royalty interest between the Johnie Acker Heirs, Julia Authelia Akers (known at that time as Julia Authelia Winslow), and Mabel M. Snowden and some of her heirs. (CR 247-252; App. 12) In that dispute, the Johnie Acker Heirs had entered into several oil and gas leases on the

13

Acker ranch whereby overriding royalties were conveyed to Edwin Acker, Jr. (CR 247-252; App. 12)

The plaintiffs in the 1988 lawsuit (being Julia Authelia Winslow, Mabel M. Snowden and others) felt that they were entitled to share in the overriding royalties in addition to their respective undivided 1/5th of 1/8th royalty interests in the Acker ranch. (CR 247-252; App. 12) The Johnie Acker Heirs contended that the terms "base one-eighth (1/8) royalty interest" [in the four 1948 Murphy Estate Partition Deeds] and "above the one-eighth (1/8) royalty" [in the 1948 Snowden NPMD], and "basic one-eighth (1/8) royalty interest" in the 1953 Declaration and Agreement, limited the Winslow and Snowden interests to only 1/5 each of a 1/8 royalty. (CR 247-252; App. 12) They were correct.

The trial court reviewed the language in the four 1948 Murphy Estate Partition Deeds, including the 1948 Snowden NPMD to her four siblings and the 1953 Declaration and Agreement, and interpreted all of the reservations and restrictions contained therein (construing their different language together) as limiting the four other Murphy siblings' non-executive interests to only four-fifths (4/5ths) of a one-eighth (1/8th) royalty – that is, an undivided 1/5th of 1/8th royalty interest to each of the five children of J. E. Murphy. (CR 253-272; App. 13)

The judgment of the court was appealed. (CR 247-252; App. 12)

This honorable court of appeals upheld the trial court's judgment. *Julia Authelia Winslow v. Edwin V. Acker*, 781 S.W.2d 322 (Tex. App–-San Antonio 1989, writ denied). (CR 247-252; App. 12)

## The instant Royalty Interest Dispute is Limited to Mabel Snowden Heirs and Johnie Acker Heirs

The other Defendants named in this case, to-wit, the Edna Mae Jones Heirs and the Julia Authelia Winslow Heirs, do not contest the division of royalties under the Swift Lease as interpreted by the Mabel Snowden Heirs and, in fact, many executed and delivered Division Orders to Swift Energy reflecting the division as set forth by the Mabel Snowden Heirs, ("Division Orders"). (CR 160-246; App. 11)

Notwithstanding the fact that there was no dispute among the Mabel Snowden Heirs, the Edna Mae Jones Heirs, and/or the Julia Authelia Winslow Heirs, Swift Energy wrongfully withheld and suspended Seven and One-Half (7 ½%) percent of the royalties from the Swift Lease, when it should have only withheld and suspended Two and One-Half (2 ½%) Percent, i.e., the difference between what the the Mabel Snowden Heirs contend that the Johnie Acker Heirs are entitled to receive - an undivided 1/5th of 1/8th royalty interest (1/5th x 12.5%), and what the Johnie Acker

15

Heirs contend that they are entitled to receive - an undivided 1/5th of 1/4th royalty interest (1/5th x 25%) under the Swift Lease. This dispute amounts to 2-½% royalty interest, not 7-½%. However, after Summary Judgment was granted to the Johnie Acker Heirs, Swift Energy unilaterally released 5% of the suspended royalties to the Mabel Snowden Heirs and final Judgment in this case disposes of all issues with Swift Energy. Hence, this appeal is limited to the dispute between the Johnie Acker Heirs and the Mabel Snowden Heirs over the suspended 2-1/2% royalties and future royalties under the Swift Lease, and the construction of the subject deed conveyances.

## STANDARDS OF REVIEW

When both sides move for summary judgment and the trial court grants one motion and denies the other, as at bar, summary judgment evidence presented by both sides is reviewed and this honorable court of appeals determines all questions presented. *Comm'rs Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). Furthermore, as in the instant case where the Mabel Snowden Heirs have pleaded the affirmative defense of Res Judicata and Collateral Estoppel, a movant who conclusively establishes all of the elements of an affirmative defense is entitled to summary judgment. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995).

16

Summary judgment is reviewed *de novo. Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Evidence presented in the motion and response are analyzed in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 208 (Tex.2002). The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *See also Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.2009) (citing *Comm'rs Court of Titus County,* 940 S.W.2d at 81); *see also Provident Life & Accident Ins. Co.,* 128 S.W.3d at 216*; see also Nelson's Legal Investigating & Consulting v. Myrick,* No. 04-11-00158-CV, 2011 WL 6090082, at *2 (Tex.App.—San Antonio Dec. 7, 2011, no pet.) (mem. op.); Tex.R.Civ.P. 166a(c).

## SUMMARY OF THE ARGUMENT

In the instant case, the Mabel Snowden Heirs have demonstrated that they are entitled to a declaration setting forth their rights under the

competent summary judgment evidence in support of their motion for summary judgment and, in particular, are entitled to a declaration that the Johnie Acker Heirs are only entitled to an undivided non-participating 1/5th of 1/8th royalty in and under the Swift Lease. The trial court had ample summary judgment proof to grant summary judgment in favor of the Mabel Snowden Heirs.

## ISSUE NUMBER ONE
## (RESTATED)

Whether the motion for summary judgment filed by the Mabel Snowden Heirs, supported by competent summary judgment evidence, required the trial court to properly construe the referenced conveyances in the Correction Warranty Deed in order to validate the grantor's intent.

## ARGUMENT AND AUTHORITIES

### *The Mabel Snowden Heirs Met Their Burden Of Proof*

In support of their motion for summary judgment, the Mabel Snowden Heirs attached the following competent summary judgment proof:

Exhibit 1:   1948 Murphy Estate Partition Deeds (Certified Copies):

(i) Johnie L. Acker, Partition Deed, Vol. 43, Pg 218, McMullen
County Deed Records, Filed: Oct. 27, 1948;
(ii) Edna M. Jones, Partition Deed, Vol. 43, Pg 221, McMullen
County Deed Records, Filed: Oct. 27, 1948;
(iii) Emmett G. Murphy, Partition Deed, Vol. 44, Pg 30, McMullen

18

County Deed Records, Filed: Oct. 27, 1948;
(iv) Julia A. Ackers, Warranty Deed, Vol. K-4, Pg 313, La Salle
County Deed Records, Filed: Oct. 27, 1948.

Exhibit 2:   Green Martin, General Warranty Deed, Vol. D-4, Pg. 53-55, La
Salle County Deed Records, Filed: Oct. 1, 1945 (Certified Copy).

Exhibit 3:   1948 Snowden NPMD
Non-Participating Mineral Deed, Vol K-4, Pg. 311, La Salle County Deed
Records, Filed: Oct. 27, 1948 (Certified Copy).

Exhibit 4:   1953 Declaration & Agreement
Declaration & Agreement, Vol X-4, Pg. 350, La Salle County Deed Records,
Filed: Dec. 18, 1953 (Certified Copy).

Exhibit 5:   1953 Royalty Deed
Royalty Deed, Vol X-4, Pg. 355, La Salle County Deed Records, Filed: Dec.
31, 1953 (Certified Copy).

Exhibit 6:   1965 Mineral Deed
Mineral Deed; Vol 135, Pg. 135, La Salle County Deed Records, Filed:  April
14, 1965 (Certified Copy).

Exhibit 7:   1980 Correction Deed
Correction Warranty Deed, Vol 225, Pg. 246, La Salle County Deed
Records, Filed: July 8, 1980 (Certified Copy).

Exhibit 8:   Swift Energy Lease
Oil and Gas Lease dated December 1, 2009; Swift Energy Production

Exhibit 9:   Division Orders; Swift Energy Production

Exhibit 10:   *Julia Authelia Winslow v. Edwin V. Acker,* 781 S.W.2d 322
(Tex. App–San Antonio 1989, writ denied).

Exhibit 11:  Cause No. 1013-C, Julia Winslow et al v. Edwin V. Acker et al, in
the 343rd Judicial District Court, McMullen County, Texas (Certified Copies
of the following orders and pleadings):

Final Judgment
Defendants' Motion for Summary Judgment
Plaintiffs' Response to Defendants' Brief in Support of Defendants'
Motion for Summary Judgment
Defendants' First Amended Original Answer and Counterclaim
Plaintiffs' First Amended Original Petition

Exhibit 12: Affidavit of Richard J. Karam
Affidavit of Michael L. McReynolds

## 1. Documents are Unambiguous

A contract or deed that can be given a definite or certain legal meaning is not ambiguous. *See Stewart & Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 74 (Tex.1997). The construction of an unambiguous deed is a question of law for the court. *Luckel v. White,* 819 S.W.2d 459, 461 (Tex.1991). The primary duty of a court when construing deeds that are unambiguous is to ascertain the intent of the parties from all of the language as contained in the four corners of the relevant the deeds. *Id.* Neither party contends that the deeds in this case are ambiguous.

The Mabel Snowden Heirs contend that when the Court construes the documents attached to their Motion, the intent of the parties is clear and certain that only an undivided 1/5th of 1/8th royalty interest was conveyed to the Johnie Acker Heirs. Indeed, the other Murphy siblings who are named defendants in the lawsuit recognize this truth by not contesting the issues and by the execution and delivery of Division Orders consistent

20

therewith.

**2.** *Winslow vs. Acker*: **The declaration of rights in this prior appeal constitutes Res Judicata and/or Collateral Estoppel to the issues in the instant appeal.**

Res Judicata precludes re-litigation of claims that have been finally adjudicated or that arise out of the same subject matter and could have been litigated in the prior action. *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). Res Judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996).

Collateral Estoppel precludes re-litigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). The doctrine applies when the party against whom Collateral Estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. *Id.*

In *Winslow v. Acker,* this honorable court of appeals reviewed the language in the 1948 Murphy Estate Partition Deeds, the 1948 Snowden

NPMD, and the 1953 Declaration and Agreement. *Julia Authelia Winslow,* 781 S.W.2d at 322-26. (CR 247-252; App. 12) In so doing, the court of appeals interpreted all of the reservations and restrictions contained therein (construing their differing language together) as limiting the four other Murphy siblings' non-executive interests, including the Johnie Acker Heirs, to only four-fifths (4/5ths) of a one-eighth (1/8th) royalty – that is, an undivided 1/5th of 1/8th royalty interest to each of the children of J. E. Murphy. *Julia Authelia Winslow,* 781 S.W.2d at 327. (CR 247-252; App. 12) Therefore, the trial court's declaration regarding the deeds in *Winslow v. Acker* constitutes Res Judicata and/or Collateral Estoppel to the limitations of the mineral grant from Mabel M. Snowden to her four siblings and their heirs, i.e., each would receive $1/5^{th}$ of $1/8^{th}$ of the royalties and no more. *See Julia Authelia Winslow,* 781 S.W.2d at 327-328. (CR 247-252; App. 12)

In their supplemental briefing in support of their motion for summary judgment, the Johnie Acker Heirs misinterpret the law when they cite the decision in *Hausser* for the proposition that the trial court is prohibited from examining prior conveyances when construing a deed. (CR 604-607; App. 20); *Hausser v. Cuellar,* 345 S.W.3d 462, 470-71 (Tex. App.–San Antonio 2011, pet. denied).

22

In *Hausser,* the deed under scrutiny <u>did not</u> reference a prior conveyance.  The conveying language in <u>*Hausser*</u> provided as follows:

> Grantors] have GRANTED, SOLD, CONVEYED, ASSIGNED AND DELIVERED, and by these presents do GRANT, SELL, ASSIGN, CONVEY AND DELIVER unto the said Grantees, Share and share alike, an undivided (1/2) interest in and to all of the oil royalty, gas royalty, royalty in casinghead gas and gasoline, and royalty in other minerals in and under, and that may be produced and mined from the following described land situated in the County of Zapata and State of Texas, to wit: ..... *Id.* at 467.

The majority of the court of appeals in *Hausser* emphasized that when a deed is unambiguous on its face, it would be improper to look back at prior conveyances for interpretation disapproving of the decision of *Neel. Id.* at 470 (citing *Neel v. Killam Oil Co., Ltd.,* 88 S.W.3d 334, 340-41 (Tex.App.—San Antonio 2002, pet. denied)). However as explained by Justices Marion and Hilbig in their dissent in *Hausser,* the majority misreads *Neel because* the examination of the prior deed in *Neel* was merely <u>to confirm</u> the conclusion, not to create it.  *Hausser,* 345 S.W.3d at 472 (dissent).

The Mabel Snowden Heirs agree with both principles of law that an unambiguous deed should be read to harmonize and give effect to all its provisions by ascertaining the intent from the four corners of the document and that in certain cases, such as the appeal at bar, where a deed references the intent – not creates it – it is appropriate to look to prior referenced

23

conveyances.

At bar, the 1965 Mineral Deed from Mabel M. Snowden to Johnie Lorene Acker states:

Mabel M. Snowden Grants and convey to Johnie Lorene Acker an ….

"undivided one-fifth (1/5th) interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in and to the land hereinafter described, **the mineral interest hereby conveyed being all of the interest conveyed by Johnie Lorene Acker to Mabel M. Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas."**
(CR 111-114; App. 8) (emphasis added)

The 1965 Mineral Deed, unlike the *Hausser* deed, specifically referenced a prior deed for a <u>description of the mineral interest being conveyed</u>. Hence, the prior deed must be referred to in order to ascertain the intent of the parties as to the interest being conveyed. *See Harris v. Windsor,* 156 Tex. 324, 325-327, 294 S.W.2d 798, 799-800 (Tex.1956).

In *Harris,* the issue was whether the "reservations" contained in the prior deed were carried forward. The granting clause of the deed stated:

'And **being the same land described in Warranty deed from the The Federal Land Bank of Houston to W. C. Windsor, recorded in Vol. X-2, Page 119, Deed Records of Marion County, Texas**, reference to which is made for all purposes.' *Id.*

The Texas Supreme Court in *Harris* relied on the "made for all purposes" to incorporate the reservations from the prior conveyance in

following language:

> It is obvious that the reference in the Federal Land Bank deed to the Liverman-Tems deed, 'for all legal purposes,' was not for the purpose of description, but for the purpose of disclosing that the deed was subject to all restrictions and reservations in that deed. As before stated, that deed reserved one-half in the minerals to Liverman. *Id.* at 156 Tex. at 327, 294 S.W.2d at 800.

In the appeal at bar, the reference "made for all purposes" is unnecessary because the reference in the Snowden deed to the prior deed was specific to "the mineral interest hereby conveyed." In other words, the reference to the prior deed was for the specific purpose of describing the interest being conveyed.

Reliance by the Johnie Acker Heirs on the decision in *Myrad Properties, Inc.* and the subsequent additions to the Texas Property Code, Section 5.030 which made the case "dead letter law," is also inapposite as the Mabel Snowden Heirs are not contending that the Correction Warranty Deed adds an additional mineral interest, but to the contrary, that the Correction Warranty Deed merely restated the prior grant in terms of a royalty interest rather than a mineral interest with reservations. *Myrad Properties, Inc. v. La Salle Bank Nat. Ass'n,* 300 S.W.3d 746, 749-750 (Tex.2009). (CR 604-607; App. 20) In this regard, the Correction Warranty Deed speaks for itself on the intent and purpose of the correction:

"This Deed is made in place of and as a Deed of Correction of [the 1965 Mineral Deed] wherein **by error or mistake, Grantors conveyed to Grantee an undivided 1/5th mineral interest in and to all of the oil, gas and other minerals**, when in truth and fact **Grantors should have conveyed an undivided non-participating 1/5th of the whole and entire royalty interest**, and this instrument ..., **in all other respects confirming said former Deed** ..... " (CR 115-120; App. 9) (emphasis added)

In fact the 1965 Mineral Deed did state that it conveyed an undivided 1/5th mineral interest in all the oil, gas and other minerals; however, that broad conveyance was qualified by the succeeding language "being all of the interest conveyed by Johnie Loren Acker to Mabel M. Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas."  The 1953 Royalty deed likewise references the interest as "being all of the interest conveyed by Mabel M. Snowden to Johnie Lorene Acker .... by Deed dated October 27, 1948 ...... " Hence, in each of the successive conveyances one must refer back to the 1948 Mabel Snowden NPMD to determine exactly what was and what is being conveyed, which unquestionably restricts the conveyance to 1/5 of 1/8th royalty.  The Correction Warranty Deed states that "in truth and fact Grantors should have conveyed an undivided nor-participating 1/5th of the whole and entire royalty ... confirming in all other respects the former Deed.  It is clear that the Correction Warranty Deed merely expresses the

conveyance as a non-participating mineral interest (NPMI) rather than a mineral interest which reserves for grantor all other aspects of the mineral estate. (CR 115-120; App. 9)

The five essential elements of a severed mineral estate, are (1) the right to develop [the right of ingress and egress]; (2) the right to lease [the executive right]; (3) the right to receive bonus payments; (4) the right to receive delay rentals and (5) the right to receive royalty payments). *See Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986); *Julia Authelia Winslow,* 781 S.W. 2d at 326. In fact, the interest conveyed remains the same, albeit expressed in different terminology.

The contention by the Johnie Acker Heirs is that the Correction Warranty Deed <u>removed</u> the reference to the prior 1965 Mineral Deed. This position is frivolous. Nowhere in the Correction Warranty Deed does it do so. (CR 115-120; App. 9) If that was the intent of the correction, the removal could have been easily included in the Correction Warranty Deed.

When the 1965 Mineral Deed and the 1980 Correction Warranty Deed are reconciled, it would read as follows:

> Mabel M. Snowden ….. do(es) grant, bargain, sell and convey to the said Johnie Lorene Acker, an undivided non-participating one-fifth (1/5th) of the whole and entire royalty interest ……. in and to all of the oil, gas and other minerals described below, **being all of the interest conveyed by Johnie Lorene Acker to Mabel M.**

27

**Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas.**"
(CR 107-110; App. 7) (CR 115-120; App. 9) (emphasis added)

### 3.   Attorneys Fees -

### Declaratory Judgment

Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, the Mabel Snowden Heirs seek a declaratory judgment from this court of appeals that would have the effect of settling the entitlements regarding the suspended royalties and settling future disputes under the documents granting such royalty rights. TEX. CIV. PRAC. & REM. CODE ANN. §37.004 (WEST 2007). Pursuant to Texas Civil Practice and Remedies Code §37.009, the Mabel Snowden Heirs are entitled to costs of court and reasonable and necessary attorney's fees as set forth and stipulated by the parties in the Final Judgment of the trial court (fees to be awarded to Appellants in the event this court of appeals reverses and renders judgment in favor of the Mabel Snowden Heirs. TEX. CIV. PRAC. & REM. CODE ANN. §37.009 (WEST 2007). (CR 273-276).

## CONCLUSION AND PRAYER

The Mabel Snowden Heirs pray that this honorable court of appeals

reverse the trial court's final judgment and as a result the underlying summary judgment order and grant judgment on appeal for the relief sought by the Mabel Snowden Heirs and any further relief to which they are justly entitled.

Respectfully Submitted,

THE LAW OFFICE OF GILBERT VARA, JR.
&
LAW OFFICES OF RICHARD J. KARAM
*The Ariel House*
8118 Datapoint Drive
San Antonio, Texas 78229-3228
Telephone: (210) 614-6400
Telecopy:   (210) 614-6401
Emails:     gilbert@varalaw.com,
            rjkaram@aol.com

By: /S/_____
        GILBERT VARA, JR.
        State Bar No.: 20496250
        RICHARD J. KARAM
        State Bar No.: 11097500
        Attorneys for Patricia Jo Kardell,
        Martin Murphy Snowden,
        Mickey Darrell Snowden, and
        Mary Delilla Snowden

## CERTIFICATE OF SERVICE

I certify that on December 18, 2015, pursuant to TEX. R. APP. P. 4 (e), 9.5(a), a true copy of Appellants' Brief was delivered to the following counsel of record by e-service:

LAW OFFICE OF WILSON CALHOUN
Attn.: Wilson Calhoun
719 S. Shoreline Blvd., Suite 404
Corpus Christi, Texas 78401
Telephone: (361) 882-3300
Telecopy: (361) 888-5404
Email: Wilson@wcalhoun.com
&
LAW OFFICE OF AUDREY MULLERT VICKNAIR
Attn.: Audrey Mullert Vicknair
802 N. Carancahua, Suite 1350
Corpus Christi, Texas 78401-0022
Telephone: (361) 888-8413
Telecopy: (361) 887-6207
Email: avicknair@vicknairlaw.com
*Attorneys for*
*Edwin V. Acker, Jr., et al*

By: /S/_____
GILBERT VARA, JR.

NO. 04-15-00534-CV

_____

IN THE FOURTH COURT OF APPEALS AT SAN ANTONIO

_____

PATRICIA JO KARDELL, MARTIN MURPHY SNOWDEN, MICKEY
DARRELL SNOWDEN AND MARY DELILLA SNOWDEN,

Appellants,

v.

SWIFT ENERGY OPERATING, LLC,

Appellee.

_____

**APPELLANTS' APPENDIX**

_____

LIST OF DOCUMENTS

App. 1      Judgment.................................................................(CR 654-672)

App. 2      Order Granting Acker Motion for Summary Judgment and
            Denying Snowden Motion for Summary Judgment.. (CR 640-649)

App. 3      1948 Murphy Estate Partition Deeds..........................(CR 071-088)

App. 4      Green Martin, General Warranty Deeds ....................(CR 089-094)

App. 5      1948 Snowden NPMD............................................... (CR 095-100)

App. 6      1953 Declaration & Agreement................................... (CR 101-106)

App. 7      1953 Royalty Deed.....................................................(CR 107-110)

App. 8      1965 Mineral Deed.....................................................(CR 111-114)

App. 9      1980 Correction Deed................................................(CR 115-120)

App. 10     Swift Energy Lease.....................................................(CR 121-159)

App. 11        Division Orders.........................................................(CR 160-246)

App. 12        *Julia Authelia Winslow v. Edwin V. Acker*.................(CR 247-252)

App. 13        Cause No. 1013-C,
*Julia Winslow, et al. v. Edwin V. Acker*.....................(CR 253-272)

App. 14        Motion for Summary Judgment –
filed by Mabel Snowden Heirs...................................(CR 056-276)

App. 15        Response to Snowden Motion for Summary Judgment –
filed by Johnie Acker Heirs...............  ....................(CR 365-446)

App. 16        Motion for Summary Judgment –
filed by Johnie Acker Heirs........................................(CR 277-331)

App. 17        Response to Snowden and Acker
Motions for Summary Judgment –
filed by Swift Energy.................................................(CR 447-593)

App. 18        Response to Acker Motion for Summary Judgment –
filed by Mabel Snowden Heirs...................................(CR 594-599)

App. 19        Corrected Response to Snowden and Acker
Motions for Summary Judgment –
filed by Swift Energy............................................... (CR 600-603)

App. 20        Supplemental Briefing –
filed by Johnie Acker Heirs.......................................(CR 604-607)

App. 21        Response to Acker Supplemental Briefing –
filed by Mabel Snowden Heirs................................... (CR 608-612)

App. 22        Letter Ruling Granting Acker Defendants' Motion for Summary
Judgment.......................................................................(CR 613)

| SWIFT ENERGY OPERATING, LLC | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| vs. | § | |
| | § | |
| PATRICIA JO KARDELL, MARTIN | § | |
| MURPHY SNOWDEN, MICKEY | § | |
| DARRELL SNOWDEN, MARY | § | |
| DELILLA SNOWDEN, EDWIN V. | § | |
| ACKER, JR., STEPHEN ADOLPH | § | |
| ACKER, ELAINE ACKER GEORGE, | § | |
| LOLA MAE AKERS, PAMELA BOSS, | § | |
| DEAN EDWARD BURKETT, DEEANN | § | **218th JUDICIAL DISTRICT** |
| BURKETT WILSON, CARON | § | |
| MARIE CORUM, BRIAN HUNTER, | § | |
| JENNY MAY WOODALL LAWRENCE, | § | |
| MALYDALYN JONES MITCHELL, | § | |
| BONNIE LEE SKIDMORE, LOURENE | § | |
| YVONNE WOODALL VANCE, | § | |
| SHARON L. WILLIAMS, DANIEL | § | |
| WILSON, FRANCIS MADISON | § | |
| WOODALL, JOHNNY LEE WOODALL, | § | |
| SHELLA ACKER REINKE, AND | § | |
| EDWIN SCOTT ACKER | § | LA SALLE COUNTY, TEXAS |

FILED FOR RECORD
A: 10:15 O'clock A M.
JUL 21 2015
Margarita A. Esc...
County & District Clerk
LA SALLE COUNTY, TEXAS
BY _____ DEPUTY

## FINAL JUDGMENT

On this day came on to be considered the parties' motion for entry of final judgment in this matter. This Court finds it has jurisdiction over the subject matter and the parties to this proceeding.

Swift Energy Operating, LLC, Plaintiff-in-Interpleader (hereafter "Swift"), brought this interpleader action against Defendants, Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, Mary Delilla Snowden, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Lola Mae Akers, Pamela Boss, Dean Edward Burkett, Deeann Burkett Wilson, Caron Marie Corum, Brian Hunter, Jenny May Woodall Lawrence, Malydalyn Jones

1

Mitchell, Bonnie Lee Skidmore, Lourene Yvonne Woodall Vance, Sharon L. Williams, Daniel Wilson, Francis Madison Woodall, Johnny Lee Woodall, Shella Acker Reinke, and Edwin Scott Acker, being potential rival claimants to seven and one half percent (7.5%) of the oil and gas royalties arising from that certain Oil and Gas Lease dated December 1, 2009, from Martin Murphy Snowden *et al.* as Lessor, to Swift ("disputed royalties"), as evidenced by Memorandum of Oil & Gas Lease recorded in Volume 490, Page 98, of the Official Records of La Salle County, Texas. Covering the Subject Property as defined below (the "Swift Lease").

Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shella Acker (Reinke) Bonner, and Edwin Scott Acker (collectively "Acker Defendants"), upon being duly served with citation, filed an Answer and Cross-Claim against all other Defendants, claiming they are entitled to a royalty under the Swift Lease equal to one-fifth (1/5th) of the one-fourth (1/4th) of the oil, gas, and other minerals produced and saved or sold from the Subject Property or lands pooled therewith. Thereafter, the Acker Defendants non-suited their claims as against Defendants, Lola Mae Akers, Dean Edward Burkett, Francis Madison Woodall, Johnny Lee Woodall, Bonnie Lee Skidmore, Pamela Boss, Deeann Burkett Wilson, Caron Marie Corum, Brian Hunter, Lourene Yvonne Woodall Vance, Sharon L. Williams, and Daniel Wilson.

Defendants, Martin Murphy Snowden, Mickey Darrell Snowden, Patricia J. Snowden Kardell, and Mary Delila Snowden (collectively "Snowden Defendants"), upon being duly served with citation, filed Answers and Cross-Claims against the Acker Defendants' under

2

the Uniform Declaratory Judgments Act, Chapter 37, Civil Practice and Remedies Code to determine the respective rights of said Defendants to the disputed royalties.

The Snowden Defendants also filed a Counterclaim against Swift for breach of contract for suspending and constructively tendering into the registry of the court five percent (5%) out of the seven and one-half percent (7.5%) disputed royalties, asserting that only two and one-half percent (2.5%) of said royalties were actually in dispute.

Defendants, Jenny May Woodall Lawrence, Malydaln Jones Mitchell, Sharon L. Williams, Lola Mae Akers, Caron Marie Corum, Brian James Hunter, and Pamela Boss, acting pro se, filed Answers disavowing any interest in the disputed royalties and requesting a release and discharge from the interpleader.

Defendants, Dean Edward Burkett, Francis Madison Woodall, Johnny Lee Woodall, Bonnie Lee Skidmore, Deeann Burkett Wilson, Lourene Yvonne Woodall Vance, and Daniel Wilson, although each having been duly served with citation and a copy of Plaintiff's Original Petition in Interpleader did not appear and answer. The citations were served according to the law and returned to the clerk where they have remained on file for the time required by law.

On June 25, 2013, the court heard oral arguments on the following competing motions: (a) the motion for summary judgment of Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Sheila Acker (Reinke) Bonner, and Edwin Scott Acker and (b) the motion for summary judgment of Defendants Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden.

3

On April 3, 2014, this court granted the motion for partial summary judgment of the Acker Defendants and denied the motion for partial summary judgment of the Snowden Defendants against Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker. The partial summary judgement did not dispose of competing claims for attorney's fees under the Uniform Declaratory Judgment Act, Chapter 37, Civil Practice and Remedies Code (the "Code"), or resolve other claims and causes of action, including the Interpleader action of Swift and the claims of the Snowden Defendants against the Interpleader. The said remaining claims are hereafter disposed of herein.

Therefore, this final judgment disposes of all claims and causes of action in this matter. The Court hereby renders this final judgment as follows:

**IT IS THEREFORE, ORDEDED, ADJUDGED AND DECREED** that Defendants, Jenny May Woodall Lawrence, Malydaln Jones Mitchell, Sharon L. Williams, Lola Mae Akers, Caron Marie Corum, Brian James Hunter, and Pamela Boss, having filed Answers disavowing any interest in the disputed royalties and requesting a release and discharge from the interpleader are hereby divested of any and all interest in the disputed royalties and are hereby released and discharged from this Interpleader action.

**IT IS FURTHER, ORDERED, ADJUDGED AND DECREED** that Defendants, Dean Edward Burkett, Francis Madison Woodall, Johnny Lee Woodall, Bonnie Lee Skidmore, Deeann Burkett Wilson, Lourene Yvonne Woodall Vance, and Daniel Wilson, having admitted the material allegations asserted herein by failing to answer and/or to otherwise dispute the allegations concerning the ownership of the disputed royalties made the

4

subject of this suit, and having wholly made default as to asserting any rival claims to the said disputed royalty in this interpleader action, default judgments are hereby **GRANTED** to Swift against Defendants, Dean Edward Burkett, Francis Madison Woodall, Johnny Lee Woodall, Bonnie Lee Skidmore, Deeann Burkett Wilson, Lourene Yvonne Woodall Vance, and Daniel Wilson, and that said Defendants are hereby divested of any rights and claims to the disputed royalty interest and interpled funds and are further divested of and denied any right to contest the interpleader action brought by Swift.

**IT IS FURTHER, ORDERED, ADJUDGED AND DECREED** that a take nothing judgment is hereby entered on the Snowden Defendants counterclaims against Swift; that the interpleader action was properly brought and Swift is hereby discharged in full from this interpleader action; and Swift is awarded TWO THOUSAND FIVE HUNDERD DOLLARS ($2,500.00) in attorney fees from the Acker Defendants, to be paid jointly and severally by and amongst them.

**IT IS HEREBY DECLARED** that the five percent (5%) royalty derived out of the seven and one-half percent (7.5%) disputed royalty was and is the property of the Snowden Defendants and that the heirs, successors and assigns of Edna Mae Jones and Julia Authelia Winslow are not entitled to any portion thereof, having rights, respectively, to only 1/5th of 1/8th (or 12.5%) of the royalties derived from the Subject Property as hereinafter more fully described, that is, 1/5th of 1/8th non-participating royalty interest to the Edna Mae Jones Heirs, successors and assigns, and 1/5th of 1/8th non-participating royalty interest to the Julia Authelia Winslow Heirs, successors and assigns, each such interest derived by through and under the Non-Participating Mineral Deed dated October

5

27, 1948 and filed of record in Book K-4, Page 311 of the Deed Records of LaSalle County, Texas.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED,** that the said five percent (5%) royalty derived out of the seven and one-half percent (7.5%) disputed royalty has heretofore been paid to the Snowden Defendants by Swift and the court hereby confirms the payments of all such royalties paid to date by Swift; and releases Swift from any liability relating to said payments. The Snowden Defendants shall be entitled to any future five percent (5%) royalty payments derived out of the said seven and one-half percent (7.5%) disputed royalty from the Subject Property.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the motion for summary judgment of Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker is hereby **GRANTED** as hereinafter described and restated.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that a Declaratory Judgment is rendered under Chapter 37 of the Code, that pursuant to the Correction Warranty Deed from Mabel Snowden and her husband Joe Snowden to Johnie Lorene Acker, dated June 24, 1980, and recorded at Volume 225, Page 248 of the Deed Records of La Salle County, Texas on July 8, 1980, a copy of which is attached to this judgment as Exhibit A, the heirs, successors, and assigns of Johnie Lorene Acker own an undivided non-participating one-fifth of the whole and entire royalty interest in and to all of the oil, gas, and other minerals in the following property:

FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas known as

6

Sur. 137 patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue Land Scrip No. 244, Pat. No. 240, Vol. No. 35;

SECOND TRACT: 640 acres of land, more or less, in La Salle County, Texas, known as Sur. No. 143, patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip. No. 401, Pat. NO. 423, Vol. 30;

THIRD TRACT: 638.5 acres of land in La Salle County, Texas, and being all of Sur. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;

FOURTH TRACT: 193.1 acres out of Ori. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 344, described by metes and bounds as follows:

BEGINNING at the SW corner of Sec. No. 147, J. V. Massey and the N. W. Corner of Sec. No. 148, A. Salinas for the N. W. corner of this Sur;;

THENCE E. with Sec. line 1921 vrs. to a stk. at the intersection with the E. line of E. W. Alderman subdivision for the N. E. cor. of this Survey;

THENCE S. with said subdivision line 657.4 vrs. to a stk. set in fence line for the S. E. corner of this Sur.;

THENCE W. with fence line and past post at 663 vrs. past cor. of said fence, 1921 vrs. to a stk. in W. line of said Sec. No. 148, for the S. W. cor. of this sur.;

THENCE N. with said line 567.4 vrs. to the place of beginning;

FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No. 244, School

7

File No. 40248, being Abst. No. 1468, Pat. No. 154, Vol. No. 52;

The above-described five tracts of land contain 2,751.6 acres, more or less, are the same lands conveyed by Green Martin, et ux. to Mrs. Mabel M. Snowden by deed dated September 28, 1945, recorded in Vol. D-4, Pages 53- 55, Deed Records of La Salle County, Texas, and also recorded in Vol. 88, Pages 86-88, Deed Records of Dimmit County, Texas, to which Deed and records reference is here made for a full and complete description of said land. These five tracts of land are herein referred to as "the Subject Property."

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that a Declaratory Judgment is hereby rendered under Chapter 37 of the Code, that Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Sheila Acker [Reinke] Bonner, and Edwin Scott Acker, and their heirs, successors, and assigns are entitled to a royalty under the Swift Lease equal to one-fifth (1/5th) of the one-fourth (1/4th) of the oil, gas, and other minerals produced and saved or sold from the Subject Property or lands pooled therewith and that therefore the Acker Defendants shall be entitled to two and one-half percent (2.5%) royalty payments derived out of the said seven and one-half percent (7.5%) disputed royalty from the Subject Property in addition to the two and one-half percent (2.5%) undisputed royalty payments they have been receiving from Swift for a total five percent (5.0%) royalty payment under the Swift Lease.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all future royalty payments under the Swift Lease that become owing after the date of this Judgment to which the Acker Defendants are entitled under the foregoing provisions of this Judgment, shall be hereafter paid directly to the Acker Defendants, one-half (1/2) to Edwin V. Acker,

8

Jr., one-fourth (1/4) to Stephen Adolph Acker, and one-fourth (1/4) to Elaine Acker George, after this judgment becomes final. However, if a timely appeal is filed and this judgment is superseded pursuant to the Texas Rules of Appellate Procedure, then the said two and one-half percent (2.5%) disputed future royalty shall be paid by Swift into the registry of this court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that a Declaratory Judgment is hereby rendered under Chapter 37 of the Code, that Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, and Elaine Acker George, are entitled to the funds that have been constructively interpled into the registry of the court and held in suspense by Swift, which as of the date of judgment is the sum of $_377,543 $\frac{18}{}$_. The Interpled Funds shall be paid by Swift as follows: (i) one-half (1/2) to Edwin V. Acker, Jr., one-fourth (1/4) to Stephen Adolph Acker, and one-fourth (1/4) to Elaine Acker George if this judgment is not superseded on appeal in which case the payment shall be made within sixty days of the date of this judgment, or (ii) into the registry of the court if an appeal is filed and this judgment is superseded pursuant to the Texas Rules of Appellate Procedure and the Texas Civil Practice and Remedies Code, in which case the payment shall be made within sixty days of the date this judgment is superseded. Upon Swift's payment of the Interpled Funds as so ordered in this paragraph, Swift is fully and finally discharged as to all such payments.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the motion for summary judgment of Defendants, Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden is hereby, in all things **DENIED** as it applies to

9

Defendants Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that judgment is rendered that the Acker Defendants recover from the Snowden Defendants, trial court attorney's fees in the amount of $15,000.00 under Section 37.009 of the Code.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that in the event of an appeal of the judgment in favor of the Acker Defendants against the Snowden Defendants under Chapter 37 of the Code, judgment is rendered that the Acker Defendants recover from the Snowden Defendants, (i) attorney's fees for representation through appeal to the court of appeals in the sum of $15,000.00, (ii) an additional sum of $5,000.00 for representation at the petition for review stage in the Supreme Court of Texas, if any, (iii) an additional $10,000.00 for representation at the merits briefing stage in the Supreme Court of Texas, if any, and (iv) an additional $5,000.00 for representation through oral argument and completion of proceedings in the Supreme Court of Texas, if any. Post-judgment interest will accrue at the rate of 5% on all of these sums in accordance with the Texas Finance Code and legal authority. Each award of appellate attorney's fees, and the interest thereon, is conditioned on the Acker Defendants prevailing in the last such appeal taken.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that if (and only if) the judgment in favor of the Acker Defendants against the Snowden Defendants is reversed by an appellate court and judgment is rendered by the appellate court in favor of the Snowden Defendants on their Motion for Summary Judgment against the Acker Defendants under Chapter 37 of the Code, then the Snowden Defendants shall recover from the Acker

10

Defendants, (i) trial attorney's fees in the amount of $15,000 under Section 37.009 of the Code, (ii) attorney's fees for representation through appeal to the court of appeals in the sum of $15,000.00, if any, (iii) an additional sum of $5,000.00 for representation at the petition for review stage in the Supreme Court of Texas, if any, (iv) an additional $10,000.00 for representation at the merits briefing stage in the Supreme Court of Texas, if any, and (v) an additional $5,000.00 for representation through oral argument and completion of proceedings in the Supreme Court of Texas, if any. Each award of attorney's fees, and the interest thereon, is conditioned on the Snowden Defendants prevailing in the last such appeal taken. Post-judgment interest will accrue on any such attorney's fees awarded at the rate of 5%, beginning on the date the appellate court judgment reversing and rendering in favor of the Snowden Defendants becomes effective in accordance with the Texas Finance Code and legal authority.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all remaining claims between the Acker Defendants and the Snowden Defendants not otherwise disposed of herein are DENIED.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all remaining claims of Defendants against Swift not otherwise disposed of herein are **DENIED** and upon Swift's payment of the Interpled Funds as hereinbefore Ordered, Swift is fully and finally discharged and this Interpleader action is **DISMISSED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all remaining claims of Swift against the Defendants not otherwise disposed of herein are **DENIED**.

11

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that court costs shall be paid by the party incurring same.

This Judgment is final, disposes of all claims and all parties and is appealable.

The Court further awards Swift and the Acker Defendants any and all writs necessary to enforce this judgment.

SIGNED this 21 day of July, 2015.

_____
JUDGE PRESIDING

**APPROVED AS TO FORM:**

**LAW OFFICE OF WILSON CALHOUN**
719 S. Shoreline Blvd., Suite 404
Corpus Christi, Texas 78401
(361) 882-3300; (361) 888-5404 fax

By: _____
**Wilson Calhoun**
State Bar No. 03645500
Attorney for Edwin V. Acker, Jr., et al.

**LAW OFFICE OF RICHARD J. KARAM**
The Ariel House
8118 Datapoint Drive
San Antonio, Texas 78229
(210) 614-6400; (210) 614-6401 fax

By: _____
**Richard J. Karam**
State Bar No. 11097500
Attorney for Patricia Jo Kardell, et al.

12

**LAW OFFICE OF FREDERICK R. ZLOTUCHA**
222 Main Plaza East
San Antonio, Texas 78205
(210) 227-9877; (210) 227-8316 fax

By: _____
Frederick R. Zlotucha
State Bar No. 22281500
Attorney for Swift Energy Operating, LLC

13

**JENNY MAY WOODALL LAWRENCE**
Pro Se Defendant

_249 County Road 648_

_Dayton, TX 77535_
(Address)

_Jenny May Woodall Lawrence 7-17-2015_
Signature

**MALYDALN JONES MITCHELL**
Pro Se Defendant

_113 CR 1112 Pearsall TX 78061_
(Address)

_Malydaln Jones Mitchell_
Signature

**PAMELA BOSS**
Pro Se Defendant

_____

_____
(Address)

_____
Signature

**SHARON L. WILLIAMS**
Pro Se Defendant

_____

_____
(Address)

_____
Signature

14

**JENNY MAY WOODALL LAWRENCE**
Pro Se Defendant

_____

(Address)


_____

Signature

**MALYDALN JONES MITCHELL**
Pro Se Defendant

_____

(Address)

*Pamela Boss*
Signature

**PAMELA BOSS**
Pro Se Defendant
*4189 Summit Way*
*Marietta GA 30066*
(Address)


_____

Signature

**SHARON L. WILLIAMS**
Pro Se Defendant

_____

(Address)


_____

Signature

14

**JENNY MAY WOODALL LAWRENCE**
Pro Se Defendant

_____

_____
(Address)


_____
Signature

**MALYDALN JONES MITCHELL**
Pro Se Defendant

_____

_____
(Address)


_____
Signature

**PAMELA BOSS**
Pro Se Defendant

_____

_____
(Address)


_____
Signature

**SHARON L. WILLIAMS**
Pro Se Defendant _(Sharon Williams)_
_5105 Mountain Spring Trail_
(Address) _Fort Worth TX 76103_


_____
Signature

14

**BRIAN JAMES HUNTER**
Pro Se Defendant

P.O. box 6818 Jackson, WY 83001
(Address)

Signature

**LOLA MAE AKERS**
Pro Se Defendant

(Address)

Signature

**CARON MARIE CORUM**
Pro Se Defendant

(Address)

Signature

15

**BRIAN JAMES HUNTER**
Pro Se Defendant

_____

(Address)

_____

Signature

**LOLA MAE AKERS**
Pro Se Defendant

_____

(Address)

_____

Signature

**CARON MARIE CORUM**
Pro Se Defendant

464 N W Pebble Beach Drive
(Address)
Lakehills, TX 78063

_Caron Corum_
Signature

15

CAUSE NO. 12-06-001222-CVL

| | | |
|---|---|---|
| SWIFT ENERGY OPERATING, LLC | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | |
| | § | |
| PATRICIA JO KARDELL, MARTIN | § | |
| MURPHY SNOWDEN, MICKEY | § | |
| DARRELL SNOWDEN, MARY | § | |
| DELILLA SNOWDEN, EDWIN V. | § | |
| ACKER, JR., STEPHEN ADOLPH | § | |
| ACKER, ELAINE ACKER GEORGE, | § | |
| LOLA MAE AKERS, PAMELA BOSS, | § | 218th JUDICIAL DISTRICT |
| DEAN EDWARD BURKETT, DEEANN | § | |
| BURKETT WILSON, CARON | § | |
| MARIE CORUM, BRIAN HUNTER, | § | |
| JENNY MAY WOODALL LAWRENCE, | § | |
| MALYDALYN JONES MITCHELL, | § | |
| BONNIE LEE SKIDMORE, LOURENE | § | |
| YVONNE WOODALL VANCE, | § | |
| SHARON L. WILLIAMS, DANIEL | § | |
| WILSON, FRANCIS MADISON | § | |
| WOODALL, JOHNNY LEE WOODALL, | § | |
| SHELLA ACKER REINKE, AND | § | |
| EDWIN SCOTT ACKER | § | LA SALLE COUNTY, TEXAS |

FILED FOR RECORD
At 10:15 o'clock A M.

JUL 21 2016

MARGARITA A. ESPINOZA
COUNTY & DISTRICT CLERK
LA SALLE COUNTY, TEXAS
BY _____ DEPUTY

| DEFENDANT | APPEARED | FAILED TO APPEAR |
|---|---|---|
| Dean Edward Burkett | | ✓ |
| Deeann Burkett Wilson | | ✓ |
| Bonnie Lee Skidmore | | ✓ |
| Lourene Yvonne Vance | | ✓ |
| Daniel Wilson | | ✓ |
| Francis Madison Woodall | | ✓ |
| Johnny Lee Woodall | | ✓ |

| | | |
|---|---|---|
| SWIFTENERGY OPERATING, LLC | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 218th JUDICIAL DISTRICT |
| | § | |
| PATRICIA JO KARDELL, MARTIN | § | |
| MURPHY SNOWDEN, MICKEY | § | |
| DARRELL SNOWDEN, MARY | § | |
| DELILLA SNOWDEN, EDWIN V. | § | |
| ACKER, JR., STEPHEN ADOLPH | § | |
| ACKER, ELAINE ACKER GEORGE, | § | |
| LOLA MAE AKERS, PAMELA BOSS, | § | |
| DEAN EDWARD BURKETT, DEEANN | § | |
| BURKETT WILSON, CARON | § | |
| MARIE CORUM, BRIAN HUNTER, | § | |
| JENNY MAY WOODALL LAWRENCE | § | |
| MALYDALYN JONES MITCHELL, | § | |
| BONNIE LEE SKIDMORE, LOURENE | § | |
| YVONNE WOODALL VANCE, | § | |
| SHARON L. WILLIAMS, DANIEL | § | |
| WILSON, FRANCIS MADISON | § | |
| WOODALL, JOHNNY LEE WOODALL, | § | |
| SHELLA ACKER REINKE, AND | § | |
| EDWIN SCOTT ACKER | § | LA SALLE COUNTY, TEXAS |

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGEMENT

On June 25, 2013, the court heard oral arguments on the following motions: (a) the motion for summary judgment of Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shella Acker (Reinke) Bonner, and Edwin Scott Acker and (b) the motion for summary judgment of Defendants Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden. The parties and their counsel appeared before the court for the hearing on the motion. After considering the pleadings, motions, summary judgment evidence, and arguments of counsel, the court grants the Acker Motion for Summary Judgment as herein described and denies the Snowden Motion for Summary Judgment as it applies to Defendants,

Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker.

**IT IS THEREFORE ORDERED** that the motion for summary judgment of Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker is hereby GRANTED as herein described.

**IT IS FURTHER ORDERED AND DECLARED** that a Declaratory Judgment is hereby rendered under Chapter 37 of the Civil Practice and Remedies Code ("the Code"), that pursuant to the Correction Warranty Deed from Mabel Snowden and her husband Joe Snowden to Johnie Lorene Acker, dated June 24, 1980, and recorded at Volume 225, Page 248 of the Deed Records of La Salle County, Texas on July 8, 1980, a copy of which is attached to this judgment as **Exhibit A**, the heirs, successors, and assigns of Johnie Lorene Acker own an undivided non-participating one-fifth of the whole and entire royalty interest in and to all of the oil, gas, and other minerals in the following property:

FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas known as Sur. 137 patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue Land Scrip No. 244, Pat. No. 240, Vol. No. 35;

SECOND TRACT: 640 acres of land, more or less, known as Sur. No. 143, Patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip. No. 401, Pat. No. 423, Vol. 30;

THIRD TRACT: 638.5 acres of land in La Salle County, Texas, and being all of Sur. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;

FOURTH TRACT: 193.1 acres out of Ori. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 344, described by metes and bounds as follows:

BEGINNING at the SW corner of Sec. No. 147, J. V. Massey and the N. W. Corner of Sec. No. 148, A. Salinas for the N. W. corner of this sun.;

THENCE E. with Sec. line 1921 vrs. to a stk. at the intersection with the E. line of E. W. Alderman subdivision for the N. E. cor. of this Survey;

THENCE S. with said subdivision line 657.4 vrs. to a stk. set in fence line for the S. E. corner of this Sur.;

THENCE W. with fence line and past post at 663 vrs. past cor. of said fence, 1921 vrs. to a stk. in W. line of said Sec. No. 148, for the S. W. cor. of this sur.;

THENCE N. with said line 567.4 vrs. to the place of beginning;

FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No. 244, School File No. 40248, being Abst. No. 1468, Pat. No. 154, Vol. No. 52;

The above-described five tracts of land contain 2,750 acres, more or less, and are the same land conveyed by Green Martin, et ux. to Mrs. Mabel M. Snowden by deed dated September 28, 1945, recorded in Vol. D-4, Pages 53- 55, Deed Records of La Salle County, Texas, and also recorded in Vol. 88, Pages 86-88, Deed Records of Dimmit County, Texas, to which Deed and records reference is here made for a full and complete description of said land. These five tracts of land are hereinafter referred to as "the Subject Property."

**IT IS FURTHER ORDERED AND DECLARED** that a Declaratory Judgment is hereby rendered under Chapter 37 of the Code, that Defendants, Edwin V. Acker, Jr., Stephen Adolph

Acker, Elaine Acker George, Shella Acker (Reinke) Bonner, and Edwin Scott Acker, and their heirs, successors, and assigns are entitled to a royalty under the Swift Lease described below equal to one-fifth (1/5th) of the one-fourth (1/4th) of the oil, gas, and other minerals produced and saved or sold from the Subject Property or lands pooled therewith;

**IT IS FURTHER ORDERED AND DECLARED** that a Declaratory Judgment is hereby rendered under Chapter 37 of the Code, that Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker are entitled, out of the funds that have been constructively interplead into the registry of the court, and/or held in suspense by Plaintiff-In-Interpleader Swift Energy Operating, LLC, to that portion of said funds calculated so that they will have received under the Swift Lease, when taken together with other disbursements of royalty under the Swift Lease, a total royalty calculated as one-fifth (1/5th) of the one-fourth (1/4th) royalty owed thereunder by Swift Energy Operating, LLC.

**IT IS FURTHER ORDERED** that the motion for summary judgment of Defendants, Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden is hereby, in all things, DENIED as it applies to Defendants, Edwin V. Acker, Jr., Stephen Adolph Acker, Elaine Acker George, Shelia Acker (Reinke) Bonner, and Edwin Scott Acker.

The "Swift Lease" referenced above is that certain Oil and Gas Lease, dated December 1, 2009, from Martin Murphy Snowden et al, as Lessor, to Swift Energy Operating, LLC, as evidenced by Memorandum of Oil & Gas Lease recorded in Volume 490, Page 98 of the Official Records of La Salle County, Texas, covering the Subject Property.

This is a partial summary judgment and disposes of no claims not specifically referred to herein.

SIGNED this 3 day of *april* , 2014.

_____
JUDGE PRESIDING

FILED FOR RECORD
At 7:30 o'clock A M.

APR 1 5 2014

MARGARITA A. ESCOBA
COUNTY & DISTRICT CLERK
LA SALLE COUNTY, TEXAS
By _____ Deputy

**APPROVED:**

LAW OFFICE OF WILSON CALHOUN
719 S. Shoreline Blvd., Suite 404
Corpus Christi, Texas 78401
(361)882-3300; (361)888-5404 fax
Email: Wilson@wcalhoun.com

By: _____

Wilson Calhoun
State Bar No. 03645500
Attorney for Edwin V. Acker, Jr., Et Al

**APPROVED AS TO FORM ONLY:**

**LAW OFFICE OF RICHARD J. KARAM**
The Ariel House
8118 Datapoint Drive
San Antonio, Texas 78229
210/614-6400; 210/614-6401 Fax
Email: RJKaram@aol.com

By: _____

**Richard J. Karam**
State Bar No. 11097500
Attorney for Patricia Jo Kardell, Et Al

LAW OFFICE OF FREDERICK R. ZLOTUCHA
222 Main Plaza East
San Antonio, Texas 78205
(210)227-9877; (210)227-8316 fax
Attorney for Swift Energy

By: _____

Frederick R. Zlotucha
State Bar No. 22281500
Attorney for Swift Energy Operating, LLC

03/27/2014 THU 7:52 FAX 501 000 9404 WILSON CALHOUN

# Exhibit A

## To Order Regarding Motions for Summary Judgment

24 June 1980

adexed

39137

## CORRECTION WARRANTY DEED

THE STATE OF TEXAS      §

                              KNOW ALL MEN BY THESE PRESENTS:

COUNTIES OF LA SALLE
AND DIMMIT                §

That we, MABEL M. SNOWDEN, joined pro forma by her husband, JOE G. SNOWDEN, of La Salle County, Texas, in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration to us in hand paid by JOHNIE LORENE ACKER, of McMullen County, Texas, the receipt of which is hereby acknowledged, have GRANTED, BARGAINED, SOLD AND CONVEYED, and by these presents do GRANT, BARGAIN, SELL AND CONVEY to the said JOHNIE LORENE ACKER, an undivided non-participating one-fifth (1/5) of the whole and entire royalty interest as her separate, sole and individual property in and to all of the oil, gas and other minerals described below, subject to the reservation hereinafter made. Said land is situated in La Salle and Dimmit Counties, Texas and described as follows:

> **FIRST TRACT:** 640 acres of land, more or less, in La Salle County, Texas known as Sur. 137 patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue Land Scrip No. 244, Pat. No. 240, Vol. No. 35;
>
> **SECOND TRACT:** 640 acres of land, more or less, known as Sur. No. 143, Patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip. No. 401, Pat. No. 423, Vol. 30;
>
> **THIRD TRACT:** 638.5 acres of land in La Salle County, Texas, and being all of Sur. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;
>
> **FOURTH TRACT:** 193.1 acres out of Ori. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 344, described by metes and bounds as follows:
>
> BEGINNING at the SW corner of Sec. No. 147, J. V. Massey and the N. W. Corner of Sec. No. 148, A. Salinas for the N. W. corner of this sur.;
>
> THENCE E. with Sec. line 1921 vrs. to a stk. at the intersection with the E. line of E. W. Alderman subdivision for the N. E. cor. of this Survey;

THENCE S. with said subdivision line 657.4
vrs. to a stk. set in fence line for the S. E.
corner of this Sur.;

THENCE W. with fence line and past post at 663
vrs. past cor. of said fence, 1921 vrs. to a stk.
in W. line of said Sec. No. 148, for the S. W.
cor. of this sur.;

THENCE N. with said line 567.4 vrs. to the
place of beginning;

FIFTH TRACT: 640 acres of land in La Salle and
Dimmit Counties, Texas, being all of School Section
No. 138, issued to the T. T. R. R. Co., by virtue
of Cert. No. 244, School File No. 40248, being Abst.
No. 1468, Pat. No. 154, Vol. No. 52;

together with the rights of ingress and egress at
all times for the purpose of taking said
minerals; the said five tracts of land above des-
cribed containing 2,750 acres, more or less, and
being the same land conveyed by Green Martin, et ux.
to Mrs. Mabel M. Snowden by deed dated September 28,
1945, recorded in Vol. D-4, Pages 53-55, Deed Records
of La Salle County, Texas, and also recorded in Vol.
88, Pages 86-88, Deed Records of Dimmit County, Texas,
to which Deed and records reference is here made for
a full and complete description of said land.

TO HAVE AND TO HOLD the same unto the said JOHNIE LORENE ACKER as
her separate and individual property, her heirs and assigns forever;
and we do hereby bind ourselves, our heirs, executors and adminis-
trators to warrant and forever defend all and singular the said royalty
interest unto the said JOHNIE LORENE ACKER, her heirs and assigns,
against every person whomsoever lawfully claiming or to claim the same
or any part thereof, by, through or under us, but not otherwise.

This Deed is made in place of and as a Deed of Correction of a
Deed executed by Grantors herein to Grantee, dated March 25, 1965, and
recorded in Vol. 135, Pages 135-136, Deed Records of La Salle County,
Texas, wherein by error or mistake, Grantors conveyed to Grantee an
undivided 1/5th mineral interest in and to all of the oil, gas and
other minerals, when in truth and fact Grantors should have conveyed
an undivided non-participating 1/5th of the whole and entire royalty
interest, and this instrument is made by Grantors and accepted by
Grantee in order to correct said mistake, and in all other respects

confirming said former Deed, and it shall be effective as of and retroactive to March 25, 1965.

WITNESS our hands this the 2⁴ day of June, 1980.

_Mabel M. Snowden_
Mabel M. Snowden

_Joe G. Snowden_
Joe G. Snowden

ACCEPTED this 24ᵗʰ day of June, 1980.

_Johnie Lorene Acker_
Johnie Lorene Acker

_Edwin V. Acker_
Edwin Valentine Acker

| THE STATE OF TEXAS | § |
| COUNTY OF LA SALLE | § |

BEFORE ME, the undersigned authority, on this day personally appeared JOE G. SNOWDEN and MABEL M. SNOWDEN, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office on this the 2⁴ day of _____, 1980.

_Virginia Ann Raguel_
Notary Public, State of Texas

| THE STATE OF TEXAS | § |
| COUNTY OF McMULLEN | § |

BEFORE ME, the undersigned authority, on this day personally appeared JOHNIE LORENE ACKER and husband, EDWIN VALENTINE ACKER, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office on this the 24ᵗʰ day of June, 1980.

_M. R. Bercaw_
Notary Public, State of Texas

M. R. BERCAW, JR. Notary Public
In and for Duval County, Texas

VOL. 101 PAGE 402

My Commission Expires
6/30/80

VOL. 225 PAGE 248

FILED: July 8, 1980 AT 11:00 A. M.
RECORDED: July 8, 1980 AT 11:30 A. M.

NORA MAE TYLER, COUNTY CLERK
LA SALLE COUNTY, TEXAS

FILE NO. 4976

THE STATE OF TEXAS

COUNTY OF McMULLEN

KNOW ALL MEN BY THESE PRESENTS:

That we, Edna Mae Jones, joined pro forma by her husband, Jimmie Jones, Mabel Mullen Snowden, joined pro forma by her husband, J. G. Snowden, Julia Antoelia Akers, joined pro forma by her husband, W. F. Akers, and Emmett Granvel Murphy, four of the children of J. S. Murphy, deceased, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, to us cash in hand paid by Johnie Lorene Acker, receipt of which is hereby acknowledged, have GRANTED, SOLD, AND CONVEYED, and by these presents do GRANT, SELL AND CONVEY, unto Johnie Lorene Acker, the only other child of J. S. Murphy, Deceased, of Wharton County, Texas, as her separate Individual property, the following described real estate, together with all improvements thereon, situated in McMullen County, Texas, subject to the mineral reservation and water reservation hereinafter mentioned, said property being more particularly described as

being the same land described as the third tract in a deed from J. E. Murphy and wife, May Murphy, to John W. Womack, dated January 29, 1909, and filed for record on February 19, 1909, and recorded in Volume N. page 178 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description of same.

SECOND TRACT: Two Hundred Forty (240) acres of land, the same being the Southwest 1/4 and the West 1/2 of the Northwest 1/4 of School Section No. 128, made by virtue of Certificate No. 966, issued to Adams, Beaty, & Moulton for 640 acres and being the same 240 acres out of said Section No. 128 described in the deed from J. E. Murphy and wife, May Murphy to John W. Womack, dated January 29, 1909, filed for record on February 19, 1909, and recorded in Volume N. Page 178 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made; and it is also the same 240 acres out of School Section No. 128 described in a partition deed between J. E. Murphy and L. C. Flack dated October 26, 1907, filed for record January 25, 1908, and recorded in Volume M, Page 504 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description of same.

The two above described tracts of land are also described in a sheriff's deed from W. T. Holland to J. E. Murphy, dated June 2, 1914, filed June 30, 1914, and recorded in Volume R on pages 553-554 of the Deed Records of McMullen County, Texas, and reference is here also made to this deed for a description of this land.

TO HAVE AND TO HOLD the surface estate of the above described premises, together with all and singular the rights, hereditaments, and appurtenances thereunto in any wise belonging, unto the said Johnie Lorene Acker, as her separate individual property, her heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors, administrators, successors, and assigns, to warrant and forever defend all and singular the surface estate of the said premises unto the said Johnie Lorene Acker, her heirs, assigns, and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described land are hereby conveyed or are intended or affected by this instrument except as hereinafter provided and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described land in the same undivided proportion that said parties now own and hold said oil, gas, and other minerals together with the right of ingress and egress at all times for the purposes of mining, drilling, and exploring said lands for oil, gas, and other minerals, and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Johnie Lorene Acker, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas, and mineral leases

Hammonds or the driller of Cox & Hammonds' well, for water used off of Section 480 above described shall go one-half (1/2) to Edna Mae Jones, as her separate property, and one-half (1/2) to Johnie Lorene Acker, as her separate property, and also any other water that is sold off of wells number one and number two on Section 480 shall go 1/2 to Edna Mae Jones, as her separate property, and the other 1/2 to Johnie Lorene Acker, as her separate property, and this shall continue so long as either Edna Mae Jones or Johnie Lorene Acker live unless the said Johnie Lorene Acker decides to sell said land on which said wells are located and has a buyer and she has entered into a contract to sell same, in which event the said Edna Mae Jones shall appoint an appraiser and the said Johnie Lorene Acker shall appoint an appraiser, and the two appraisers appointed shall in turn appoint a third appraiser, and they shall appraise the value of the interest of Edna Mae Jones in said water rights herein reserved and granted to her, and the said Johnie Lorene Acker shall pay said Edna Mae Jones for the appraised value, and the finding of the appraisers shall be final and there shall be no appeal therefrom, and when same is paid to the said Edna Mae Jones she shall quit-claim all her right, title, and interest in and to said water rights herein reserved to her.

It is agreed and understood that on the death of both Edna Mae Jones and Johnie Lorene Acker the water right herein reserved shall terminate, but until the death of both of them the benefits herein set forth shall be binding on their heirs, executors, administrators, and assigns.

It is further understood and agreed, anything to the contrary notwithstanding, that Johnie Lorene Acker is to have the use of water out of said wells and the right to sell water from said wells, but when she sells the said water she shall pay to Edna Mae Jones, as her separate property, one-half (1/2) of whatever she gets for same.

Executed this the 21st day of October, 1948.

                                        Edna Mae Jones
                                        Jimmie Jones
                                        Mabel Mullen Snowden
                                        J. C. Snowden
                                        Julia Authelia Akers
                                        W. B. Akers
                                        Emmett Granvel Murphy

THE STATE OF TEXAS
COUNTY OF DUVAL

Before me, the undersigned authority, a Notary Public in and for Duval County, Texas, on this day personally appeared Jimmie Jones and Edna Mae Jones, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Edna Mae Jones, wife of the said Jimmie Jones, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Edna Mae Jones, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did

to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the said J. G. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk in and for LaSalle County, Texas.

THE STATE OF TEXAS
COUNTY OF LaSALLE

Before me, the undersigned authority, xxxxxxxxxxxxxxxxx in and for LaSalle County, Texas, on this day personally appeared W. F. Akers and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W. F. Akers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk in and for LaSalle County, Texas.

THE STATE OF TEXAS
COUNTY OF LaSALLE

Before me, the undersigned authority, xxxxxxxxxxxxxxxxx in and for LaSalle County, Texas, on this day personally appeared Emmett Granvel Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk in and for LaSalle County, Texas.

FILED FOR RECORD THIS 27 DAY OF OCT. A. D. 1948 AT 4 O'CLOCK P.M.

AND DULY RECORDED THIS 27 DAY OF OCT. A. D. 1948 AT 5:30 O'CLOCK P.M.

BY Geady Wheeler DEPUTY.

REX C. QUINN, CLERK COUNTY COURT.
McMULLEN COUNTY, TEXAS.

CERTIFICATE
THE STATE OF TEXAS        X
COUNTY OF McMULLEN        X
        I, Dorairene Garza, COUNTY CLERK IN AND FOR SAID
COUNTY AND STATE DO HEREBY CERTIFY THAT THE
FOREGOING IS A TRUE AND CORRECT COPY OF THE
INSTRUMENT HEREWITH SET OUT AS APPEARS OF RECORD
IN VOL. 93 , PAGE 218 , DEED RECORDS

:::::::::::::::::::::

FILE NO. 4977

THE STATE OF TEXAS

COUNTY OF McMULLEN

KNOW ALL MEN BY THESE PRESENTS:

unto Edna Mae Jones, the only other child of J. E. Murphy, Deceased, of Duval County, Texas, as her separate individual property, the following described real estate, together with all improvements thereon, situated in McMullen County, Texas, subject to the mineral reservation hereinafter mention, said property being more particularly described as follows, to-wit:

| Abstract No. | Survey No. | Certificate No. | Patent No. | Original Grantee | Acres |
|---|---|---|---|---|---|
| 54 | 121 | 732 | 295 | A B & M | 640 |
| 57 | 123 | 994 | 294 | A B & M | 640 |

Being the same surveys No.121 and No. 123 described in a partion deed between J. E. Murphy and L. G. Black, dated October, 26, 1907, filed January 25, 1908, and recorded in Volume M, page 504 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description of the land herein conveyed.

TO HAVE AND TO HOLD the surface estate of the above described premises, together with all and singular the rights, hereditaments, and appurtenances thereunto in any wise belonging, unto the said Edna Mae Jones, as her separate individual property, her heirs and assigns forever; and we do hereby bind ourselves, our heirs, executors, administrators, successors, and assigns, to warrant and forever defend all and singular the surface estate of the said premises unto the said Edna Mae Jones, her heirs, assigns, and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described lands are hereby conveyed or are intended or affected by this instrument except as hereafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described lands in the same undivided proportion that said parties now own and hold said oil, gas, and other minerals together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said lands for oil, gas, and other minerals, and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Edna Mae Jones, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas and mineral leases so executed by her, except that she shall reserve in each oil, gas and mineral lease so executed by her, a base one-eighth (1/8) royalty interest for the benefit of herself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own same.

The rights and privileges herein granted to the grantee herein shall not only be for her benefit, but shall be for the benefit of her heirs, executors, administrators, and assigns, and shall be a covenant running with the surface of the land above described.

EXECUTED this the 21st day of October, 1948.

ment, and acknowledged to me that they each executed the same for the purposes and considera-tion therein expressed, and the said Johnie Lorene Acker, wife of the said E.V. Acker, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Johnie Lorene Acker, acknowledged such instrument to be her act and deed and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of October, A.D. 1948.

(SEAL)      Geo. W. Ward, Notary Public in and for Duval County, Texas.

THE STATE OF TEXAS      ◊

COUNTY OF La Salle      ◊      BEFORE ME, the undersigned authority, xxHxtxnxyxxRxtxkkx in and for La Salle County, Texas, on this day personally appeared J.G. Snowden and Mabel Mullen Snowden his wife, both known to me to be the persons whose names are subscribed to the foregoing in-strument, and acknowledged to me that they each executed the same for the purposes and consid-eration therein expressed, and the said Mabel Mullen Snowden, wife of the said J.G. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October, A.D. 1948.

(SEAL)      Mrs. A.U. Knaggs, County Clerk in and for La Salle County, Texas.

THE STATE OF TEXAS      ◊

COUNTY OF LA SALLE      ◊      BEFORE ME, the undersigned authority, xxxxxxxxxxxxxxxxx in and for La Salle County, Texas, on this day personally appeared W.F. Akers and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W.F. Akers having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October A.D. 1948.

(SEAL)      Mrs A.U. Knaggs, County Clerk in and for La Salle County, Texas.

THE STATE OF TEXAS ◊

COUNTY OF Duval      ◊      BEFORE ME, the undersigned authority, a Notary Public in and for Duval County, Texas, on this day personally appeared Emmett Granvel Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of October, A.D. 1948.

(SEAL)      Geo. W. Ward, Notary Public in and for Duval County, Texas.

FILED FOR RECORD THIS 27th DAY OF OCTOBER, A.D. 1948, AT 4:00 O'CLOCK P.M.

AND DULY RECORDED THIS 28th DAY OF OCTOBER A.D. 1948, AT 9:00 O'CLOCK A.M.

CERTIFICATE

THE STATE OF TEXAS        X

COUNTY OF McMULLEN        X

I, Dorairene Garza, COUNTY CLERK IN AND FOR SAID
COUNTY AND STATE DO HEREBY CERTIFY THAT THE
FOREGOING IS A TRUE AND CORRECT COPY OF THE
INSTRUMENT HEREWITH SET OUT AS APPEARS OF RECORD
IN VOL. 43 , PAGE 221, DEED RECORDS

That we, Edna Mae Jones, joined pro forma by her husband, Jimmie Jones, Johnie Lorene Acker, joined pro forma by her husband, E.V. Acker, Mabel Mullen Snowden, joined pro forma by her husband, J.G. Snowden, and Julia Authelia Akers, joined pro forma by her husband W.F. Akers, four of the children of J.E. Murphy, deceased, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, to us cash in hand paid by Emmett Granvel Murphy, receipt of which is hereby acknowledged, have GRANTED, SOLD and CONVEYED, and by these presents do GRANT, SELL and CONVEY, unto Emmett Granvel Murphy, the only other child of J.E. Murphy, deceased, of Duval County, Texas, as his separate individual property, the following described real estate, together with all improvements thereon, situated in Duval and McMullen Counties, Texas, subject to the mineral reservation hereinafter mentioned, said property being more particularly described as follows, to-wit:

FIRST TRACT:   Section 120, Certificate 1683, original Grantee, B.S. & F. purchased from the State of Texas by A.L. Dilworth, fully described in Ledger 68, page 304, File 83539 of the General Land Office of Texas, said property containing 640 acres, more or less, and being situated in Duval County, Texas.

SECOND TRACT:   The East one-half of Section 112, Certificate 1679, Original Grantee, B.S.& F., purchased from the State of Texas by A.L. Dilworth, fully described in Ledger 61, page 41, file 75731, of the General Land Office of Texas, containing 320 acres of land, more or less, and being situated in Duval and McMullen Counties, Texas.

THIRD TRACT:   The West one-half of Section 112, Certificate 1679, Original Grantee, B.S.& F., purchased from the State of Texas by A.L. Dilworth, fully described in Ledger 61, page 42, File 75732 of the General Land Office of Texas, containing 320 acres of land, more or less, and situated in Duval and McMullen Counties, Texas.

FOURTH TRACT:   The North one-half of Section 222, certificate 1/93 Original Grantee, J. Poitevent, purchased from the State of Texas by A.L. Dilworth, fully described in Ledger 64, page 375, File 79957 of the General Land Office of Texas, containing 353 acres of land, more or less, and situated in Duval County, Texas.

The above four tracts are the same land conveyed by A.L. Dilworth, et ux, to J.E. Murphy by deed dated August 2, 1928, recorded in Volume 22, page 82, of the Deed Records of McMullen County, Texas, to which record reference is here made for a full and complete description of same.

FIFTH TRACT:   The North one-half (N.1/2) of the Southwest one-fourth (SW$\frac{1}{4}$) and the South one-half (S$\frac{1}{2}$) of the Northwest one-fourth (nw$\frac{1}{4}$) of Section 104, Abstract 1535, Certificate 1865, Original Grantee, B.S.& F. consisting of 160 acres;   the West three-fourths (W.3/4) of Section 110, Abstract No. 1603, Certificate 1688, Original Grantee, B.S.& F., consisting of 547 acres;   and the East one-half (E$\frac{1}{2}$) of the Northeast one-fourth (NE$\frac{1}{4}$) and the East one-half (E$\frac{1}{2}$) of the Southeast one-fourth (SE$\frac{1}{2}$) of Section 110, Abstract 1536, Certificate 1688, original grantee, B.S.& F., consisting of 160 acres, aggregating altogether 867 acres of land, situated in Duval and McMullen Counties, Texas, being the same land described in a deed from B.J. Martin, et ux, to J.E. Murphy, dated June 13, 1934,

of the said premises unto the said Emmett Granvel Murphy, his heirs, assigns and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by through or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals, in, on or under the above described lands are hereby conveyed or are intended or affected by this instrument except as hereinafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas and other minerals, in, on and under all of the above described lands in the same undivided proportion that said parties now own and hold said oil, gas and other minerals together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said lands for oil, gas and other minerals, and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing____ to the contrary notwithstanding, that the grantee of the surface estate herein, Emmett Granvel Murphy, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas or mineral lease that he desires on any such terms as he may desire, and receive, as his separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas and mineral leases so executed by him, except that he shall reserve in each oil, gas and mineral lease so executed by him, a base one-eighth (1/8) royalty interest for the benefit of himself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own same.

The rights and privileges herein granted to the grantee herein shall not only be for his benefit, but shall be for the benefit of his heirs, executors, administrators, and assigns, and shall be a covenant running with the surface of the land above described.

EXECUTED this the 21st day of October, 1948.

> Edna Mae Jones
> Jimmie Jones
> Johnie Lorene Acker
> E.V. Acker
> Mabel Mullen Snowden
> J.G. Snowden
> Julia Authelia Akers
> W.F. Akers

THE STATE OF TEXAS §

COUNTY OF Duval § BEFORE ME, the undersigned authority, a Notary Public in and for Duval County, Texas, on this day personally appeared Jimmie Jones and Edna Mae Jones, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Edna Mae Jones, wife of the said Jimmie Jones, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Edna Mae Jones, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN under my hand and seal of office this the 23rd day of October. A.D. 1948.

therein expressed, and the said Johnie Lorene Acker, wife of the said E.V. Acker, having been examined by me privily and apart from her husband, and having the same fully explained to her, she she, the said Johnie Lorene Acker, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of October, A.D. 1948.

(SEAL)    Geo. W. Ward, Notary Public in and for Duval County, Texas.

THE STATE OF TEXAS              ◊

COUNTY OF LA SALLE              ◊    BEFORE ME, the undersigned authority, xxNotaryxPublic in and for La Salle County, Texas, on this day personally appeared J.G. Snowden and Mabel Mullen Snowden his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the said J.G. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October, A.D. 1948.

(SEAL)    Mrs A.U. Knaggs, County Clerk, in and for La Salle County, Texas.

THE STATE OF TEXAS              ◊

COUNTY OF LA SALLE              ◊    BEFORE ME, the undersigned authority, xxNotaryxPublic in and for La Salle County, Texas, on this day personally appeared W.F. Akers and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W.F. Akers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October, A.D. 1948.

(SEAL)    Mrs A.U. Knaggs, County Clerk in and for La Salle County, Texas.

FILED FOR RECORD THIS 27th DAY OF OCTOBER A.D. 1948, AT 4:00 O'CLOCK P.M.

AND DULY RECORDED THIS 27th DAY OF OCTOBER A.D. 1948, AT 5:00 O'CLOCK P.M.

By _Gladys Wheeler_ Deputy.          Rex C. Quinn, County Clerk
                                      McMullen County, Texas

::::::::::::::::::::::

FILE NO. 4981

CERTIFICATE
THE STATE OF TEXAS          X
COUNTY OF McMULLEN          X
        I, Dorairene Garza, COUNTY CLERK IN AND FOR SAID
COUNTY AND STATE DO HEREBY CERTIFY THAT THE
FOREGOING IS A TRUE AND CORRECT COPY OF THE
INSTRUMENT HEREWITH SET OUT AS APPEARS OF RECORD
IN VOL. ____44____ , PAGE __30__ , __DEED__ RECORDS
OF McMULLEN COUNTY, TEXAS.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA TOLEDO, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

...................., have ......., SOLD and CONVEYED, and by these presents do GRANT, SELL and CO.... unto Julia Authelia Akers, the only other child of J. E. Murphy, deceased, of La Salle Cou.... Texas, as her separate individual property, the surface estate of the following described r.... estate, together with all improvements thereon, situated in La Salle County, Texas, to-wit:

Nine hundred (900) acres of land in La Salle County, Texas, on which Julia Authelia A.... and her husband, W. F. Akers, now live, being fully described as ten (10) separate tracts o.... land in a deed from A. G. Salmon, et ux, to J. E. Murphy, dated July 24, 1946, and recorded.... Volume E-4, on pages 540 et seq., of the Deed Records of La Salle County, Texas, to which d.... and record reference is here made for a full and complete description of same.

TO HAVE AND TO HOLD, the surface estate of the above described premises, together with .... and singular the rights, hereditaments and appurtenances thereunto in anywise belonging, unt.... the said Julia Authelia Akers, as her separate individual property, her heirs and assigns fo.... ever. And we do hereby bind ourselves, our heirs, executors, administrators, successors and .... assigns, to warrant and forever defend all and singular the surface estate of the said premi.... unto the said Julia Authelia Akers, her heirs, assigns, and successors, against every person .... whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under .... but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties .... hereto that no part of the oil, gas, or other minerals in, on, or under the above described l.... are hereby conveyed or are intended or affected by this instrument except as hereinafter prov.... and the parties hereto, their respective heirs and assigns, shall continue to own and hold in.... common all of the oil, gas, and other minerals in, on, and under all of the above described l.... in the same undivided proportion that said parties now own and hold said oil, gas and other mi.... erals together with the right of ingress and egress at all times for the purpose of mining, d.... ing, and exploring said lands for oil, gas, and other minerals, and removing the same therefro.... and none of the royalties, reversionary interests, or other rights of said parties under exist.... ing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being .... further provided, however, anything in the foregoing to the contrary notwithstanding, that the.... grantee of the surface estate herein, Julia Authelia Akers, shall have the exclusive right to .... execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease tha.... she desires on any such terms as she may desire, and receive, as her separate property, such .... bonuses, oil payments, and rentals as may be paid under said oil, gas, and mineral leases so .... executed by her, except that she shall reserve in each oil, gas, and mineral lease so executed .... by her, a base one-eighth (1/8) royalty interest for the benefit of herself and the other four .... children of J. E. Murphy, Deceased, grantors herein, in the same proportion they now own same.

The rights and privileges herein granted to the grantee herein shall not only be for her .... benefit, but shall be for the benefit of her heirs, executors, administrators, and assigns, and .... shall be a covenant running with the surface of the land described.

EXECUTED this the 21st day of October, 1948.

Mabel Mullen Snowden
Mabel Mullen Snowden

J. G. Snowden
J. G. Snowden

Edna Mae Jones
Edna Mae Jones

Jimmie Jones
Jimmie Jones

Johnie Lorene Acker

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA GONZALEZ, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office, Witness my
hand and Seal of Office

Thereby Certified on  5/07/13

, and she declared that she had willingly signed the same for the purposes and considera-
therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the 23rd day of October, 1948.

Geo. W. Ward
GEO. W. WARD
Notary Public in and for Duval County, Texas.

Seal.

STATE OF TEXAS:

COUNTY OF DUVAL    :

BEFORE ME, the undersigned authority, on this day personally appeared E. V. Acker and
his Lorene Acker, his wife, both known to me to be the persons whose names are subscribed to
foregoing instrument, and acknowledged to me that they each executed the same for the pur-
poses and consideration therein expressed, and the said Johnie Lorene Acker,, wife of the said
E. Acker, having been examined by me privily and apart from her husband, and having the same
fully explained to her, she, the said Johnie Lorene Acker, acknowledged such instrument to be
her act and deed, and she declared that she had willingly signed the same for the purposes and
consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the 2rd day of October, 1948.

Geo. W. Ward
GEO. W. WARD
Notary Public in and for Duval County, Texas.

Seal.

STATE OF TEXAS:

COUNTY OF LA SALLE:

BEFORE ME, the undersigned authority, on this day personally appeared J. G. Snowden, and
Mabel Mullen Snowden, his wife, both known to me to be the persons whose names are subscribed
to the foregoing instrument, and acknowledged to me that they each executed the same for the
purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the
said J. G. Snowden, having been examined by me privily and apart from her husband, and having
the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instru-
ment to be her act and deed, and she declared that she had willingly signed the same for the
purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the 27 day of October, 1948.

Mrs. A. U. Knaggs,
MRS. A.UU. KNAGGS
Notary Public in and for La Salle County, Texas.

Seal.

STATE OF TEXAS:

COUNTY OF DUVAL    :

BEFORE ME, the undersigned authority, on this day personally appeared Emmett Granvel Murphy,
known to me to be the person whose name is subscribed to the foregoing instrument, and acknow-
ledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the 23rd day of October, 1948.

Geo. W. Ward
GEO. W. WARD
Notary Public in and for Duval County, Texas.

Seal.

Filed; October 27, 1948 at 2:00 o'clock P. M.

Recorded: October 28, 1948 at 3:30 o'clock P. M.

*Mrs. A. U. Knaggs*
County Clerk, La Salle County, Texas.

##############

STATE OF TEXAS
COUNTY OF LASALLE.

MARGARITA _____ county/District Clerk
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

Thereby certified on    5/07/13

Green Martin, et ux

To:  General Warranty Deed

Mrs. Mabel M. Snowden

STATE CF TEXAS:

COUNTY OF LA SALLE:                    KNOW ALL MEN BY THESE PRESENTS:

That we, Green Martin and wife, Julia Tully Martin, of Frio County, Texas, in consideration of the sum of Ten and no/100 Dollars ($10.00) paid by the grantee hereinafter named, the receipt of which is hereby acknowledged, and for the further consideration that said grantee, Mrs. Mabel M. Snowden and husband, J. C. Snowden, have executed their promissory note of even date herewith for the sum of Thirty-five Thousand and no/100 DOLLARS ($35,000.00), payable to the order of Green Martin whose post office address is Pearsall, Texas, bearing interest at the rate of 4 per cent per annum from date until maturity, past due principal and interest to bear 10% interest per annum from maturity until paid, principal and interest being payable in annual installments of Two Thousand and no/100 Dollars ($2,000.00), or more, each, plus interest, payable on or before the 1st day of October, 1946 and continuing until the whole of said sum, with interest, has been duly paid, It is agreed and understood that if the Grantee pays more than $2,000.00, on the principal during any one year said note shall not be considered in default until the amount paid on said note is less than $2,000.00 per year plus interest, and grantee is given the right to pay all or any part of said note at any time, said note containing the usual provision for 10% attorney's fees, and being secured by a VENDOR'S LIEN herein and hereby expressly retained in favor of the holder thereof on the property hereinafter described, and also by a DEED OF TRUST thereon of even date herewith to John W. Willson Trustee, have GRANTED, SOLD AND CONVEYED, and by these presents do GRANT, SELL AND CONVEY unto Mrs. Mabel M. Snowden, of McMullen County, Texas, as her sole and separate individual property, said property herein conveyed being located and situated in Dimmit and La Salle Counties, Texas, and containing 2751.6 acres of land more or less, and being more particularly described as follows, to-wit:

FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas, known as Sur. No. 137, patented to Emanuel Ridgeway, assignee, of the T. T. Ry. Col, by virtue of land scrip No. 244, Pat. No. 240, Vol. No. 35, described by metes and bounds as follows:

BEGINNING at a stake in prairie the S E Cor of Sur. No. 135, by virtue L. S. 243, Tyler Tap R. R. Co., for S. E. Cor. of this Sur;

THENCE with said Sur. West 1900 vrs. to its S. W. Cor. for N W. Cor. of this Sur;

THENCE SOUTH 1900 vrs. to S E Cor Sur No. 136 by virtue of Land Scrip No. 243, Tyler Tap R. R.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESCOBEDO, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office. Witness my
hand and Seal of Office

Thereby Certified on ___S/07/13___

BEGINNING at a post the S. W. cor. of Sur. 137, L. S. 244, Tyler Tap R. R. Co., for N. W. Cor. of this Sur;

THENCE with said Sur. East 1900 vrs to its S. E. Cor. for N. E. cor. of this Sur;

THENCE South 1900 vrs. set stake for S. E. Cor;

THENCE West 1900 vrs a stake at S E Cor of Sur. No. 138, for S. W. cor of this Sur;

THENCE North 1900 vrs to the place of beginning.

THIRD TRACT: 638.5 acres of land, in La Salle County, Texas, and being all of Sur. No. 147, Cert. 68, Pat'd. to E. Ridgeway, assee, of J. V. Massey, by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres described by metes and bounds as follows:

BEGINNING at a point the S E Cor of Sur. No. 138, Scrip No. 244, T. T. R. R. Co., the S. W. Cor. of Sur. No. 143, Scrip 401, J H Gibson for N. W. Cor. of this Sur;

THENCE South 1900 vrs. a stake in prairie for S W Cor.;

THENCE East 1900 vrs. a stake the S. W. Cor. of Sur. No. 145, Scrip No. 402, J. H. Gibson, for S. E. Cor. of this Sur;

THENCE N. 1900 vrs. a stake the N. W. Cor. of said Sur. No. N. E. Cor. of this Survey;

THENCE West 1900 vrs to the beginning.

FOURTH TRACT: 193.1 acres of land out of Orig. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 1344, the portion of said Sur. hereby conveyed, being described by metes and bounds as follows:

BEGINNING at the S W Cor of Sec No. 147, J. V. Massey and the N W Cor of Sec. No. 148, A. Salinas for the N W Cor of this Sur;

THENCE E. with Sec. line 1921 vrs. to a stk at the intersection with the E. line of E. W. Alderman sub-division for the N E Cor of this Sur;

THENCE S. with said sub-division line 567.4 vrs. to a stk set in fence line for the S E Cor of this Sur;

THENCE W. with fence line and past post at 663 vrs. past Cor. of said fence, 1921 vrs. to a stk in N. line of said Sec. No. 148, for the S. W. cor. of this Sur;

THENCE N. with said line 567.4 vrs. to the place of beginning.

FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No. 244, School File No. 40248, being Abst. No. 1468, Pat. No. 154, Vol. No. 52, described by metes and bounds as follows:

BEGINNING at a stake in prairie, at the SE Cor of Sur No. 136, made for L. S. 243, Tyler Tap R. R. Co., for the N E Cor of this Survey;

THENCE with said Survey West 1900 vrs to its S W Cor of this Sur;

THENCE S. 1900 vrs set a stake for S W Cor;

THENCE E. 1900 vrs. set a stake for S E Cor;

THENCE N. 1900 vrs to the place of beginning.

And being the land described as Sections Nos. 137, 143, 147, 138 and part of 148 conveyed to Green Martin and W W McKinley by H E Hunter, Adm. by deed dated the 17th day of January, 1917, and shown of record in Vol. T-1, page 200, Deed Records of La Salle County, Texas.

Grantors guarantee and warrant that the land herein conveyed contains at least 2750 acres,

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA SOLEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office, Witness my
hand and Seal of Office

property, her heirs and assigns forever. And we do hereby bind ourselves, our heirs, executors and administrators, to WARRANT AND FOREVER DEFEND the title to said property unto the said gran above named, her heirs and assigns, against every person whomsoever lawfully claiming or to cla the same, or any part thereof.

EXECUTED this 28th day of September, A. D. 1945.

Green Martin
GREEN MARTIN

Julia Tulley Martin
JULIA TULLY MARTIN

Documentary Stamps: $60.50

STATE OF TEXAS:

COUNTY OF FRIO:   BEFORE ME, the undersigned authority, on this day personally appeared Green Martin and wife, Julia Tully Martin, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purpose and consideration therein expressed. And the said Julia Tully Martin having been examined by m privily and apart from her husband, and having the same fully explained to her, she, the said Julia Tully Martin acknowledged such instrument to be her act and deed, and declared that she h willingly signed the same for the purposes and consideration therein expressed, and that she id not wish to retract it.

Given under my hand and seal of office, this 28th day of September, A. D. 1945.

Fritz C. Sorrell
Notary Public in and for Frio County, Texas.
FRITZ C. SORRELL

(Seal).

Filed October 1, 1945 at 8:05 o'clock A. M.

Recorded October 1, 1945 at 11:55 o'clock A. M.

Mrs. G. U. Knappe
County Clerk, La Salle County, Texas.

S-4451

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA _____, County/District Clerk.
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office. Witness my
hand and Seal of Office.

el M. Snowden, et vir

Non-Participating Mineral Deed

Mae Jones, et al .

STATE OF TEXAS:

TY OF LA SALLE:                    KNOW ALL MEN BY THESE PRESENTS:

THAT WE, Mabel M. Snowden and husband, J. G. Snowden of said County and State, herein called

tors, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable con-

ration to us cash in hand paid by Edna Mae Jones of Duval County, Texas, Johnie Lorene Acker

arton County, Texas, Julia Authelia Akers of La Salle County, Texas, and Emmett Granvel

hy of McMullen County, Texas, hereinafter called Grantees, the receipt of which is hereby

owledged, HAVE GRANTED, BARGAINED, SOLD and CONVEYED and by these presents do GRANT, BARGAIN

and CONVEY unto said Grantees, an undivided four-fifths (4/5ths) interest as their separate

vidual property so that each will hold an undivided one-fifth (1/5th) interest in and to all

he oil, gas and other minerals acquired by Mabel M. Snowden from Green Martin and wife

a Tully Martin by Deed dated September 28, 1945, recorded October 1, 1945 in Vol. D-4,

ges 53-55 of the Deed Records of La Salle County, Texas, in andunder the following describ

ts of land situated in La Salle County, andDimmitt County, Texas, to-wit:

FIRST TRACT:    640 acres of land, more or less, in La Salle County, Texas, known as Sur. No.

patented to Emanuel Ridgeway, assignee, of the T. T. Ry. Co., by virtue of land scrip No.

Pat. No. 240, Vol. No. 35, described by metes and bounds as follows:

BEGINNING at a stake in prairie the S. E. cor. of Sur. No. 135 by virtue L. S. 245, Tyler

R. R. Co., for N. E. Cor. of this Sur.;

THENCE with said Sur. West 1900 vrs. to its S. W. cor. for N. W. Cor. of this Sur;

THENCE South 1900 vrs. to S. E. Cor. Sur. No. 136 by virtue of Land Scrip No. 245, Tyler T

Co., for S. W. Cor of this Sur.;

THENCE East 1900 vrs. a stake for S. E. Cor. of this Sur;

THENCE North 1900 vrs. to the beginning;

SECOND TRACT:  640 acres of land, more or less, known as Sur. No. 143, Patented to I. W.

assee, of J. H. Gibson by virtue of Scrip No. 401, Pat. No. 493, Vol. 30, described by a

and bounds as follows:

728

BEGINNING at a post the S. W. Cor. of Sur. 157, L. S. #44, Tyler Tap R. R. Co., for N. W.

of this Sur;

THENCE with said Sur. East 1900 vrs. to its S. E. Cor. for N. E. Cor. of this Sur.;

THENCE South 1900 vrs. set stake for S. E. Cor.

THENCE West 1900 vrs. a stake at S. E. Cor. of Sur. No. 158, for S. W. Cor. of this

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA YESCUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

THENCE North 1900 vrs. to the place of beginning.

THIRD TRACT: 638.5 acres of land, in La Salle County, Texas, and being all of Sur. No. 147, Cert. 68 Pat'd to E. Ridgeway, assee, of J. V. Massey, By Pat. No. 422, Vol. 30, which for 640 acres, but which contains by actual measurement only 638.5 acres described by metes bounds as follows:

BEGINNING at a post the S. E. Cor. of Sur. No. 138, Scrip No. 244, T. T. R. R. Co., the W. Cor. of Sur. No. 143, Scrip 401, J. H. Gibson for N. W. Cor. of this Sur;

THENCE South 1900 vrs. a stake in prairie for S. W. Cor;

THENCE East 1900 vrs. a stake the S.W. Cor. of Sur. No. 145, Scrip No. 402, J. H. Gibson for a S. E. Cor of this Sur;

THENCE N. 1900 vrs. a stake the N. W. Cor of said Sur. for N. E. Cor. of this Sur.;

THENCE W. 1900 vrs. to the beginning.

FOURTH TRACT: 193.1 acres of land out of Orig. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 1344, th portion of said Sur. hereby conveyed, being described by metes and bounds as follows:

BEGINNING at the S. W. Cor. of Sec. No. 147, J. V. Massey and the N. W. Cor. of Sec. No. 148, A. Salinas for the N. W. Cor of this Sur;

THENCE E. with Sec. line 1921 vrs. to a stk at the intersection with the E. line of E. W. Alderman sub-division for the N. E. Cor. of this Sur;

THENCE S. with said sub-division line 567.4 vrs. to a stk set in fence line for the S. E. Cor. of this Sur;

THENCE W. with fence line and past post at 663 vrs. past Cor. of said fence, 1921 vrs to stk in W. line of said Sec. No. 148, for the S. W. cor. of this Sur;

THENCE N. with said line 587.4 vrs. to the place of beginning;

FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No. 244, School File No. 40248, being Abst. No. 1468, Pat. No. 154, Vol. No. 52, described by metes and bounds as follow

BEGINNING at a stake in prairie, at the S. E. Cor. of Sur. No. 136, made for L. S. 243, Tyler Tap R. R. Co., for the N. E. Cor. of this Survey;

THENCE with said Survey West 1900 vrs. to its S. W. Cor. of this Sur;

THENCE S. 1900 vrs. set a stake for S. W. Cor;

THENCE E. 1900 vrs. set a stake for S. E. Cor;

THENCE N. 1900 vrs. to the place of beginning

And being the land described as Sections Nos. 137, 143, 147, 138, and part of 148 conveyed to Green Martin and W. W. McKinley by H. E. Hunter, Adm. by deed dated the 17th day of January, 1917, and shown of record in Vol. T-1, Page 200, Deed Records of La Salle County, Texas;

together with the rights of ingress and egress at all times for the purpose of taking said minerals; the said five (5) tracts of land above described containing 2,750 acres, more or less, and being the same identical land conveyed by Green Martin and wife, Julia Tully Martin by deed dated September 28, 1945, recorded in Vol. D-4 on Pages 53-55 of the Deed Records of La Salle County, Texas, and also recorded in Vol. 88 on Pages 86-88 of the Deed Records of Dimmit County, Texas, to which said Deed and record reference is here made for a full and complete description of said land.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

Thereby Certified on    5/9/13

leases so made; that Grantees shall receive under such lease or leases four-fifths (the same being one-fifth (1/5th) to each Grantee)) part of all the oil, gas and other minerals taken and saved under any such lease or leases and he or she shall receive the same out of the royalty provided for in such lease or leases, but Grantees shall have no part in the annual rentals paid to keep such lease or leases in force until drilling is begun;

TO HAVE AND TO HOLD the same unto the said Grantees Edna Mae Jones, Johnie Lorene Acker, Julia Authelia Akers and Emmett Granvel Murphy, as their separate individual property, their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said minerals unto the said Grantees their heirs and assigns against all persons whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under us but not otherwise.

WITNESS OUR HANDS this the 27 day of October, 1948.

Mabel M. Snowden  
Mabel M. Snowden

J. G. Snowden  
J. G. Snowden

STATE OF TEXAS:

COUNTY OF LA SALLE:

BEFORE ME, the undersigned authority, on this day personally appeared J. G. Snowden, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the said J. G. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed,, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the 27 day of October, 1948.

Mrs. A. U. Knaggs  
MRS. A. U. KNAGGS  
Notary Public in and for La Salle County, Texas.

SEAL.

Filed: October 27, 1948 at 2:00 o'clock P. M.

Recorded: October 28, 1948 at 2:50 o'clock P. M. _Mrs. A. U. Knaggs_

County Clerk, La Salle County, Texas.

STATE OF TEXAS
COUNTY OF L'SALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office, Witness my
hand and Seal of Office

I hereby Certified, on _____ 5/07/13 _____

MARGARITA A. ESQUEDA, COUNTY/DISTRICT CLERK

No. 3075

Edna Mae Jones, et al

To:Declaration and Agreement

The Public

THE STATE OF TEXAS)
)
COUNTY OF McMULLEN)KNOW ALL MEN BY THESE PRESENTS:

That, WHEREAS, in the division of the Estate of J. E. Murphy, deceased, between Edna Mae Jones, Johnie Lorene Acker, Mabel Mullen Snowden, Julia Authelia Akers and Emmett Granvel Murphy, it was the intention of the parties that the one who received surface rights would also receive the full right to receive all rentals on existing leases and bonuses and rentals on any future leases off of the land on which the surface rights were conveyed to him or her; and,

WHEREAS, a question has arisen as to the instruments executed being clear regarding rentals on existing leases, and as to royalty that is to be reserved in further leases for the benefit of the respective lessor and the other children of J. E. Murphy, deceased, their heirs and assigns;

NOW, THEREFORE, for and in consideration of the benefits running from one to the other, and in order to clarify each deed executed dividing the Estate of J. E. Murphy, deceased, we, Edna Mae Jones, joined pro forma by her husband Jimmie Jones, Johnie Lorene Acker, joined pro forma by her husband E. V. Acker, Mabel Mullen Snowden, joined pro forma by her husband, J. G. Snowden, Julia Authelia Akers, an adult feme sole, and Virginia Gertrude Akers Murphy, an adult feme sole, and sole devisee under the will of Emmett Granvel Murphy, deceased, do hereby execute this instrument and hereby declare, that in making the division of the property in the Estate of J. E. Murphy, deceased, it was the intention of said parties to grant to the party receiving the surface, the right to receive all rentals from oil, gas and mineral leases then on said land so granted and to receive all bonuses and rentals on leases that might thereafter be made by the party to whom said surface was conveyed by Special Warranty Deed, provided, however, that the Lessor in said oil, gas and mineral lease, so executed by him or her, should reserve, in each oil, gas and mineral leases so executed, a basic one-eighth (1/8) royalty interest (if all royalty interest was owned by J. E. Murphy at the time of his death, then a full 1/8th royalty would be reserved; otherwise a proportion of 1/8th reserved) for the benefit of the Lessor and the other children of J. E. Murphy, deceased, and those claiming under said children or child; and this is particularly true as to the land received by Edna Mae Jones in McMullen County; the land received by Johnie Lorene Acker in McMullen County; the land received by Julia Authelia Akers in La Salle County; and the land received by Emmett Granvel Murphy in McMullen and Duval Counties, Texas, all of which division was by Special Warranty Deeds to said Emmett Granvel Murphy, the deed of Emmett Granvel Murphy being dated October 21, 1948, and recorded in Volume 70, pages 527-531, of Duval County Deed Records, reference to which is here made for all purposes, and the other deeds being executed on or about the same date, being recorded in the respective counties where the land is located, and reference to each of which is here made for all purposes.

EXECUTED this 9th day of December, 1953.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk.
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office. Witness my
hand and Seal of Office

I hereby Certified, on    5/07/13

Julia Authelia Akers

/s/ Virginia Gertrude Akers Murphy
Virginia Gertrude Akers Murphy

THE STATE OF TEXAS )
COUNTY OF JIM WELLS )

BEFORE ME, the undersigned authority, a Notary Public in and for Jim Wells County, Texas, on this day personally appeared JIMMIE JONES and EDNA MAE JONES, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said EDNA MAE JONES, wife of the said JIMMIE JONES, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said EDNA MAE JONES, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 16th day of December, 1953.

SEAL
/s/ Judith Gomez
JUDITH GOMEZ
Notary Public in and for Jim Wells County, Texas.

THE STATE OF TEXAS )
                    )
COUNTY OF LA SALLE )

BEFORE ME, the undersigned authority, a Notary Public in and for La Salle County, Texas, on this day personally appeared E. V. ACKER and JOHNIE LORENE ACKER, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said JOHNIE LORENE ACKER, wife of the said E. V. ACKER, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said JOHNIE LORENE ACKER, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 18 day of December, 1953.

SEAL
/s/ Richard L. Dobie, Jr.

Notary Public in and for La Salle County, Texas.

THE STATE OF TEXAS:

COUNTY OF LA SALLE:

BEFORE ME, the undersigned authority, a Notary Public in and for La Salle County, Texas, on this day personally appeared J. G. SNOWDEN and MABEL MULLEN SNOWDEN, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said MABEL MULLEN SNOWDEN, wife of the said J. G. SNOWDEN, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said MABEL MULLEN SNOWDEN, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 18 day of December, 1953.

SEAL
/s/ Richard L. Dobie, Jr.

Notary Public in and for La Salle County, Texas.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA SOLEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office, Witness my
hand and Seal of Office

Thereby certified on. 5/07/13

THE STATE OF TEXAS)
)
COUNTY OF LA SALLE)

BEFORE ME, the undersigned authority, on this day personally appeared JULIA AUTHELIA AKERS, an adult feme sole, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 18 day of December, 1953.

SEAL                                        /s/ H. H. Wildenthal
                                            H. H. WILDENTHAL
                                            Notary Public in and for La Salle County, Texas.

THE STATE OF TEXAS)
)
COUNTY OF JIM WELLS)

BEFORE ME, the undersigned authority, on this day personally appeared VIRGINIA GERTRUDE AKERS MURPHY, an adult feme sole, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS 16th day of December, 1953.

SEAL                                        /s/ Judith Gomez
                                            JUDITH GOMEZ
                                            Notary Public in and for Jim Wells County, Texas.

Filed:December 18, 1953 at 11:40 A.M.

Recorded:December 18, 1953 at 2:15 P.M.    Geo. E. Cook, by Patsy Ruth Head

                                            GEO. E. COOK, COUNTY CLERK, LA SALLE COUNTY, TEXAS.

* * * * * * * * * * *

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

COUNTY OF LA SALLE:

That we, Johnie Lorene Acker, joined pro forma by her husband, E. V. Acker, of Wharton County, Texas; and Virginia Gertrude Akers Murphy, an adult feme sole and sole devisee under the will of Emmett Granvel Murphy, Deceased, of Jim Wells County, Texas, in consideration of the sum of Ten Dollars and other good and valuable consideration to us in hand paid by Mabel M. Snowden of La Salle County, Texas, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell and convey unto said Mabel M. Snowden, an undivided two-fifths (2/5ths) interest as her separate individual property in and to s of the oil, gas and other minerals in and to the land hereinafter described, the mineral interes hereby conveyed being all of the interest conveyed by Mabel M. Snowden to Johnie Lorene Acker and Emmett Granvel Murphy by Deed dated October 27, 1948, and recorded in Vol. K-4, pages 311-313 Deed Records of La Salle County, Texas. Said land is situated in La Salle and Dimmit Counties, Texas, and described as follows:

FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas, known as Sur. No. 137, patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue of Land Scrip No. 244, Pat. No. 240, Vol. No. 35;

SECOND TRACT: 640 acres of land, more or less, known as Sur. No. 143, Patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip No. 401, Pat. No. 423, Vol. 30;

THIRD TRACT: 638.5 acres of land in La Salle County, Texas, and being all of Sur. No. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;

FOURTH TRACT: 193.1 acres out of Orig. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. B44, described by metes and bounds as follows:

BEGINNING at the SW corner of Sec. No. 147, J. V. Massey and the N. W. corner of Sec. No. 148, A. Salinas for the N. W. cor. of this sur.;

THENCE E. with Sec. line 1921 vrs. to a stk. at the intersection with the E. line of E. W Alderman subdivision for the N. E. cor. of this sur.;

THENCE S. with said subdivision line 567.4 vrs. to a stk set in fence line for the S. E. cor. of this sur.;

THENCE W. with fence line and past post at 663 vrs. past cor. of said fence, 1921 vrs. to a stk in W. line of said Sec. No. 148, for the S. W. cor. of this sur.;

THENCE N. with said line 567.4 vrs. to the place of beginning;

FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No. 244, School File No. 40248, being Abst. No. 1468, Pat. No. 154, Vol. No. 52;

together with the rights of ingress and egress at all times for the purpose of taking said minerals; the said five tract of land above described containing 2,750 acres, more or less, and being the same land conveyed by Green Martin, et ux to Mrs. Mabel M. Snowden by Deed dated September 28, 1945, recorded in Vol. D-4, Pages 53-55, Deed Records of La Salle County, Texas, and also recorded in Vol. 88, Pages 86-88, Deed Records of Dimmit County, Texas, to which Deed and records reference is here made for a full and complete description of said land.

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA SOSEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears on
record in my office, Witness my
hand and Seal of Office

Thereby Certified, on   5/30/13

Mabel M. Snowden, her heirs and assigns, against every persons whomsoever lawfully claiming or to claim the same or any part thereof, by through or under us but not otherwise.

Witness our hands this 31st day of December, 1953.

/s/ Johnie Lorene Acker
Johnie Lorene Acker

/s/ E. V. Acker
E. V. Acker

/s/ Virginia Gertrude Akers Murphy
Virginia Gertrude Akers Murphy

THE STATE OF TEXAS:
COUNTY OF LA SALLE:

Before me, the undersigned authority, a Notary Public in and for said State and County, on this day personally appeared E. V. Acker and Johnie Lorene Acker, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed; and the said Johnie Lorene Acker, wife of the said E. V. Acker having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Johnie Lorene Acker acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the 31st day of December, A. D. 1953.

SEAL

/s/ Richard L. Dobie, Jr.

Notary Public, La Salle County, Texas.

THE STATE OF TEXAS:
COUNTY OF LA SALLE:

Before me, the undersigned authority, a Notary Public in and for said State and County, on this day personally appeared Virginia Gertrude Akers Murphy, an adult feme sole, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 31st day of December, A. D. 1953.

SEAL

/s/ Richard L. Dobie, Jr.

Notary Public, La Salle County, Texas.

Filed: December 31, 1953, at 4:55 P.M.
Recorded: January 2, 1954, at 9:30 A.M. *Geo. E. Cook by Patsy Ruth Abbott*

GEO. E. COOK, COUNTY CLERK, LA SALLE COUNTY, TEXAS.

\* \* \* \* \* \* \*

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

Thereby Certified. or.  5/8/13

That we, Mabel M. Snowden, joined pro forma by her husband, Tony Snowden, of La Salle County, Texas, in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration to us in hand paid by Johnie Lorene Acker, of McMullen County, Texas, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell and convey to the said Johnie Lorene Acker, and undivided one-fifth (1/5) interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in and to the land hereinafter described, the mineral interest hereby conveyed being all of the interest conveyed by Johnie Lorene Acker to Mabel M. Snowden by deed dated December 31, 1953, and recorded in Volume X-4, Page 355, Deed Records of La Salle County, Texas. Said land is situated in La Salle and Dimmit Counties, Texas and described as follows:

FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas known as Sur. 137, patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue Land Scrip No 244, Pat. No 240, Vol. No 35:

SECOND TRACT: 640 acres of land, more or less, known as Sur. No. 143, Patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip. No. 401, Pat. No 423, Vol. 30:

THIRD TRACT: 638. 5 acres of land in La Salle County, Texas, and being all of Sur. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;

FOURTH TRACT: 193.1 acres out of Ori. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4 Abst. No 344, described by metes and bounds as follows:

BEGINNING at the SW corner of Sec. No 147, J. V. Massey and the N. W. Corner of Sec. No. 148, A. Salinas for the N. W. cor. of this sur.;
THENCE E. with Sec. line 1921 vrs. to a stk. at the intersection with the E. line of E. W. Alderman subdivision for the N. E. cor. of this Survey, ;

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office, Witness my
hand and Seal of Office



FIFTH TRACT: 640 acres of land in La Salle and Dimmit Counties, Texas, being all of School Section No. 138, issued to the T. T. R. R. Co., by virtue of Cert. No 244, School File No. 40248, being Abst. No 1468, Pat. No. 154, Vol. No. 52;

together with the rights of ingress and egress at all times for the purpose of taking said minerals; the said five tracts of land above described containing 2,750 acres, more or less, and being the same land conveyed by Green Martin et ux to Mrs. Mabel M. Snowden by Deed dated September 28, 1945, recorded in Vol. D-4, Pages 53-55, Deed Records of La Salle County, Texas, and also recorded in Vol. 88, Pages 86-88, Deed Records of Dimmit County, Texas, to which Deed and records reference is here made for a full and complete description of said land.

To have and to hold the same unto the said Johnie Lorene Acker as her separate and individual property, her heirs and assigns forever; and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said minerals unto the said Johnie Lorene Acker, her heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by through or under us but not otherwise.

Witness our hands this the 25th day of March, 1965.

Mabel M. Snowden

Tony Snowden

THE STATE OF TEXAS,

County of La Salle

Tony Snowden

said Tony Snowden

BEFORE ME, the undersigned, a Notary Public, in and for said County, Texas, on this day personally appeared and Mabel M. Snowden wife of known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed. And the said Mabel M. Snowden wife of the said Tony Snowden having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel M. Snowden acknowledged such instrument to be her act and deed, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 15 day of April, A. D. 19 65

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office, Witness my
hand and Seal of Office

# CORRECTION WARRANTY DEED

THE STATE OF TEXAS §

COUNTIES OF LA SALLE
AND DIMMIT §

KNOW ALL MEN BY THESE PRESENTS:

That we, MABEL M. SNOWDEN, joined pro forma by her husband, JOE G. SNOWDEN, of La Salle County, Texas, in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration to us in hand paid by JOHNIE LORENE ACKER, of McMullen County, Texas, the receipt of which is hereby acknowledged, have GRANTED, BARGAINED, SOLD AND CONVEYED, and by these presents do GRANT, BARGAIN, SELL AND CONVEY to the said JOHNIE LORENE ACKER, an undivided non-participating one-fifth (1/5) of the whole and entire royalty interest as her separate, sole and individual property in and to all of the oil, gas and other minerals described below, subject to the reservation hereinafter made. Said land is situated in La Salle and Dimmit Counties, Texas and described as follows:

> FIRST TRACT: 640 acres of land, more or less, in La Salle County, Texas known as Sur. 137 patented to Emanuel Ridgeway, assignee of the T. T. Ry. Co., by virtue Land Scrip No. 244, Pat. No. 240, Vol. No. 35;
>
> SECOND TRACT: 640 acres of land, more or less, known as Sur. No. 143, Patented to I. W. Bean, assee. of J. H. Gibson by virtue of Scrip. No. 401, Pat. No. 423, Vol. 30;
>
> THIRD TRACT: 638.5 acres of land in La Salle County, Texas, and being all of Sur. 147, Cert. 68, patented to E. Ridgeway, assee. of J. V. Massey by Pat. No. 422, Vol. 30, which calls for 640 acres, but which contains by actual measurement only 638.5 acres;
>
> FOURTH TRACT: 193.1 acres out of Ori. Sur. No. 148, in the name of A. Salinas, situated in La Salle County, Texas, Cert. No. 68, Pat. No. 131, Vol. No. 4, Abst. No. 344, described by metes and bounds as follows:
>
> BEGINNING at the SW corner of Sec. No. 147, J. V. Massey and the N. W. Corner of Sec. No. 148, A. Salinas for the N. W. corner of this sur.;
>
> THENCE E. with Sec. line 1921 vrs. to a stk. at

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office, Witness my
hand and Seal of Office

Thereby Certified, on  5/07/13

THENCE S. with said subdivision line 657.4
vrs. to a stk. set in fence line for the S. E.
corner of this Sur.;

THENCE W. with fence line and past post at 663
vrs. past cor. of said fence, 1921 vrs. to a stk.
in W. line of said Sec. No. 148, for the S. W.
cor. of this sur.;

THENCE N. with said line 567.4 vrs. to the
place of beginning;

FIFTH TRACT:   640 acres of land in La Salle and
Dimmit Counties, Texas, being all of School Section
No. 138, issued to the T. T. R. R. Co., by virtue
of Cert. No. 244, School File No. 40248, being Abst.
No. 1468, Pat. No. 154, Vol. No. 52;

together with the rights of ingress and egress at
all times for the purpose of taking said
minerals; the said five tracts of land above des-
cribed containing 2,750 acres, more or less, and
being the same land conveyed by Green Martin, et ux.
to Mrs. Mabel M. Snowden by deed dated September 28,
1945, recorded in Vol. D-4, Pages 53-55, Deed Records
of La Salle County, Texas, and also recorded in Vol.
88, Pages 86-88, Deed Records of Dimmit County, Texas,
to which Deed and records reference is here made for
a full and complete description of said land.

TO HAVE AND TO HOLD the same unto the said JOHNIE LORENE ACKER as
her separate and individual property, her heirs and assigns forever;
and we do hereby bind ourselves, our heirs, executors and adminis-
trators to warrant and forever defend all and singular the said royalty
interest unto the said JOHNIE LORENE ACKER, her heirs and assigns,
against every person whomsoever lawfully claiming or to claim the same
or any part thereof, by, through or under us, but not otherwise.

This Deed is made in place of and as a Deed of Correction of a
Deed executed by Grantors herein to Grantee, dated March 25, 1965, and
recorded in Vol. 135, Pages 135-136, Deed Records of La Salle County,
Texas, wherein by error or mistake, Grantors conveyed to Grantee an
undivided 1/5th mineral interest in and to all of the oil, gas and
other minerals, when in truth and fact Grantors should have conveyed
an undivided non-participating 1/5th of the whole and entire royalty
interest, and this instrument is made by Grantors and accepted by
Grantee in order to correct said mistake, and in all other respects

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy, as the same appears on
record in my office. Witness my
hand and Seal of Office

I hereby certified on ___5/07/13___

WITNESS our hands this the 2d day of June, 1980.

_Mabel M. Snowden_
Mabel M. Snowden

_Joe G. Snowden_
Joe G. Snowden

ACCEPTED this 24th day of June, 1980.

_Johnie Lorene Acker_
Johnie Lorene Acker

_Edwin Valentine Acker_
Edwin Valentine Acker

THE STATE OF TEXAS §

COUNTY OF LA SALLE §

BEFORE ME, the undersigned authority, on this day personally appeared JOE G. SNOWDEN and MABEL M. SNOWDEN, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office on this the 2d day of June, 1980.

_Virginia Ann Pagel_
Notary Public, State of Texas

THE STATE OF TEXAS §

COUNTY OF McMULLEN §

BEFORE ME, the undersigned authority, on this day personally appeared JOHNIE LORENE ACKER and husband, EDWIN VALENTINE ACKER, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office on this the 24th day of June, 1980.

_____
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF LASALLE

MARGARITA A. ESQUEDA, County/District Clerk,
LaSalle County, Texas, Do hereby
certify that this is a true and
correct copy as the same appears of
record in my office. Witness my
hand and Seal of Office

# KARDELL

# RESPONSE TO

# REQUEST FOR PRODUCTION NO. 8

# OIL AND GAS LEASE

THE STATE OF TEXAS § 

COUNTY OF LA SALLE § KNOW ALL MEN BY THESE PRESENTS THAT:
   and
COUNTY OF DIMMIT §

THIS AGREEMENT, is made on the 1st day of December, 2009, by and between MARTIN MURPHY SNOWDEN, MICKEY DARRELL SNOWDEN, PATRICIA J. SNOWDEN KARDELL, and MARY DELILLA SNOWDEN, (whose mailing address is c/o Patricia J. Snowden Kardell, 66 Crestline, Pleasanton, Texas 78064), as "Lessor," whether one or more, and SWIFT ENERGY OPERATING, LLC, a Texas limited liability company (whose mailing address is 16825 Northchase Drive, Suite 400, Houston, Texas 77060, as "Lessee."

## WITNESSETH:

1.   **Grant of Lease.**

A.   Lessor, in consideration of Ten and No/100 Dollars ($10.00) and other valuable consideration in hand paid by Lessee, the receipt of which is hereby acknowledged, and in consideration of the royalties herein provided and the covenants, agreements and obligations of Lessee herein contained, and upon the conditions and with the limitations hereinafter set forth and contained, hereby leases and lets exclusively unto the said Lessee, for the purposes of investigating, exploring, prospecting, drilling and mining for, and producing oil and gas ("oil and gas" for all purposes of this Lease being defined to include oil, gas, casinghead gas and the byproducts thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil or gas from wells on the leased premises), laying pipelines, building tanks, roads, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, store transport and own said products (but not including the construction of housing for its employees), the following described lands and premises in La Salle and Dimmit Counties, Texas (sometimes referred to herein as "said Land" or "Leased Premises"), to-wit:

BEING 2,137.18 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the W. M. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the W. M. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas, and being more particularly described in that certain General Warranty Deed dated September 28, 1945 from Green Martin and wife, Julia Tully Martin to Mrs. Mabel M. Snowden and husband, J. G. Snowden, recorded in Volume D-4, Page 53, Deed Records of La Salle County, Texas.

For the purpose of calculating the payments hereinafter provided for, the Leased Premises shall be treated as comprising 2,137.18 acres of land whether it actually comprises more or less.

B.   This Lease is expressly made subject to any and all easements affecting said premises, as shown by the records of the County Clerk of the County in which the Leased Premises are situated,

_d&e 1 G3 40

to which reference is here made.

C.      Lessor expressly EXCEPTS from this Lease and RESERVES to Lessor, all minerals of every kind and character, in, on and under the lands above described, except only the oil and gas as herein defined in the foregoing provisions of this Section 1. In addition, Lessor EXCEPTS from this Lease, and RESERVES to Lessor, the right to use said land and the surface thereof for the purposes of investigating, exploring, prospecting, drilling, mining for and producing all such other minerals, which are excepted from this Lease, laying pipelines, and building roads, tanks, power stations, telephone lines and other structures thereon to mine, produce, save, take care of, treat, transport, and own said excepted other minerals; provided, however, that such operations shall not unreasonably interfere with Lessee's operations and use of the Leased Premises.

## 2.      Term.

A. Primary Term. Subject to the other provisions herein contained, this Lease shall be for a term of three years (3) from the date hereof (herein called "primary term"), and so long thereafter as this Lease may be maintained in force and effect under the other terms and provisions hereof.

B. Option to Extend Primary Term. Notwithstanding anything contained herein to the contrary, Lessee shall have the option to extend the primary term of this lease as to the lands then covered by this lease for an additional two (2) years (that is, to the date of December.1, 2014) by payment or tender to Lessor, on or before December 1, 2012, of an amount equal to Six Hundred Dollars ($600.00) per net mineral acre for the lands then covered by this lease. This option to extend will only be available if Lessee should drill at least one well during the primary term of this lease.

## 3.      Royalties:

The royalties to be paid to Lessor are:

A.      Oil:

On all oil and on all liquid hydrocarbons extracted from gas under the provisions of Subparagraph B.(1) below, twenty-five percent (25.00%) of that produced and saved from said lands, the same to be delivered to Lessor into the storage tanks or into the pipeline to which the wells may be connected, or, at Lessor's option, such oil and liquid hydrocarbons shall be sold with Lessee's oil and liquid hydrocarbons at the same price received by Lessee (but in no event for less than the market value thereof), or, at Lessor's option, such products shall be delivered to Lessor at the wells into tanks or other receptacles to be furnished by Lessor. Lessor's options hereunder may be exercised from time to time, and the exercise or failure to exercise an option at any time shall not constitute a waiver of Lessor's right to exercise further options.

B.      Gas:

(1)      On gas produced from said lands, including casinghead gas and residue gas at the tailgate of any plant through which gas produced from said lands may be processed, twenty-five percent (25.00%) of the market value of the gas at the place of use or sale by Lessee, or at Lessor's option, twenty-five percent (25.00%) of the gas, in kind, either at the well or at the outlet side of the separator, hereinafter provided for, or at the tailgate of any plant through which gas is processed. Prior

dr 2 G3   40

to the use or sale of any gas produced from said lands, Lessee shall run such gas through a field-type separator or other comparable equipment ordinarily used in the industry for the purpose of separating, extracting and saving liquid and liquefiable hydrocarbons recoverable from the gas, and royalties shall be payable on the remaining gas under the provisions of this Subparagraph B(1) and royalties on the extracted liquids shall be payable under the provisions of Subparagraph A. above; provided, however, Lessee shall not be required to run the gas through a field-type separator or comparable equipment if the gas is to be processed in a recycling, absorption, pressuring or other plant belonging wholly or in part to the Lessee or any affiliated or subsidiary company, or if the liquid hydrocarbon content of the gas is so small as to make the installation and operation of field-type separators or comparable equipment unprofitable, or if the pressure of the gas is such that running the gas through separators or comparable equipment would diminish the ability to sell and deliver the separated gas against existing gathering system or pipeline pressures.

(2)     On condensate and all other products separated, extracted or manufactured from gas produced from said lands by any extraction, absorption, pressuring or other plant belonging wholly or in part to Lessee or any affiliated or subsidiary company, twenty-five percent (25.00%) of the market value at the plant of all such condensate and other products so separated, extracted, or manufactured, or, at Lessor's option, twenty-five percent (25.00%) of such condensate and other products in kind shall be delivered to Lessor at the plant outlet. In the event of the blending of any part of such condensate or other products with chemical additives for making any product therefrom, the royalty on such products, whether paid in kind or at market value, shall be calculated at the plant outlet on the resulting blended product, less Lessor's proportionate share of the direct cost of such chemical additives and the blending thereof.

(3)     On condensate and all other products separated, extracted or manufactured from gas produced from said lands by an extraction, absorption, pressuring or other plant belonging to a third party or parties, twenty-five percent (25.00%) of the amount received by Lessee from the sale of condensate and other products separated, extracted or manufactured by said plant and credited to Lessee under the terms of Lessee's contract with such plant.

(4)     The market value of any gas, condensate or other products of gas shall never be less than the total proceeds received by Lessee or by any affiliated or subsidiary company by reason of the sale of such gas, condensate or other products. The total proceeds received shall include, but not be limited to, the fair value of all consideration received by Lessee or by any affiliated or subsidiary company related to the marketing and/or dedication of gas, condensate, other products or reserves (such as take-or-pay payments, take-or-pay settlements and awards, dedication payments, advance payments, contract adjustments, gas exchange consideration, contract buy-out/buy-down payments and similar consideration). Subject to the foregoing, for the purpose of computing Lessor's royalty on gas under Subparagraph B(1) hereof, "market value" of the gas shall be computed at the point of delivery to the purchaser, if sold, or at the point of use, if used, and "market value" is defined as follows:

(a)     If Lessee shall enter into a bona fide arms-length gas sales contract for the sale of gas to a purchaser which is not an affiliated or subsidiary company, and if such contract shall contain adequate provisions for the redetermination, at least annually, of the price for which the gas is sold, to ensure that the price for such gas shall always be reasonably equivalent to the current market value of gas, when produced, in Texas Railroad Commission District Nos. 1, 2 and 3, the market value of the gas sold under such contract shall be

dec 3 G3 40

costs, or, at the option of Lessor, Lessee shall account to Lessor for twenty-five percent (25.00%) of the gross amount received by Lessee from the sale of such sulphur.

(2)     In the event Lessee should contract with another for the removal or recovery of sulphur content from gas under an arrangement whereby the processor retains all or a portion of the sulphur so removed or recovered for a price less than market value, in compensation for such removal or recovery, then, and in either of said events, Lessor shall be paid as royalty the market value of twenty-five percent (25.00%) of such sulphur so removed or recovered from such gas.

(3)     It is further provided that if gas produced from said lands is processed by Lessee for the removal and/or recovery of sulphur content therefrom, and a portion of such gas is used or consumed in the operation of the plant or other facility so utilized in such removal and/or recovery, Lessor shall be paid as royalty the market value of twenty-five percent (25.00%) of the gas so used or consumed in the operation of the plant or other facility.

D.     General Royalty Provisions:

(1)     Accounting and payments to Lessor of royalties from the production of oil and gas from any well shall commence no later than ninety (90) days after the initial commencement of production in paying quantities. Thereafter, unless otherwise specifically provided herein, all accountings and payments for royalties shall be made on or before the 28th day of the second calendar month following the calendar month in which the production occurred. In the event any payment for royalties is not received by Lessor from Lessee within five (5) days of the date it is due and payable, Lessee shall pay to Lessor an additional sum ("Late Charge") equal to five (5%) percent of the amount due. In addition to any other charges permitted herein, if Lessee makes a payment of royalties to Lessor by check and the check is returned to Lessor by Lessee's bank marked NSF (Non Sufficient Funds), then an additional charge of $50.00 per check returned shall be paid by Lessee to Lessor. Should Lessee at any time fail to make royalty payments to Lessor on or before the last day of the second calendar month following the calendar month in which production occurred from any well, and should the default continue for a period of thirty (30) days after Lessee's receipt of written demand therefor from Lessor, Lessor may, at Lessor's election, cancel this Lease as to such well and said lands ascribed to such well by giving Lessee thirty (30) days advanced written notice of such cancellation. Lessee may avoid such cancellation by paying Lessor all sums (including Late Charge and interest) then owed by Lessee to Lessor prior to the expiration of said thirty (30) day period. Unless otherwise herein expressly provided, and whether or not Lessor shall have cancelled this lease as to any well and said lands ascribed to such well for non-payment, any royalties which are suspended and not paid to Lessor within the time periods specified therefor shall accrue interest at the rate of ten percent (10%) per annum from the due date until paid. Interest due hereunder shall be compounded annually. Acceptance by Lessor of royalties which are past due shall not act as a waiver or estoppel of Lessor's right to receive or recover any and all interest due thereon under the provisions hereof unless the written acceptance or acknowledgment by Lessor to Lessee expressly so provides. Any tender or payment to Lessor of a sum less than the total amount due the Lessor hereunder which is made or intended to be made as an offer of settlement or an accord and satisfaction by or on behalf of Lessee, must be accompanied by a Notice of Settlement Offer, so denominated, addressed to Lessor. Any such offer of settlement submitted solely by the tender of a check containing language of settlement or accord and satisfaction printed or otherwise inserted thereon shall not be deemed an offer of settlement or accord and satisfaction unless accompanied by such a Notice of Settlement Offer. Lessee shall pay all costs of litigation, including reasonable attorney's fees, expert witness and consultation fees

d36 5 G3   40

125

incurred by Lessor in connection with any lawsuit in which Lessor is successful in recovering any royalties or interest or in terminating this Lease due to Lessee's failure to pay royalties within the period set forth herein.

(2)    The execution and delivery of a division order shall never be a requirement or condition precedent to distributing actual royalties to Lessor. If requested by Lessee, Lessor shall execute a written statement of Lessor's interest in minerals or royalties and Lessor's current address and social security or taxpayer's I.D. number. Nothing more shall be required of Lessor in order to obtain Lessor's royalty on actual production.

(3)    For the purposes of calculating royalties payable to Lessor on gas produced and saved from the Leased Premises, the volumes of such gas shall be measured and metered as produced at each well, and the heating value or Btu content of such gas shall be determined and calculated as produced at each well. Lessee shall not be required to determine and calculate the Btu content of gas produced from each well more than twice each year. All measurements, metering, determinations, and calculations shall, at Lessee's expense, be effected and performed accurately and in accordance with standards and procedures generally accepted and applied in the industry, and in compliance with any applicable laws and regulations, by qualified parties.

(4)    If at any time during a calendar year Lessor's royalty is required to be calculated pursuant to Subparagraph B(4)(b) hereof, Lessee shall so advise Lessor in writing within thirty (30) days following the month in which such provision became applicable.

(5)    Once each calendar year, and within sixty (60) days following Lessor's written request therefor, Lessee shall provide Lessor's accounting information with respect to production for the prior calendar year. The accounting information shall include, with respect to gas and liquid hydrocarbons produced and sold hereunder, monthly wellhead metered volumes, monthly average BTU content, gas analysis reports, sales price, gross sales proceeds (including the amount of reimbursement for taxes and/or costs or expenses), names of purchasers, the amount of royalties paid Lessor during the preceding calendar year, and if Subparagraph B(4)(b) was applicable during such period, the applicable index price for all gas. With respect to oil and/or condensate produced and sold hereunder, the accounting information shall include monthly volumes, sales price, names of purchasers, and the royalties paid Lessor during the preceding calendar year. In the event Lessee drills and completes a well or wells on the Leased Premises for each well drilled and completed on the Leased Premises the Lessee shall furnish to the Lessor the true and correct Operator Name and Number, Field Name and Number and Lease Name and Number. All such information must correspond to the information furnished the Railroad Commission of the State of Texas and shall furnish Lessor with the name, number or other identifying information that the production from such well is reported to the Comptroller of Public Accounts of the State of Texas, and such information must be furnished Lessor within sixty (60) days after such well has been put on line. In the event any such information should change, Lessee shall furnish Lessor notice of such change together with the updated information corresponding to such change. Lessee shall be under a continuing obligation to furnish such information to Lessor upon the request of Lessor but not more than once each calendar year unless there has been a change in such information during such calendar year.

(6)    Lessor's royalty interest shall, in all cases, bear its proportionate part of all production, severance, windfall profits and ad valorem taxes attributable thereto.

_____ 6 ___ 40

(7)     Except as specifically provided in Subparagraphs B(2) and B(4) above, all royalties

payable under Subparagraphs B(1), and B(2), and C(1) of this Section 3 shall be without deduction for any costs of producing, marketing, gathering, transporting, separating, dehydrating, compressing, processing, manufacturing, treating, marketing, or other costs involved in making the oil or gas ready for sale or use, nor any part of the costs of the constructing, operating or depreciating of any plant or other facilities or equipment for processing or treating said oil or gas produced from said lands.

(8)     Lessee shall be under the duty to exercise good faith in the disposition, sale and accounting to Lessor for Lessor's royalty, and Lessee shall keep in mind Lessor's interest as well as its own interest in any and all contracts relating to the sale and/or transmission for the sale of oil and gas and any of its products or constituents, produced under the terms of this Lease.

(9)     Notwithstanding any other term or provision of this Lease to the contrary, Lessee hereby agrees to and does hereby toll any limitation period provided for under the Laws of the State of Texas for any unpaid royalties due Lessor under the terms and provisions of this Lease and Lessee specifically agrees that the limitations period for any unpaid royalties due Lessor under the terms and provisions of this Lease shall not begin to run unless and until Lessor discovers such non payment or improper payment and acquires actual knowledge of such non payment or improper payment and Lessor and Lessee agree that the "discovery rule" shall be applicable to this Lease to the same extent as if it had been adopted by the Supreme Court of the State of Texas.

(10)    Limitations. It is expressly understood and agreed that in the event of the assertion of any claim by Lessor that this Lease has terminated, in whole or in part, by reason of a cessation of production and/or operations, Lessee waives and shall not be entitled to assert and shall not assert any defense based upon any statute of limitations or other law based upon the passage of time prior to Lessor's filing of suit upon the claim ("Defense"), to the extent the Defense might otherwise be based upon any period of time prior to the date of actual delivery to each Lessor against whom a Defense might be asserted, of a written notice, which is not included with, in or as part of any other communication with respect to lease termination, stating verbatim that Lessee has commenced and is continuing adverse possession of all or part of the Leased Premises under a claim of right that is inconsistent with and is hostile to the Lessor;

Each notice given hereunder, in order to commence a limitations period, must make specific reference to this Lease, including the names of the parties, the date, and the Leased Premises, must state that it is given pursuant to this Subparagraph 10 of the Lease, and must be accompanied by a true and correct copy of this Subparagraph of the Lease.

It is understood and agreed that, for purposes of a Defense, no claim or cause of action described in this paragraph shall be claimed, or may be found, to have accrued prior to the date of actual delivery of notice as provided herein.

(11)    Measuring. BTU Analysis and Gas Allocation

A.     In making all gas accounting calculations affecting Lessor's gas royalty, it is recognized and agreed that: (1) the pressure base used in measuring gas produced under the terms of this Lease shall be 14.65 pounds per square inch; (2) the standard pressure base temperature shall be sixty (60) degrees Fahrenheit, correction to be made for pressure according to

_d36 7 63   40

127

Boyle's Law, and for specific gravity, according to tests made by the Balance Method, or by a generally approved method of measuring and testing in use by the industry at that time. Individual well meters used for wet measurement for allocation purposes shall be construed, tested and maintained using standard methods in general use by the gas industry.

B.     All gas produced from the Leased Premises shall be measured by individual well meters at the wellhead prior to conducting any post-production operations, including operations for separation, dehydration, or treatment, unless Lessee elects that all or a portion of the gas and condensate produced from the Lease flow to centrally located separation, dehydration or treatment facilities ("Central Facility or Central Facilities"), in which case, Lessor consents to such procedure, subject to the terms hereof. Allocation methodologies used by Lessee shall be in compliance with recommended industry practices and any changes to the allocation methodology described below shall be communicated (including the reason for the change) in advance by Lessee to Lessor in writing.

C.     Lessee, at its sole cost, agrees to install check meters ("CM") at the sales meters of all Lease Central Facilities. All gas at the meters that measure the total flow of gas from Central Facilities shall be measured and accounted for before the same leaves a Central Custody Transfer Meter ("CCTM") in accordance with ANSI/API 2530-AGA Report No. 3(1990) and any supplements thereto as adopted by Lessee.

D.     For gas accounting purposes, gas samples shall be calculated by a non-affiliated service company according to the technical standards recommended at the time by the Gas Processors Association (GPA) on an "as-delivered" BTU basis.

E.     Unless Lessor and Lessee agree otherwise in writing, Lessee shall take or cause to be taken, at least quarterly, wellhead gas samples from all producing wells located on the Lease. Gas samples shall be taken in accordance with GPA Standard 2166, or any then current revision thereof and a non-affiliated service company shall analyze all such samples quarterly. Lessee shall timely respond to written requests sent no more than once a year by Lessor inquiring as to what companies are then analyzing such samples. If a wellhead sample is not taken for any reasons, the gross heating value ("BTU content") from the previous sample at such particular wellhead shall be used as a substitute. Upon Lessor's request in writing, Lessee shall give Lessor's designated representative reasonable notice of the taking of all wellhead gas samples to be taken after receipt by Lessee of such request (the purpose of which is to measure the gas quality of any well being so sampled), in order that the Lessor may have an opportunity to have a representative present when the sample is taken. Lessee shall on written request of Lessor's representative promptly furnish Lessor with copies of all such sample analyses. Lessor, at Lessor's expense, may elect to install Lessor's own meter at or near any wellhead meter, or at any CCTM on the Lease, or conduct, at Lessors expense, its own independent sampling and analysis of gas from Lessees and/or Lessors meters on the Lease and Lessee agrees to cooperate with Lessor if the Lessor so elects. Any such installation shall be performed by Lessee. Lessor shall give Lessees designated representative notice of the taking of Lessor's independent gas samples in order that Lessee may have an opportunity to have a representative present when any sample might be taken by a representative of the Lessor. Lessor shall, on written request from Lessee, promptly furnish Lessee with copies of all of Lessor's sample analyses if any are taken on behalf of the Lessor.

F.     Lessee shall also take gas samples, through continuous sampling, at any CCTM in accordance with principals established by the GPA and such continuous samplings shall

be analyzed monthly by a non-affiliated service company. Should Lessee fail to take the continuous sampling and conduct the independent analysis of such continuous sampling at each CCTM for any reason, then the BTU content taken at the applicable CCTM for the previous month's sample shall be substituted by Lessee in calculating the royalties due the Lessor for any such production.

        G.      Gas Samples taken from a CCTM in the manner called for herein shall be used by the Lessee in calculating royalty payments, and for royalty accounting purposes gas measured at the applicable CCTM shall be allocated back to each well in accordance with this provision. It is further agreed that:

        (1)      Where there is no production flowing to an applicable Central Facility during an entire calendar month from any new wells, or from any existing well(s) that have been reworked or re-completed and, the BTU content of the first gas sample taken at the applicable CCTM, after any such well or wells have commenced to produce or have been restored to production varies by more than two (2%) percent from the BTU content of the gas samples taken at the applicable CCTM during the previous month, either party may request the weighted average BTU content (after adjusting for any free condensate that condenses in the pipeline from the well to the CCTM) of the total wellhead gas samples (taken from all producing wells located on the Lease) be used to reconcile royalty payments for that month; or

        (2)      If either party can demonstrate that the weighted average BTU content (after accounting for free condensate that condenses in the pipeline from the well to the CCTM) of the total wellhead gas samples (taken from all producing wells located on the Lease that are flowing to the applicable CCTM) varies by more than two (2%) percent from the BTU content of the gas samples taken at the applicable CCTM, during any give month, then the weighted average BTU content of the total wellhead gas samples shall be used to reconcile royalty payments for that month.

        The weighted average BTU content referred to above is defined as the sum of the total wellhead MMBTU's divided by the sum of the total wellhead MMCF's, for any given month for wells flowing to the applicable Central Facility.

        If a requested reconciliation is not disputed by either party, payments or adjustments attributable to the reconciliation shall be made within 120 days from the date the reconciliation request is received by the other party, otherwise the gas samples taken from an applicable CCTM shall be used for calculating royalty payments.

        H.      If more than one gas sample is taken during a given month at the wellhead or at the CCMT, then the gas sample containing the highest BTU content shall be used if the sample containing the highest BTU content is more than Two (2%) percent higher than any other samples taken at the wellhead shall be used for allocation and the initial sample taken at the CCTM shall be used for calculating royalty payments.

        I.      Lessee shall endeavor to use the same service company(s) to undertake all gas sample analyses required on the Lease and to notify Lessor in writing of any planned changed In Its selected service company at least thirty (30) days prior to any such change.

d3f 9 G3 40

J.      Condensate Allocation

(1)     For centralized facilities, Texas Railroad Commission ("TRC") well tests will be taken in accordance with and when required by the TRC. The data taken from these tests will be used to allocate condensate to individual wells:

(2)     If a well flows less than 100 MCFD and has not produced condensate during the last three well tests, and if flowing conditions do not change for that well, Lessor exempts Lessee from further well tests and condensates will not be allocated to the well.

(3)     Lessee will conduct a test for the proper duration needed in order to obtain an accurate test.

(4)     For any well that is re-worked or re-completed, Lessee will endeavor to perform a well test within 30 days after re-establishing production.

(5)     If the results from a well test indicate a well begins or ceases to produce condensate, Lessee will evaluate the accuracy of the test and decide if additional well testing will be undertaken to determine the allocation of condensate.

(6)     The results from the well test will be applicable until the next well test is performed.

K.      Gas Meter Tests

Lessee will perform meter tests (i.e. calibration tests and orifice plate inspections) at each wellhead, and at the CCTM, at least quarterly in accordance with generally accepted industry standards. CCTM meter tests shall be conducted according to the recommendations found in Chapter 21 of the AGA/API Manual, or any current revisions thereof. Upon Lessor's request in writing, Lessee shall give Lessor's designated representative reasonable advance notice of all gas meter tests to be taken after receipt by Lessee of such request in order the Lessor may have an opportunity to have a representative present at all meter tests.

L.      Fuel Gas Recovered by Vapor Recovery Unit

Only those vapors or emissions recovered through the applicable Central Facility Vapor Recovery Unit will be allocated for purposes of royalty payments.

M.      Central Facility

The parties hereto agree to the following allocation methodologies, subject to the provisions hereof for periodic audit and verification, viz:

(1)     Data Requirements for Allocation Data gathered from the following will be used for allocation calculations:

(a)     Central Facilities

080 10 G3   40

130

- The as-delivered (corrected for water vapor) BTU factor taken at the CCTM.

- The monthly gas volume (as corrected for missing or corrected meter data) measured at the applicable CCTM.

- The as-delivered BTU factor of the gas recovered by the applicable Central Facility Vapor Recovery Unit (VRU).

- The monthly volume (as corrected for missing or corrected meter data) measured at the applicable Central Facility VRU meter.

- The total monthly condensate measured at the applicable Central Facility.

(b)     Wellhead (For each well)

- The Oil/Gas Ratio (OGR) taken from the latest well test for each well flowing to the applicable Central Facility.

- The monthly gas volume (as corrected for missing or corrected meter data) measured at the wellhead meter.

- The as-delivered BTU factor for each wellhead.

(2)     Allocation Calculations

(a)     BTU Factors and Water Vapor Corrections

- The dry BTU factors that are to be measured at each meter will be corrected for water vapor by the non-affiliated service company undertaking the analysis ("As Delivered") and the resulting corrected As Delivered BTU factor shall be carried forward in the calculation. This is the application of a volumetric correction for water vapor content to the Dry BTU factor.

(b)     Central Facility Total Gas Volume

- The total gas measured at the applicable Central Facility is the sum of the corrected monthly produced gas measured at the applicable CCTM and the corrected monthly gas measured at the applicable Central Facility VRU meter.

(c)     Central Facility Gas MMBTU

- The gas MMBTU measured at the applicable Central Facility will be calculated using the corrected monthly produced gas volume measured at the applicable CCTM and the As-Delivered BTU factor measured by continuous sampler at the applicable Central Facility.

(d)     Central Facility VRU Gas MMBTU

_dss 11 G3   40

- The VRU gas MMBTU produced at the applicable Central Facility will be calculated using the corrected monthly gas volume measured at the applicable Central Facility VRU meter and the As-Delivered BTU factor measured at the applicable Central Facility VRU meter.

      (e)    Central Facility Total MMBTU

- The total MMBTU measured at the applicable Central Facility is the sum of the gas MMBTU measured at the applicable CCTM and the VRU gas MMBTU measured at the applicable Central Facility VRU meter.

      (f)    Condensate Allocation

- Monthly, the theoretical condensate produced by each well will be calculated by using the corrected wellhead volumes and the applicable OGR. Summing the theoretical condensate produced by each well will derive the total theoretical condensate produced by all wells. The percentage of the total theoretical condensate provided by each well is then calculated and this percentage is then applied to the total monthly condensate sold from the applicable Central Facility to calculate the condensate allocated to each well for royalty calculation purposes.

      (g)    Wellstream Measurement

- A correction for measurement of the full well-stream through an orifice meter will be made in accordance with a meter factor based on tests in accordance with herewith. Changes to this method are permitted and Lessee will both communicate and document any changes in advance to Lessor's designated representative.

      (h)    Gas Allocation

- The corrected measure wellhead volume will be reduced by the meter factor as set out herein. The sum of the corrected wellhead volumes will then be calculated. The percentage of the new corrected wellhead volume totals provided by each well is then calculated and this percentage then applied to the applicable Central Facility total corrected gas volume to calculate the gas production allocated to each well for the given month.

      (i)    MMBTU Allocation

- A wellhead MMBTU will be calculated for each well from the meter factor corrected wellhead volume and the As-Delivered wellhead BTU factor. The sum of the wellhead MMBTU's will then be calculated. The percentage of the wellhead MMBTU total provided by each well is then calculated and this percentage then applied to the calculated applicable Central Facility total MMBTU to allocate the MMBTU to each well for the give month.

_d3e 12 G3 40

$mm\lambda$

(j)    Check Stub BTU Factor

- Due to the allocation process, the As-Delivered wellhead BTU factor may not be the same as the allocated wellhead BTU factor that appears on the monthly royalty payment check stub.

- The allocated BTU factor that appears on the check stub is calculated by dividing the allocated wellhead MMBTU by the allocated wellhead volume (MCF).

- The BTU factor that will be reported on the check stub is an allocated BTU factor.

4.    **Shut-in Royalties: Minimum Royalties.**

A.    If at any time or from time to time there shall be any well or wells on any part or parts of this Lease then in force and effect capable of producing gas or gas and/or condensate in paying quantities but from which gas or gas and/or condensate are not sold or used for lack of an adequate market, Lessee may pay or tender to Lessor as shut-in gas well royalty a sum equal to Fifty and No/100 Dollars ($50.00) per year for each acre of the Leased Premises included in the gas unit on which each such well shall be situated or, if no gas unit designation shall have been made, then on the number of acres which Lessee would be entitled to retain around such gas well under the provisions of Section 8 hereof, in the event of partial termination. The first such yearly payment or tender shall be made to Lessor within ninety (90) days after the well was shut-in and succeeding payments shall be made annually thereafter on or before the day of the month upon which such well was shut-in (which shut-in date shall be the beginning date of each annual period for which payment is made). The payment or tender of shut-in gas well royalty may be made by the check or draft of Lessee delivered to Lessor on or before such date of payment. While such shut-in gas well royalty is paid or tendered as above provided, this Lease, insofar as it covers such gas well and the acreage for which such payment is made, shall, subject to the other terms and provisions hereof, remain in force and effect as though such well were producing gas or gas and/or condensate in paying quantities, provided that the payment of shut-in gas well royalty as to one such unit shall have no effect upon the continuance of this Lease as to any other unit or units. It is expressly provided, however, that after the expiration of the primary term, Lessee shall not have the right to continue this Lease in force as to any such gas unit by payment of shut-in gas well royalty for any single period of more than two (2) successive years or three (3) years in the aggregate.

B.    It is agreed and provided that, notwithstanding the making of such shut-in gas well royalty payments, or otherwise, Lessee shall be and remain: (i) under the continuing obligation to use all reasonable efforts to find a market for gas to be produced from any gas well on the Leased Premises (ii) under the obligation to reasonably develop and explore any such designated tract upon which any producing or shut-in well is situated and (iii) under the obligation to drill all wells on any designated tract upon which any producing or shut-in well is situated as may be necessary to protect the same from drainage by wells on adjoining or adjacent land. It is further agreed and understood that no such payment of shut-in gas well royalty shall be necessary or required to maintain this Lease as to any such designated tract around a well capable of producing gas or gas and/or condensate in paying quantities if such tract is otherwise maintained in force and effect.

dsc 13 dз 40

a time, but in the event that Lessee may undertake the drilling of two or more wells simultaneously, allowance for time shall be made for the drilling of each said well to the end that Lessee shall receive credit for time accumulated for each well drilled with like effect as if each of said wells had been drilled consecutively.

F.     Lessee shall, within sixty (60) days after the termination of this Lease, in whole or in part, under the foregoing provisions hereof, execute and file for record (and deliver to Lessor an executed or certified copy thereof) a written recordable instrument designating and describing by metes and bounds all of the lands covered by this Lease which, upon such termination, are properly included in any shallow or deep oil unit or units or shallow, intermediate or deep gas unit or units, or horizontal units, as herein provided, and Lessee shall at such time release this Lease as to all the lands originally covered hereby not properly included in such unit or units. In the event Lessee shall fail to so designate such oil unit or units and gas unit or units or horizontal units as above provided, or shall fail to file such instrument of designation for record, within said time, then Lessor may give Lessee thirty (30) days written notice by certified mail of such failure, and if Lessee fails to designate such units as above provided within a thirty (30) days from the date of receipt of such notice, Lessor shall have the right ad privilege to designate such unit or units in the same manner and with the same effect as above provided and such designation, whether made by Lessor or Lessee, shall be effective from the date of termination as above provided.

G.     Although this Lease may have terminated in part and been partially released under the provisions of this Section 8 it is agreed that Lessee shall have and retain such easements over and across such terminated portion or portions of the land originally covered by this Lease as shall be reasonably necessary for ingress and egress and to enable Lessee to develop and operate the portion or portions of this Lease continuing in effect for the production of oil and gas therefrom, and Lessee shall not be required to move or relocate any pipelines, tanks, separators or other surface equipment or machinery used in connection with such production of oil and gas.

H.     Lessee agrees, upon Lessor's request, to give Lessor reasonable notice of the intention to take any gas/oil ratio tests of any well on the Leased Premises and, upon Lessors request, Lessee agrees to furnish Lessor with copies of reports of all gas/oil ratio tests, if made, on any well or wells on the Leased Premises, which information shall be held in strict confidence by Lessor and not divulged to any third party or used in any way other than in connection with matters relating to this Lease.

I.     Notwithstanding the termination of this Lease as to the portions of the acreage covered hereby and as to depth under the other provisions hereof, this Lease shall nevertheless remain in force and effect as to each oil unit as so designated, so long as oil or gas is produced from such oil unit in paying quantities and so long as additional drilling or reworking operations are conducted on such oil unit as herein provided. In case of cessation of actual production of oil and gas in paying quantities from any oil unit as so designated, this Lease, insofar as it covers and affects such particular oil unit which has ceased producing in paying quantities, shall terminate (notwithstanding the fact that there may be production in paying quantities from other oil unit or units) unless Lessee commences drilling or reworking operations on such particular unit within ninety (90) days thereafter and shall pursue such drilling or reworking operations on the same or successive wells at intervals of not to exceed ninety (90) days between the date of completion of operations on one well and the date of commencement of operations on another; and if production of oil or gas in paying quantities is restored on such oil unit, this Lease shall remain in force and effect as to such oil unit, so long

d³⁸ 20 G³ 40

thereafter as oil or gas is produced therefrom in paying quantities or additional drilling or reworking operations are had thereon as above provided. But, it is further provided that production or operations on one such oil unit as so designated shall have no effect upon the continuation of this Lease as to any other oil unit or units and that production of oil shall have no effect upon the continuation of this Lease as to any gas unit. It is further provided that, if there shall be production of oil from perforations more than 10,000 feet below the surface of the land under a deep oil unit and if such production of oil below 10,000 feet shall cease and Lessee's rights as to such deep oil unit are not maintained, as above provided, and if there is production of oil in paying quantities or if, as a result of such additional drilling or reworking operations, production of oil in paying quantities is obtained from a shallower depth less than 10,000 feet on such oil unit, Lessee shall proceed to designate shallow oil unit or units allocable to such oil production, in the same manner as provided in the foregoing provisions hereof for development and insofar as same covers such deep oil unit so ceasing to produce, shall thereupon terminate and be released as to all the remainder of the acreage in such deep oil unit and this Lease shall likewise terminate in depth as to all depths and horizons under each such shallow oil unit more than 100 feet below the stratigraphic equivalent of the deepest depth from which oil is being produced from such shallow oil unit. If there is a cessation of production of oil in paying quantities from any oil unit and as a result of such additional drilling or reworking operations such production of oil in paying quantities is not restored, but production of gas in paying quantities is obtained, or if any oil well is reclassified as a gas well under the *Rules and Regulations of the Railroad Commission of Texas*, or if any oil well ceases to produce oil in paying quantities, but commences or continues to produce gas in paying quantities, then upon the cessation of such drilling or reworking operations, such reclassification, or such other event, Lessee shall proceed to designate a gas unit allocable to such gas production covering acreage in such oil unit and/or from any other acreage then covered by this Lease which is not already included in a gas unit with gas production from the same horizon or horizons, including acreage in any other existing oil units designated hereunder, in the same manner provided in the foregoing provisions hereof for development and designation after the expiration of the primary term, and this Lease shall continue in force and effect as to each such gas unit so long as gas is produced therefrom in paying quantities (or gas is capable of being produced therefrom in paying quantities, with all shut-in gas well royalty paid thereon) or additional drilling or reworking operations are conducted thereon as hereinabove provided; and this Lease insofar as same covers such oil unit so ceasing to produce in paying quantities shall thereupon terminate and be released as to all the remainder of the acreage, if any, in such oil unit which is not included in such gas unit; and this Lease shall likewise terminate in depth as to all depths and horizons under such gas unit more than 100 feet below the stratigraphic equivalent of the deepest depth from which oil or gas is being produced from such gas unit.

      J.      Notwithstanding the termination of this Lease as to a portion or portions of the

acreage covered hereby and as to depth under the other provisions hereof, this Lease shall nevertheless remain in force and effect as to each gas unit as so designated so long as gas is produced from such gas unit in paying quantities (or capable of being produced therefrom in paying quantities, with all shut-in gas well royalty having been paid thereon); and if the actual production of gas in paying quantities from any gas unit shall cease, this Lease, insofar as it covers and affects such particular gas unit which has ceased producing in paying quantities, shall terminate (notwithstanding the fact that there may be production in paying quantities from some other gas unit or units) unless Lessee shall commence drilling or reworking operations on such particular gas unit within ninety (90) days thereafter and shall pursue such drilling or reworking operations on the same or successive wells at intervals not to exceed ninety (90) days between the date of completion of operations on one well and the date of

commencement of operations on another and, if production of gas in paying quantities is restored on such gas unit, so long thereafter as gas is produced therefrom in paying quantities (or capable of being produced therefrom in paying quantities, with all shut-in gas well royalty being paid thereon), or additional drilling or reworking operations are had thereon as above provided. It is further expressly provided that production or operations or paying of shut-in gas well royalty on one gas unit as so designated shall have no effect upon the continuance of this Lease as to any other gas unit or units and that production of oil shall have no effect upon the continuation of this Lease as to any gas unit. If an oil unit shall be included within the same area embraced within a larger gas unit and if there is a cessation of production of gas in paying quantities from such gas unit and Lessee's rights as to such gas unit are not maintained as above provided, then this Lease shall terminate as to only such portion of the gas unit as is not included within the oil unit or units as so designated. It is further provided that if there shall be production of gas from perforations more than 8,500 feet below the surface under a deep gas unit and if such production of gas below 8,500 feet shall cease and Lessee's rights as to such deep gas unit are not maintained (as a gas unit or as oil unit or units) as above or below provided, and if there is production of gas in paying quantities from perforations greater than 6,000 feet but less than 8,500 feet below the surface (intermediate gas unit), or from perforations less than 6,000 feet below the surface (shallow gas unit), or if, as a result of such additional drilling or reworking operations, production of gas in paying quantities is obtained from the intermediate depth between 6,000 feet and 8,500 feet below the surface, or from the shallow depth less than 6,000 feet on such gas unit, such production shall maintain this Lease only as to the intermediate gas unit or shallow gas unit, as the case may be, surrounding same and this Lease shall promptly terminate and be released as to all the remainder of the acreage (except any oil units) in such deep gas unit; and this Lease shall likewise terminate in depth as to all depths and horizons under such deep gas unit more than 100 feet below the stratigraphic equivalent of the deepest depth from which gas is being produced (or gas is capable of being produced in paying quantities, with all shut-in gas well royalty having been paid thereon), from any well completed on such intermediate gas unit, or shallow gas unit, as the case may be. It is further provided that if there shall be production of gas from perforations more than 6,000 feet and less than 8,500 below the surface under an intermediate gas unit and if such production of gas between 6,000 feet and 8,500 feet shall cease and Lessee's rights as to such intermediate gas unit are not maintained (as a gas unit or as oil unit or units) as above or below provided, and if there is production of gas in paying quantities or if, as a result of such additional drilling or reworking operations, production of gas in paying quantities is obtained, from a shallower depth less than 6,000 feet on such gas unit, such production shall maintain this Lease only as to the shallow gas unit surrounding same and this Lease shall promptly terminate and be released as to all the remainder of the acreage (except any oil units) in such intermediate gas unit; and this Lease shall likewise terminate in depth as to all depths and horizons under such gas unit more than 100 feet below the stratigraphic equivalent of the deepest depth from which gas is being produced (or gas is capable of being produced in paying quantities, with all shut-in gas well royalty having been paid thereon), from any well completed on such shallow gas unit. If there is a cessation of production of gas in paying quantities from any gas unit and as a result of such additional drilling or reworking operations such production of gas in paying quantities is not restored, but production of oil in paying quantities is obtained, or if any gas well is reclassified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, or if any gas well ceases to produce gas in paying quantities, but commences or continues to produce oil in paying quantities, then upon the cessation of such drilling or reworking operations, such reclassification, or such other event, Lessee shall proceed to designate oil unit or units allocable to such oil production covering acreage in said gas unit and/or from any other acreage then covered by this Lease which is not already included in an oil unit with oil production from the same horizon or horizons, in the same manner provided in the foregoing provisions hereof for development and designation after the

expiration of the primary term, and Lessee shall be entitled to develop and maintain this Lease in force as to any portion of such former gas unit (together with any other acreage then covered by this Lease) not included in said newly designated oil unit or units by commencing drilling or reworking operations on such remaining acreage in the same manner and in the same intervals as provided in Subparagraph 8.B. hereof for development and designation of oil units after the expiration of the primary term, provided the first such drilling or reworking operation commences on or before the expiration of ninety (90) days following Lessee's designation of said new oil unit or units; and upon conclusion of any such development by Lessee this Lease insofar as same covers such gas unit so ceasing to produce in paying quantities shall thereupon terminate and be released as to all the remainder of the acreage, except as to such oil unit or units; and this Lease shall likewise terminate in depth as to all depths and horizons under each such oil unit more than 100 feet below the stratigraphic equivalent of the deepest depth from which oil or gas is being produced from such oil unit; and this Lease shall continue in force and effect as to each such oil unit so long as oil or gas is produced therefrom in paying quantities or additional drilling or reworking operations are conducted thereon as hereinabove provided.

K. It is expressly provided that upon the termination of this Lease as to all acreage covered hereby, SAVE and EXCEPT as to shallow and/or deep oil unit or units, and shallow, intermediate and/or deep gas unit or units or horizontal units (whether at the expiration of the primary term or cessation of drilling and development, or subsequent thereto) as above provided, this Lease shall also terminate as to all depths and horizons greater than 100 feet below the stratigraphic equivalent of the deepest depth from which production in paying quantities is then being had (or at which a well capable of producing gas in paying quantities is completed) on each such unit. Lessee shall, at such time, release this Lease as to all depths as to which this Lease shall terminate, as herein provided, and shall file such release of record and furnish a copy of same to Lessor.

L. The parties hereto expressly agree that if there should be or appear to be any conflict or inconsistency between any of the terms and/or provisions of this Section 8 and any of the terms and/or provisions of any other Section or part of this Lease, the terms and provisions of this Section 8 shall prevail and control.

## 9. Reasonable Development and Exploration.

The drilling of wells in accordance with the spacing provisions of Section 8 shall not be construed as an agreement or construction on the part of Lessor that such drilling would constitute reasonable development or exploration of the Leased Premises; but Lessee agrees to drill all such additional well or wells on the Leased Premises, or such portion or portions thereof as may be in force and effect from time to time, as may be necessary to reasonably develop and explore the same for the production of oil and gas.

## 10. Offsetting Production.

For the purposes of this Section 10, a producing well located off the Leased Premises, but within 500 feet of the Leased Premises shall be defined to be a well draining the Leased Premises.

In the event a well in which Lessee owns an interest (whether working interest, overriding royalty interest and/or a royalty interest) producing oil and/or gas in paying quantities shall be brought in on adjoining land (whether such adjoining land be owned by Lessor or any third person) and draining the Leased Premises (and if there is no offsetting well on the Leased Premises), Lessee shall.

dfs 23 G3 40

mm A

137

within one hundred twenty (120) days after the commencement of production from such draining well, or in the event a well in which Lessee owns no interest (whether working interest, overriding royalty interest and/or royalty interest) producing oil and/or gas in paying quantities shall be brought in on adjoining land (whether such adjoining land be owned by Lessor or any third person) and draining the Leased Premises (and if there is no offsetting well on the Leased Premises), Lessee shall, within one hundred twenty (120) days after the commencement of production from such draining well, Lessee shall do one of the following:

A.      Commence and drill an offset well on the Leased Premises (offsetting said well on adjoining or adjacent land) and shall drill said well on the Leased Premises to a depth sufficient to test the sand or horizon from which the well on the adjoining land is producing and in a bona fide attempt to complete said well as a producer in paying quantities in the sand or horizon from which the well on adjoining land is producing; provided, if such well is lost or abandoned during the drilling thereof by reason of mechanical difficulties or by reason of encountering a cavity or impenetrable substance which renders further drilling impracticable, then Lessee shall have the right to commence another well within one hundred twenty days (120) days after the abandonment thereof and such substitute well shall be considered for all purposes as the abandoned well; or

B.      Release from this Lease all rights from the stratigraphic equivalent of the top of the producing interest down to the stratigraphic equivalent of the base of the offsetting producing geological formation in and to and not less than the applicable acreage specified in Section 8.A.(1) LESS and EXCEPT any geological zones which are then producing oil and/or gas or are capable of producing oil and/or gas based upon electric log analysis, sidewall core analysis and/or open hole formation test data in wells drilled on the Leased Premises, by Lessee, or its successors and assigns; or

C.      Pay Lessor compensatory royalty pursuant to the provisions of Section 3 above, which compensatory royalty shall be based upon actual production from the draining well; provided, however, no compensatory royalty shall be due or payable during any period of time when the draining well is shut-in and no production of oil and/or gas is being obtained from the draining well.

It is understood that Lessee shall be obligated to protect the Leased Premises from drainage by wells drilled on other lands of Lessor not included in this Lease to the same extent as though such draining wells were drilled on lands belonging to third parties. If at the time the obligation to drill an offset well accrues, Lessee shall be engaged in the drilling of another well on the Leased Premises, Lessee shall have a period of thirty (30) days after the date of completion or abandonment of such other well then being drilled by Lessee or one hundred twenty (120) days after the commencement of production of such offset well, whichever shall be the longer period, within which to commence the actual drilling of such offset well on the Leased Premises.

11.      Removal of Property and Fixtures.

Lessee shall have the right, at any time during or within one hundred eighty (180) days after the expiration or termination of this Lease but not thereafter, to remove all property and fixtures placed by Lessee on said land or the terminated portion of this Lease, weather permitting. All property and fixtures not so removed within such time shall become the property of Lessor It is further provided that Lessee shall not have the right to remove the casing from any water well or dry hole or abandoned well in violation of the provisions of Subparagraphs A and B of Section 16 hereof. Nothing herein contained shall relieve Lessee from its obligation to plug all wells drilled or utilized by Lessee in its

dec 24 63 40

mm A

138

operations hereunder.

12. **Assignments: Releases.**

The rights of either party hereunder may be assigned, in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns of the parties hereto; but no change or division in the ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding upon Lessee until thirty (30) days after Lessee shall be furnished with a copy of the recorded instrument evidencing same. In the event of the assignment of this Lease as to a segregated portion of said land, the shut-in gas well royalty and minimum royalty payable hereunder shall be apportionable among the several leasehold owners ratably according to the surface area of each, and default in payment by one shall not affect the rights of other leasehold owners hereunder. Subject to the apportionment of shut-in gas well royalty and minimum royalty as provided above, in case Lessee assigns this Lease in whole or in part, Lessee shall be relieved of all other obligations with respect to the assigned portion or portions arising subsequent to the date of the assignment. Lessee shall furnish Lessor a copy of any assignment of this Lease in whole or in part. Lessee may at any time execute and deliver to Lessor, and place of record, a release or releases covering any portion or portions of the above described premises and thereby surrender this Lease as to such portion or portions and be relieved of all subsequently accruing obligations as to the acreage surrendered (but not as to obligations which have theretofore accrued).

13. **Houses and Other Structures.**

Notwithstanding the rights granted in Section 1 hereof to lay pipelines, build tanks, power stations and telephone lines on the above lands, it is expressly understood, stipulated and agreed that this Lease does not confer upon Lessee any right or privilege to construct or maintain any lease houses, camps, warehouses, or other like structures on the Leased Premises; and Lessee shall never construct any such buildings or improvements on the Leased Premises and shall never use the Leased Premises for any such purposes; Lessee shall, however, have the right to house employees or consultants of the Lessee, or of any operator, drilling contractor or other contractor of Lessee, in trailer houses and other movable housing located on the Leased Premises while such personnel are engaged in drilling or reworking operations on the Leased Premises, and the Lessee or any contractor of Lessee may store material and equipment used or expected to be used in drilling or reworking operations on the Leased Premises in movable buildings on the Leased Premises.

14. **Operations.**

A. Lessee agrees that, prior to the commencement of any operations on the Leased Premises, Lessee shall give Lessor notice of the commencement of such operations, the approximate date of such commencement and the location of the same; such notice to be given within a reasonable time prior to the commencement of such operations, and to be mailed to Lessor at the address specified at the beginning of this Lease.

B. Lessee agrees to pay the surface owner the sum of $3,000.00 per acre for each acre of the Leased Premises utilized for drill site, roads, pipelines and location of tank batteries and other surface equipment up to the first three (3) acres utilized and the sum of Two Thousand and No/100 Dollars ($2,000.00) per acre for each acre utilized after three (3) acres and Fifty and No/100 Dollars ($50.00) per rod for pipelines, which payment shall cover the usual and ordinary damages occurring to

dec 25 G3 40

the Leased Premises from Lessee's use thereof in drilling and producing operations conducted in a reasonable and prudent manner, and which payment shall be made to the surface owner prior to the commencement of drilling and/or producing operations. Should any such well be productive of oil and/or gas, Lessee further agrees to pay to the surface owner the additional sum of $1,500.00 per year in advance, which payment shall cover the usual and ordinary damages occurring to that portion of the Leased Premises utilized for the well location, location of tank batteries and other surface equipment, pipelines, electric and telephone lines, and the access road to such well, in producing operations conducted in a reasonable and prudent manner, the first of which annual payments shall be made to the surface owner within thirty (30) days following the first anniversary date of commencement of actual production, and annually thereafter during the productive life of such well. The above payments shall not be deemed compensation for damage resulting to the Leased Premises from blowout, spillage of oil, salt water or chemicals, or damages resulting from an unreasonable, extraordinary or negligent use of the Leased Premises by Lessee, and Lessee agrees to pay the surface owner reasonable compensation for any such damage.

C.    The amount per acre compensation and the amount of the annual payment stated in Subparagraph B hereof shall remain in force and effect for a period of three (3) years from the date hereof. Thereafter, said amount shall be adjusted upward by the amount, if any, of the percentage increase in the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor for the month and year such payment is due, over the Consumer Price Index so published for the month of December 2008. In making such determination of the adjustment it shall be the obligation of Lessor to furnish such information to Lessee. In no event shall such payments be reduced. Should publication of the Consumer Price Index be discontinued, the parties shall accept comparable statistics on the cost of living as shall be compiled and published by an Agency of the United States or by a responsible financial periodical of recognized authority.

D.    If the construction of any drillsite (including associated pits), location for storage facilities or other lease equipment shall require the removal of top soil, such top soil shall be stored separate from other soils, so that the same may be spread back over the surface during restoration operations. Within a reasonable time after cessation of drilling or reworking operations or plugging and abandonment of the hole (but not to exceed three months thereafter), weather permitting Lessee shall level all dumps, fill all pits, remove or rake and burn all brush and debris, replace any top soil removed, and put the surface of the land in substantially the same condition as it was before the commencement of such operations, and shall disc the utilized area. Lessee agrees that if any oil-based mud or drilling compound containing a hydrocarbon base or any material which is harmful to the soil is used in Lessee's operations on said land, Lessee shall remove all such muds, compounds and materials from the land before pit filling and leveling is undertaken, and all such harmful materials shall be disposed of by Lessee off the Leased Premises. Water-based drilling mud not containing any of said substances may be spread over the wellsite location after it is properly dried, provided it meets with the industry standard for chloride allowance.

E.    If any well drilled hereunder is completed as a producer of oil and/or gas, as a part of Lessee's surface restoration obligation, Lessee shall reduce the area of the pad constructed for drilling such well to a size reasonably necessary to accommodate producing and reworking operations, so that the excess area may be restored to agricultural use. Within a reasonable time after any such well has been plugged and abandoned (but not to exceed three months thereafter, weather permitting), Lessee shall restore the surface utilized in the production and operation of such well in accordance with the provisions of Subparagraph D. of this Section 14.

_d3ε 26 G3   40

F.     At Lessor's and/or surface owners request, Lessee agrees to erect and maintain fences around all pits dug on the Leased Premises in connection with drilling or reworking operations promptly after cessation of such drilling or reworking operations, and shall erect and maintain fences around all tank batteries, hazardous machinery and conditions and other facilities for the protection of livestock. Such fences shall be constructed of at least five (5) strands of barbedwire, and properly braced and maintained, so as to prevent livestock from entering the area so enclosed.

G.     Lessee agrees not to allow any waste oil or salt water to flow over the surface of the Leased Premises, and not to allow same to drain down any draws, drains, creeks or ravines on the Leased Premises. Lessee agrees to dispose of all waste oil, salt water and other contaminating substances off of the Leased Premises and in compliance with all applicable governmental rules and regulations. Lessee agrees to promptly repair any leaks in tanks, pits, pipelines, engines or from other facilities of Lessee, and to clean up any leaks or spills on the Leased Premises. Should Lessee fail to make any such repair within fifteen (15) days from receipt of notice by Lessor and/or surface owner of the condition requiring repair, Lessor shall have the right to make such repair, and Lessee shall be required to pay Lessor and/or surface owner as their interest may appear, upon demand, the reasonable cost of such repair, and reasonable compensation for any damage to the Leased Premises resulting from such condition.

H.     Lessee agrees to use reasonable care at all times in all of Lessee's operations on the Leased Premises to prevent injury or damage to livestock, buildings or other property of the Lessor, or Lessor's surface tenant, situated on the surface of said land, or water wells and tanks located thereon; and Lessee agrees to pay Lessor for all damages to buildings, livestock, fences, tanks, water wells and, without limitation, all other property of the Lessor and/or surface owner situated on the surface of the Leased Premises resulting from Lessee's operations thereon; and Lessee agrees to pay the surface tenant for all damages to livestock, growing crops and improved pasturage and other property of the tenant situated on the Leased Premises and resulting from Lessee's operations thereon.

I.     Lessor and/or surface owner shall have the right to designate the location of any road to be used by Lessee for access to the Leased Premises, and for access to any well location which Lessee may utilize on the Leased Premises but such designation of such location shall not be unreasonable. If an existing road is designated for access, Lessee shall use such road to the point designated by the Lessor and/or surface owner and shall construct a new road from such point along the route designated by Lessor and/or surface owner to a well location needed by Lessee. Lessee agrees to grade not more than one road from an existing road to each location on the Leased Premises and to confine all travel incident to the drilling and producing of such well to the single graded road. All roads constructed by Lessee shall be of a good quality and design, constructed with gravel or caliche, and be suitable for all weather use, and Lessor and/or surface owner shall have the right to use any such road. Lessee shall maintain all roads constructed by Lessee in good condition and repair during the term of this Lease. Should Lessee be permitted to use an existing road for access, Lessee shall promptly make repairs to the road when needed, with periodic grading, and particularly following rains. Lessee shall fill all ruts and depressions with comparable road material to that existing, and grade the same to a smooth condition at such time as the road has dried to the point where such repairs and maintenance may be affected. Should Lessee fail to maintain an existing road used by Lessee in good condition and repair, Lessor and/or surface owner may (1) make such repair at Lessee's expense and (2) after thirty (30) days written notice to Lessee, forbid Lessee's further use of said existing road and require Lessee to construct a road for access at a route designated by Lessor and/or surface owner.

ʊɞɛ 27 ɢɜ 40

ᴍᴍᴸ

Lessor and/or surface owner shall have the right to require Lessee to remove road materials from any road constructed by Lessee, and to restore the surface occupied by the road to as near its original condition as is reasonably practicable when such road is no longer needed by Lessee.

J.     Lessee agrees that Lessee shall not cut or go over any fence or fences at any time or in connection with any operations on the Leased Premises without first obtaining the express consent of Lessor and/or surface owner. If Lessor and/or surface owner consents to the cutting of a fence, the cut must be made at the place designated by Lessor and/or surface owner and Lessee agrees, prior to cutting any fence, to install and brace three "corner type" posts with at least ten (10) inch tops on either side of the proposed cut buried five (5) feet in the ground and "H" braced with at least a three (3) inch steel pipe and to securely attach the wires thereto, so that when the fence is cut there shall be no slackening of the wires. If the cut in such fence is an outside fence, Lessee agrees, promptly after making such cut, to install and maintain an adequate cattle guard in the opening with a metal gate across the same, which gate Lessee shall keep locked at all times when not in use. If the cut in the fence is an inside fence, Lessee agrees to install a substantial metal gate or cattle guard, whichever shall be designated by Lessor and/or surface owner, in such opening. Such gates and cattle guards shall become the property of Lessor and/or surface owner as their interest may appear. Lessee agrees to promptly close all gates and properly maintain all gates and cattle guards which Lessee and Lessee's agents, servants and/or employees may use in Lessee's operations on the Leased Premises to prevent the escape of livestock through any open gates. At the request of Lessor or the surface owner, Lessee agrees, at Lessee's expense, to place a guard or representative at the gate leading to and from the Leased Premises, which guard or representative shall be responsible for keeping such gate closed when not in actual use for ingress and egress to the Leased Premises for and during the term of drilling and completion operations.

K.     Prior to erecting any storage tanks, pipelines, compressor stations, or other lease facilities required by Lessee for operations under this Lease, Lessee shall advise Lessor and/or the surface owner of Lessee's intentions, and said parties shall mutually decide upon the location of such facilities, taking into consideration the surface use by the surface owner and Lessee's needs in conducting Lessee's operations. Lessee agrees to keep any surface equipment or facilities in good condition, well maintained, and attractive in appearance. If Lessor and/or surface owner has fields located on the Leased Premises, Lessee agrees that any proposed location for Lessee's operation shall be situated in such a manner so as to prevent interruption in the normal agricultural use of such fields and to place Lessee's roads and facilities in such a manner so as to limit intrusion on such fields with Lessee's operations.

L.     Lessee agrees to bury all pipelines with a cover of at least thirty-six (36) inches from the top of the pipe to the surface of the ground and to place all pipeline improvements below the surface except for necessary meter runs and valve sites adjoining well locations. In excavating the pipeline ditch, Lessee agrees to "double ditch" Lessee's trench. The top soil shall be placed to one side and in backfilling the ditch, the top soil shall be replaced on top of the backfill after the construction. At Lessor's and/or surface owner's request, Lessee agrees to construct terraces across the right-of-way in such manner as may be necessary to protect against erosion and to maintain reasonable and appropriate surface drainage patterns. All construction vehicles shall utilize the designated pipeline route and/or the road(s) designated by the surface owner. The location of any pipeline, if laid, must be approved by Lessor and/or surface owner which consent shall not be unreasonably withheld.

d36 28 03 40

## 15. Environmental Provisions.

A.      A material condition to the grant of this Lease is Lessee's agreement that all operations conducted by Lessee, its agents, servants, employees, contractors, permittees, successors or assigns on the Leased Premises or on Lessor's adjoining property shall be conducted in compliance with all applicable laws, statutes, rules and regulations of any governmental authority having jurisdiction including, without limitation, all safety regulations and requirements of the Railroad Commission of Texas and all environmental laws, statutes, rules and regulations of any federal, state or local authority at any time applicable to the Lessee's operations on the Leased Premises.

B.      Lessee agrees that (i) no toxic or hazardous substances shall be disposed of or otherwise deposited or released in or on the Leased Premises; (ii) Lessee shall not engage in and shall not permit any other party to engage in any activity with respect to property of Lessor which would cause (a) the Leased Premises to become a hazardous waste treatment, storage or disposal facility within the meaning of the Resources Conservation and Recovery Act of 1986 ("RCRA") 42 U.S.C. §1251 of seq., as now or hereafter amended or any similar federal, state or local law or ordinance or any other environmental law, (b) a release or a threatened release of a hazardous substance from or to the Leased Premises within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") 42 U.S.C. § 9601 of seq., as now or hereafter amended or any similar federal, state or local law or ordinance or any other environmental law, or (c) the discharge of pollutants or effluents into any water source or system or the discharge into the air of any emissions, which would require a permit under the Federal Water Pollution Act of the Clean Air Act or any similar federal, state or local law or ordinance or other environmental law; (iii) Lessee shall not permit any substance or conditions in or on the Leased Premises which might support a claim or cause of action under RCRA, CERCLA or other federal, state or local environmental statutes, regulations, ordinances or other environmental regulatory requirements. As used in the preceding provision, the terms "hazardous substance" and "release" shall have the meanings specified in CERCLA and the terms "solid waste" and "disposal" or "disposed" shall have the meanings specified in RCRA; provided that in the event either CERCLA or RCRA is amended so as to broaden the meaning of any term defined hereby, such amendments shall apply to Lessee's covenants herein, and provided further to the extent that the laws of the State of Texas establish a meaning for such terms which are broader than that specified in either CERCLA or RCRA, the broader meanings or definitions shall apply. Upon the release of any acreage covered by this Lease as contemplated by the other terms hereof, the covenants and obligations of Lessee respecting surface restoration specifically shall include, without limitation, the environmental and contamination provisions of this Section 15.

C.      Lessee agrees (1) to remove from the Leased Premises and Lessors adjoining property, if, as, and when required by law, any hazardous materials placed or released thereon by Lessee, its employees, contractors, agents or permittees, (2) to perform remedial work where the need therefore arises in connection with Lessee's operations or activities on the Leased Premises, and (3) to comply in all respects with all federal, state and local governmental laws and regulations governing operations by and remedial work on or associated with the Leased Premises. Such remedial work shall be performed by one or more contractors selected by Lessee and approved in advance by Lessor and/or surface owner, and under the supervision of a consulting engineer selected by Lessee and approved in advance by Lessor and/or surface owner. All costs and expenses of remedial work made necessary by Lessee's operations shall be paid by Lessee, including, without limitation, the charges of such contractors and/or the consulting engineer, and Lessor's reasonable attorneys' fees and costs incurred in connection with the monitoring or review of remedial work. If Lessee shall fail to timely commence or

_dɜ·s 29 ɢɜ 40

143

cause to be commenced, or fail to diligently prosecute to completion, such remedial work, Lessor may, but shall not be required to cause such remedial work to be performed. Lessee shall notify Lessor of any claim or other action by any governmental agency or other third party involving the actual or alleged existence of hazardous material on the Leased Premises, and shall provide Lessor with copies of (1) any notice of any release of hazardous materials given to Lessee pursuant to any law or regulation, and (2) any report of and response to any such incident. Lessee agrees to provide such notices, reports or responses to Lessor and/or surface owner within ten (10) days after receipt or preparation of same by Lessee.

D. Lessee agrees to indemnify, pay and protect, defend and save Lessor harmless from all claims, liabilities (including strict liability), fees and expenses of any kind that arise from the actual or alleged presence or release of any hazardous material in connection with Lessee's operations on Lessor's and/or surface owner's property unless caused by the gross negligence or willful misconduct of the Lessor and/or surface owner. This indemnification shall include costs in connection with any remedial work when performed by Lessor and/or surface owner or any third party in response to any federal, state or local governmental authority, laws or regulations, due and payable upon demand therefore by Lessor and/or surface owner. As used in this Subparagraph D "remedial work" is defined as any site investigation or monitoring, any cleanup, containment, remedial, removal, or restoration work performed in response to any federal, state or local government authority or pursuant to any federal, state or local statute, rule, regulation or other laws.

E. The provisions of this Section 15 shall survive the termination or expiration of this Lease in perpetuity.

16. **General Provisions.**

A. Lessee agrees, after cessation of its use of any water well drilled by Lessee on the Leased Premises and prior to plugging or removing the casing therefrom, to tender such water well or wells to Lessor and/or surface owner and, if Lessor and/or surface owner shall elect to accept same, such water well and the casing therein shall be and become the property of Lessor and/or surface owner upon Lessor's and/or sufrace owner's payment to Lessee of the salvage value of the casing in such well; provided, however, that Lessee shall have the right to use such well or wells at any time during the continuance of this Lease in connection with any of Lessee's primary, but not secondary, production operations on the Leased Premises and, provided further, that Lessor and/or surface owner shall thenceforth assume all risks and obligations attendant to Lessor's and/or surface owner's ownership and use of said water well or wells.

B. Lessee agrees, with reference to each well drilled under this Lease, to allow Lessor and/or surface owner, upon timely request, to run a Schlumberger or similar electrical logging survey from the surface of the ground to the total depth of the surface casing to be set in such well to determine the presence of water sands in such interval; Lessor to pay the cost of such Schlumberger or other electrical logging survey, and to pay the rig costs and assume the risks of the hole during the running of such logging survey. If such well drilled on the Leased Premises is to be abandoned as a dry hole (either before or after production) prior to plugging and abandoning same, Lessee shall tender such well to Lessor and/or surface owner and, if Lessor and/or surface owner shall elect to accept such well, Lessor and/or surface owner and Lessee shall make application to the Railroad Commission of Texas to be authorized to plug such well in such manner that the well bore be left open to the depth at which the Lessor and/or surface owner shall intend to condition and equip such well bore for

production of fresh water, relieving Lessee of further liability. If such application is approved by the Railroad Commission of Texas, Lessee shall proceed to plug such well in the manner so authorized in accordance with such Rules and Regulations, and such well and the casing therein shall be turned over to Lessor and/or surface owner without payment of any consideration therefor. If Lessor and/or surface owner shall not desire to so acquire any such well, Lessee shall plug and abandon the same. Lessee agrees to plug all wells drilled on the Leased Premises, either as a dry hole or after production has ceased therefrom, in accordance with all the Rules and Regulations of the Railroad Commission of Texas as they exist at such time, however, if Lessor and/or surface owner shall accept or take over any well as aforesaid, Lessor and/or surface owner agrees and, if requested by Lessee, shall confirm such owner's agreement, at such owner's expense, (i) to comply with all laws, rules and regulations of governmental authority applicable to such well, including the operation and subsequent plugging and abandonment thereof, (ii) to indemnify and hold harmless Lessee from and against any and all claims resulting from or arising out of or in connection with operations of or for Lessor and/or surface owner on said well and from and against all costs and expenses incurred by Lessee by reason of any such claim or claims, (iii) to accept such well "as is" and "with all faults", and (iv) not to produce any oil, gas or other minerals from such well. In the event Lessee or Lessor and/or surface owner, as appropriate, shall fail to refuse to plug any such well as above required, the other party shall have the right to do so at such failing or refusing party's expense and such failing or refusing party agrees to pay the other party for all monies expended in the plugging of such well, together with interest at the rate of fifteen 15%) per annum from the date of such expenditures. If such failing or refusing party shall fail or refuse to pay the other party for the cost of plugging such well or wells within thirty (30) days after demand is made therefor and if such claim is turned over to an attorney for collection, such failing or refusing party agrees to pay in addition a reasonable attorney's fee therefor.

C.     It is expressly provided that this Lease does not cover or include any rights or privileges of hunting with firearms or dogs on the Leased Premises and no right to fish thereon, or the taking of game or fish in any manner; all such hunting and fishing rights being expressly reserved to the surface owner. Lessee agrees to instruct its agents, servants, employees and contractors not to bring any firearms or hunting equipment on the Leased Premises and not to hunt or fish thereon, or to take game or fish in any manner. If any such person or persons shall violate the provisions of this Subparagraph C, Lessee agrees to instruct such person or persons not to enter thereafter upon the Leased Premises and that, should they so enter, they shall then and thereafter be trespassers thereon and be subject to the penalties of the trespass laws of the State of Texas. Lessee agrees to restrict its agents and employees from traveling on the Leased Premises except for official business, and then only to the areas required for Lessee's operations.

D.     Lessor shall have the right, personally or by representative, at Lessor's risk, and subject to the approval of the individual on the well location charged with the safety of the rig by execution of a liability release, to have access to the derrick floor with the right to observe all operations and the right to witness the taking of electrical logs and drill-stem tests: and Lessee agrees, upon Lessor's written request, to furnish Lessor with copies of all electrical logs within ninety (90) days after taking same and a copy of each well log within ninety (90) days after completion of each well drilled on the Leased Premises; and Lessee agrees to divulge to Lessor true and correct information as requested by Lessor as to such well and the production therefrom and such technical information as Lessee may acquire and which is readily available with respect to the sands and formations encountered in such well, unless such information is deemed by Lessee to be confidential for competitive reasons. Lessor agrees to keep confidential and not to divulge to any other person information given to Lessor by Lessee as herein provided until such information is released by Lessee

dse 31 as 40

shall be fully performed and all payments due under this Lease shall be paid in La Salle County, Texas, or any other county designated by Lessor in writing hereafter. Whenever any instrument is required to be filed for record under the terms of this Lease, unless otherwise expressly provided, same shall be filed in the Office of the County Clerk(s) of the county or counties in which the land covered by this Lease is situated and at Lessee's cost, unless otherwise provided. All references in this Lease to "County Clerk" mean and refer to the County Clerk(s) of the county or counties in which the land covered by this Lease is situated.

J. All reference to "Lessee" in this Lease shall mean, include and apply to the named Lessee and all parties claiming any interest or interests in the working interest. The masculine pronoun as used in this Lease shall include the feminine and neuter and vice versa and, when appropriate, the singular shall include the plural and vice versa.

K. All references in this Lease to the Railroad Commission of Texas shall mean and include any other governmental authority, state or federal, having jurisdiction over the Leased Premises.

L. The captions used in this Lease are for convenience of reference only and do not limit or amplify the provisions hereof.

M. The rights and duties of the parties under this Lease shall be governed by the laws of the State of Texas. The parties further agree that the District Court in and for the county or counties in which the Leased Premises are situated shall have jurisdiction and venue of any and all causes of action between the parties concerning this Lease, and Lessee hereby waives any right that it may have to remove any suit filed against it for damages or other actions hereunder to any Federal Court; but Lessee does not waive any right it may have to appeal any decision rendered against it to the Federal Courts, should such appeal properly lie. In the event any payments (but not including royalty and shut-in gas well royalty) herein required to be made by Lessee to Lessor not be made when due, the same shall bear interest at the rate of ten (10%) percent per annum from the date payment is due until paid and, if any payment required hereunder is in default and is turned over to an attorney for collection or if the same is collected by a suit, Lessee agrees to pay reasonable attorney's fee.

N. Lessee shall have no right to erect or drill a salt water disposal well and/or to dispose of salt water on the Leased Premises without first obtaining the consent of Lessor.

O. No well shall be drilled within 1,000 feet of any residence now located on the Leased Premises without first obtaining the consent of the surface owner, which consent shall not be unreasonably withheld.

P. In the event the owner of the surface estate in the Leased Premises (the "surface owner") is not a Lessor, the surface owner shall be a third-party beneficiary of this Lease.

Q. The payments provided for herein as compensation for damage to, or for the use of, the surface of the Leased Premises shall be made to the surface owner, and payments for damage to personal property situated on the Leased Premises shall be made to the owner of the personal property so damaged. The surface owner of the Leased Premises, her heirs, devisees, personal representatives and assigns, is the third-party beneficiary of all of the provisions of this Lease relating to the damage to, and the use of, such surface estate. The parties agree that the surface owner, her heirs, devisees,

_d3e 33 es 40

personal representatives and assigns, shall have the right to enforce those provisions of this Lease Agreement pertaining to the surface estate without the consent of the surface owner.

17. **Seismic Operations.**

In conducting seismic operations on the Leased Premises, Lessee shall comply with the following covenants and agreements (in addition to the other applicable provisions of this Lease):

A. Lessee shall enter the Leased Premises at locations designated by Lessor and/or surface owner. Exterior gates designated for entry shall be kept closed and locked at all times except when actually utilized for passage. Interior gates that are closed when encountered shall be closed when passage has been completed, and interior gates found open when encountered, shall be left open by Lessee.

B. Lessee shall conduct its operations in a manner that shall minimize surface disturbance and damage. All seismic senderos opened on the Leased Premises shall be cut two dozer blades wide and shall be ter'aced along the slopes in such a manner as to protect against erosion and to maintain reasonable and appropriate surface drainage patterns. Trees and brush removed in the process of opening senderos shall be pushed and stacked into piles at intervals along the senderos and burned upon completion of such operations. No tree having a trunk diameter of four (4) inches or more shall be cut under any circumstances without the prior written consent of Lessor and/or surface owner, and Lessee's routes shall be deviated in order to avoid them. Lessor and/or surface owner agrees such consent shall not be unreasonably withheld.

C. All vehicles shall be operated in a manner designated to minimize damage to the surface of the Leased Premises. In the conduct of seismic operations, all vehicles, including support vehicles, shall stay in one set of ruts (that is, follow the same path) to the extent necessary to prevent excessive damage to the surface.

D. Trucks or other heavy equipment shall not be moved upon or utilized within the Leased Premises during periods of wet weather when such utilization or movement would result in creating ruts or other appreciable damage to the surface.

E. In conducting its survey, Lessee shall not cut nor lay down any interior fence without first obtaining Lessor and/or surface owner's written consent. No perimeter fences shall be cut or laid down under any circumstances.

F. Within thirty (30) days from completion of the survey, weather permitting, Lessee shall restore the surface of the Leased Premises to as near its original condition as may be reasonably practicable. Senderos may remain.

G. In the conduct of its operations, Lessee shall keep the Leased Premises in a safe and clean condition and shall not scatter, or allow the scattering, of any type of waste, broken equipment, used cans or containers, but shall keep the Leased Premises free and clear of all of such refuse. All survey tags, ribbons and markers, and all receiver and source pin flags, stakes or markers utilized by Lessee in its operations shall be removed from the Leased Premises within fifteen (15) days following the completion of the survey, weather permitting.

_0ᴛᴇ 34 G3 40

H.     Lessee shall compensate Lessor and/or surface owner for surface damages resulting from seismic surveys based on the prevailing rate being paid in the area at the time; provided, however, that the minimum payment for seismic lines shall be $3,500.00 per mile for conventional seismic surveys, and $20.00 per acre for 3-D seismic surveys. Such payment, however, shall not be deemed compensation for damage to the Leased Premises resulting from an unreasonable, extraordinary or negligent use of the Leased Premises, and Lessee agrees to pay Lessor and/or surface owner reasonable compensation for any such damage. Additionally, Lessee agrees to use reasonable care at all times in Lessee's operations on the Leased Premises to prevent injury or damage to livestock, buildings or other property of Lessor and/or surface owner situated on the surface of the Leased Premises, or water wells and surface reservoirs located thereon, and agrees to pay Lessor and/or surface owner for all damages to buildings, livestock, fences, water wells, surface reservoirs, and, without limitation, all other property of Lessor and/or surface owner situated on the surface of the Leased Premises resulting from Lessee's operations thereon.

I.     Lessee shall have no right to use water from Lessor and/or surface owner's wells, tanks or watering places without Lessor and/or surface owner's prior consent.

J.     Lessee shall not intentionally dump, spill or discharge gasoline, oil, hydraulic fluid, fuel, paint or any other foreign substance on the Leased Premises. Any accidental spill will be cleaned up immediately and reported to Lessor and/or surface owner.

K.     No seismic source points shall be conducted within 1,000 feet of any house or building on the Leased Premises without the written consent of Lessor and/or surface owner, which consent shall not be unreasonably withheld. No shot point shall be located within 500 feet of any water well on the Leased Premises without the written consent of Lessor and/or surface owner, which consent shall not be unreasonably withheld. Lessee shall test all water wells on the Leased Premises within 1,000 feet of each source line before conducting its operations and within 90 days after completion of its operations to insure that no damage has been committed to any water wells or to the quality of the water from the same. Lessee shall pay all costs associated with the testing, repair or replacement of any water wells damages as a result of its operations.

L.     Lessee may leave on the Leased Premises overnight those trucks and equipment necessary to conduct its operations. On all occasions when such trucks and equipment are left on the Leased Premises overnight, Lessee, as its sole and absolute responsibility, shall secure such trucks and equipment. At all times while on the Leased Premises Lessee shall solely be responsible for any and all damage caused to any of its trucks and equipment whether or not left on the Leased Premises overnight. Lessor and/or surface owner shall in no way be held liable or responsible for any damage caused at any time to any of Lessee's trucks or equipment, or for loss of any of Lessee's personal property brought onto the Leased Premises.

M.     At any reasonable time after this Lease has terminated in whole or in part, Lessee agrees to make available to Lessor and/or Lessor's consultants, without cost, the following:

With respect to conventional seismic surveys, Mylar sepia and Blackline print of the surveyor's Tobin Map, shot-point base map, and processed cross sections (both migrated and non-migrated) and a copy of "Final Stack" information, together with a copy of all seismic tapes for each seismic line crossing the Leased Premises, with reasonable tails in each instance so as to provide full fold coverage of the Leased Premises. The obligation to supply such information is contingent

_dse 35 63  40

upon the availability of full fold data.

With respect to 3-D seismic surveys, all seismic data interpretable on a seismic computer work station resulting from the survey insofar as it relates to the Leased Premises, and a black line print of every 10th full fold in line final processed section and shot point base map of that portion of the survey which crosses the Leased Premises, with reasonable tails in both instances so as to provide full fold coverage of the Leased Premises.

Prior to making the seismic data available to Lessor or consultant, the Lessor or consultant shall enter into a data use license and confidentiality agreement, requiring that the seismic data be maintained as confidential and not be sold, traded, loaned, copied, disclosed, distributed, transferred, or otherwise made available to other parties. Lessor and Lessor's consultants, shall have the right to utilize such data in evaluating oil and gas prospects on the Leased Premises, and Lessor may show the data subject to the terms of the data use license agreement, to any third party or parties with whom Lessor proposes to conduct good faith negotiations at arms-length with respect to developing an oil and gas prospect. Notwithstanding the above, Lessor may not show such data to third parties insofar as the data relates to that portion of the Leased Premises then subject to this Lease. Lessors use of the data, in the manner specified herein, shall be at Lessors sole risk and expense, and Lessee makes no guarantee as to the accuracy of the seismic data and disclaims all implied warranties including fitness for a particular purpose and merchantability.

18.    Force Majeure.

In the event compliance with any express or implied covenant in this Lease or the commencement of drilling or reworking operations or actual drilling, reworking or producing operations by Lessee on the Leased Premises are prevented, delayed or interrupted by war, flood, or other acts of God or of the public enemy, or as a result of scarcity of or the inability of Lessee to procure, obtain or use casing or other equipment or material or the services of a drilling or other contractor to drill, rework, complete or produce said well or wells; or as the result of the inability of Lessee to procure permit to conduct such operations; or as the result of any law, order, rule or regulation of the Railroad Commission of Texas or other governmental authority, State or Federal; it is agreed that, upon Lessee's giving notice to Lessor and reasonably full particulars in writing or by facsimile or electronic mail of the cause of such delay, prevention or interruption within a reasonable time after the occurrence of the cause relied upon; then the time for the commencement of drilling of such well, or the actual drilling thereof or production therefrom, shall be suspended during the continuance of the inability so caused, and for a period of sixty (60) days thereafter, but for no longer period, and the limitations provisions herein provided shall be extended accordingly; provided that this provision shall not suspend nor delay the time for the payment of shut-in gas well royalty or any other payments or royalties payable under the provisions of this Lease.

19.    Warranty of Title.

This Lease is made by Lessor and accepted by Lessee without warranty of title of any kind, either express or implied. Lessee may, at Lessee's option, discharge any tax, mortgage or other lien upon the mineral interest covered hereby, either in whole or in part, and in the event Lessee does so, Lessee shall be subrogated to such lien with the right to enforce same and apply royalties accruing to such party hereunder towards satisfying same. Lessee, prior to discharging any tax, mortgage or other lien upon any such mineral interest shall give notice of same to Lessor and if Lessor objects to the

mm X

discharge of such lien because they are in good faith disputing the same and if Lessor satisfies Lessee that a reasonably adequate provision has been made for the payment or discharge of same, Lessee shall not have the right to make any payment discharging said lien. Without impairment of Lessee's right under the warranty in event of failure of title, it is agreed that if any of the above-named parties owns a mineral interest in the Leased Premises less than the entire fee simple estate, then the shut-in gas royalties, royalties, and other like payments for production or in lieu of production, to be paid to such party shall be reduced proportionately.

## 20. Counterpart.

This instrument may be executed in multiple counterparts and each of which as so executed shall be given the effect of the execution of an original instrument. Such executed counterparts may be consolidated into a single instrument by combining the signature pages and acknowledgments thereto and the executing parties hereto acknowledge and agree that such instrument shall be treated and given effect for all purposes as a single instrument.

## 21. Memorandum of Lease.

The parties hereto agree to execute a Memorandum of this Lease for recording purposes.

IN WITNESS WHEREOF, this instrument is executed in duplicate originals on the date set forth in the acknowledgements of this Lease, but shall be effective for all purposes as of December 1, 2009.

LESSOR:

_____
MARTIN MURPHY SNOWDEN

_____
MICKEY DARRELL SNOWDEN

_____
PATRICIA J. SNOWDEN KARDELL

_____
MARY DELILLA SNOWDEN, by Patricia J.
Snowden Kardel, Attorney-In-Fact under Power of
Attorney

**LESSEE:**

SWIFT ENERGY OPERATING, LLC,
A Texas Limited Liability Company

By: _____P. Mitchell_____

James P. Mitchell, Sr., Vice President,
Commercial Transactions and Land

THE STATE OF TEXAS      §
COUNTY OF LA SALLE      §

and

COUNTY OF DIMMIT        §

This instrument was acknowledged before me on the ___2nd___ day of December, 2009, by MARTIN MURPHY SNOWDEN.

_____
Notary Public, State of Texas

KATHRYN A. BLACK
Notary Public, State of Texas
My Commission Expires
March 17, 2010

doc 38 03 40

THE STATE OF TEXAS § 

COUNTY OF LA SALLE §

and

COUNTY OF DIMMIT §

This instrument was acknowledged before me on the 2nd day of December, 2009, by MICKEY DARRELL SNOWDEN.

_____
Notary Public, State of Texas

THE STATE OF TEXAS §

COUNTY OF LA SALLE §

and

COUNTY OF DIMMIT §

KATHRYN A. BLACK
Notary Public, State of Texas
My Commission Expires
March 17, 2010

This instrument was acknowledged before me on the 2nd day of December, 2009, by PATRICIA J. SNOWDEN KARDELL.

_____
Notary Public, State of Texas

KATHRYN A. BLACK
Notary Public, State of Texas
My Commission Expires
March 17, 2010

d36 39 G3 40

mm

THE STATE OF TEXAS §

COUNTY OF LA SALLE §

and

COUNTY OF DIMMIT §

This instrument was acknowledged before me on the 2nd day of December, 2009, by PATRICIA J. SNOWDEN KARDELL, as attorney-in-fact on behalf of MARY DELILLA SNOWDEN.

_____
Notary Public, State of Texas

KATHRYN A. BLACK
Notary Public, State of Texas
My Commission Expires
March 17, 2010

STATE OF TEXAS §

COUNTY OF HARRIS §

BEFORE ME, on this 15th day of December, 2009, appeared James P. Mitchell, to me personally known, who being by me duly sworn, did say that he is Senior Vice President, Commercial Transactions and Land of SWIFT ENERGY OPERATING, LLC, a Texas limited liability company, and that said instrument was signed on behalf of said limited liability company by authority of its Board of Managers and that he executed the instrument for the purposes and consideration expressed therein, and he acknowledged this instrument to be the free act and deed of said limited liability company.

CYNDI A. KIMBRELL
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
02-19-2010

_____
Notary Public in and for the
State of Texas

C.     If during any year (commencing with an anniversary date of this Lease) while this Lease is in force, oil or gas shall be produced from any well on the Leased Premises, and there has not been paid or accrued hereunder to Lessor at least the sum of Fifty and No/100 Dollars ($50.00) per net acre during that year for each acre contained within the gas or oil production unit for such well(s) at the commencement of such year, by way of shut-in gas well royalty and/or royalties paid or then accrued, Lessee shall, within ninety (90) days after the end of such lease year, pay or tender to Lessor, as a minimum annual royalty, the difference between the amount per acre so paid or accrued during such lease year and said sum of Fifty and No/100 Dollars ($50.00) per acre contained within the gas or oil production unit for such well(s). The payment of minimum annual royalty provided for in this Subparagraph 4 (C.) shall not be in lieu of actual production of oil or gas in paying quantities and Lessee shall not be entitled to continue this Lease in force by payment of such minimum royalty if, in fact, the actual production of oil or gas is not in paying quantities. It is provided, however, that nothing in this Subparagraph 4 (C.) contained shall be construed as preventing or delaying the termination of this Lease under the provisions of Section 8 hereof, nor as impairing Lessee's continuing obligation to reasonably develop and explore the Leased Premises after the discovery of oil or gas thereon in paying quantities, nor as in any manner impairing Lessee's continuing obligations to protect the Leased Premises from drainage by wells on adjoining or adjacent lands, as provided in Section 10 hereof.

5.     **No Delay Rentals: Paid-up Lease:**

The payment or tender of shut-in royalty under Section 4 may be made by the check or draft of Lessee mailed or delivered to the parties entitled thereto at the address hereinbefore specified, and shall not be considered "delay rentals." The cash bonus payment paid in advance in consideration for this Lease is full consideration for such delay rentals. Lessee may at any time execute and deliver to Lessor, and place of record, a release or releases covering any portion or portions of the above described premises and thereby surrender this Lease as to such portion or portions and be relieved of all subsequently accruing obligations for shut-in-royalty as to the acreage surrendered (but not as to obligations which have theretofore accrued).

6.     **Pooling:**

Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this Lease, insofar only as gas or gas condensate rights are concerned, with other land, lease or leases in the immediate vicinity thereof, and to the extent and in the manner hereinafter stipulated, the right to pool or combine the Leased Premises as to gas being subject to the following:

A.     As used in this Section 6 the following definitions shall apply: The term "on-premise well" means a gas well located on or completed under the land covered by this Lease; and the term "off-premise well" means a gas well located on and completed under land not covered by this Lease.

B.     Until all of the land originally covered by this Lease is included in gas pooled units for on-premise wells, Lessee shall have no right or power without Lessor's prior written consent to pool or combine any of the land covered by this Lease for an on-premise well unless all of the remaining non-unitized lease acreage is included in the unit.

C.     Not less than one-half (1/2) of any unit formed for gas shall be comprised of lands

dse 14 G3   40

154

covered by this Lease for an off-premise well, and Lessee shall have no right or power to pool or combine any of the land covered by this Lease for an off-premise well unless at least one-half (1/2) of the unit acreage shall be comprised of lands covered by this Lease and included in such unit.

D. Subject to the other provisions of this Section 6, Lessee may pool or combine the acreage covered by this Lease in order to create a gas unit or units containing not more that 160 acres, if pooled as to any or all horizons between the surface of the land and the depth of 6,000 feet below the surface (shallow gas unit); and/or (ii) a gas unit or units containing not more than 320 acres of land if pooled as to any or all horizons between the depth of 6,000 feet below the surface of the land and the depth of 8,500 feet below the surface (intermediate gas unit); and/or a gas unit or units containing not more than 640 acres, if pooled as to any or all horizons greater than 8,500 feet below the surface of the land (deep gas unit). If at the time of creation of any such gas unit special Field Rules of the Railroad Commission of Texas applicable to the Leased Premises provide for spacing on the basis of less than 160 acres for units pooled as to any or all horizons less than 6,000 feet below the surface or less than 320 acres for units pooled as to any or all horizons lying between 6,000 feet below the surface of the land and a depth of 8,500 feet below the surface or less than 640 acres for units pooled as to any or all horizons greater than 8,500 feet below the surface; then the Leased Premises, or portion or portions thereof, may only be so pooled in order to create a unit or units in compliance with such rules and regulations; but in no event shall any such unit contain more than 160 acres if pooled as to any or all horizons less than 6,000 feet below the surface, nor shall any such unit contain more than 320 acres, if pooled as to any and all horizons lying below 6,000 feet below the surface of the land and a depth of 8,500 feet below the surface, nor shall any such unit contain more than 640 acres, plus ten (10%) percent tolerance if pooled as to any or all horizons greater than 8,500 feet below the surface.

E. Any such gas unit shall be in a reasonably compact shape unbroken by any tract or tracts not included in the unit, except for unleased fee-highway strips or unleased state-owned riverbed. Such gas pooled units may cover any one or more stratum or strata, and units formed by pooling as to any stratum or strata need not conform in size or area with the unit or units in which the Leased Premises may be pooled or combined as to any other stratum or strata. All of the provisions of this Section 6 shall be separately applicable to unit or units into which the Leased Premises may be pooled or combined as to stratum or strata which are separately identified in unit designation instruments. Lessee shall execute in writing an instrument or instruments identifying and describing the land comprising the unit, shall file same for record and, within a reasonable time thereafter, shall furnish an executed copy thereof to Lessor. Each of said options may be exercised by Lessee from time to time, whether before or after production has been established, either on the land covered by this Lease or on other land pooled therewith. A unit established hereunder shall be valid and effective for all purposes of this Lease even though there may be mineral, royalty or leasehold interests in land within the unit which are not effectively pooled or unitized. After production of gas or gas condensate is had from the pooled unit, the size or area of the pooled unit shall not be enlarged, and the acreage covered by this Lease and included in such unit may not be removed therefrom without Lessor's express consent in writing. In the event of operations for drilling on or production of gas from any part of a pooled unit which includes all of a portion of the land covered by this Lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this Lease or the instrument designating the pooled unit, such operations shall be considered as operations for drilling on or production of gas from land covered by this Lease, whether or not the well or wells be located on the premises covered by this Lease; in such event, operations for drilling shall be deemed to have been commenced on said land within the meaning of Section 8 of this Lease and the entire acreage constituting such unit or units as to gas as herein provided shall be treated

_d&e 15 d3 40



for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease. For the purposes of computing the royalties to which owners of royalties shall be entitled on production of gas and gas condensate from each gas unit, there shall be allocated to the lands covered by this Lease and included in such gas unit a pro rata portion of the gas and gas condensate produced from the pooled unit, after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis; that is to say, there shall be allocated to the acreage covered by this Lease that pro rata portion of the gas and gas condensate produced from the pooled unit which the number of surface acres covered by this Lease and included in the pooled unit bears to the total number of surface acres included in the pooled unit, commencing with the date of first production from the pooled unit; that is, royalties shall be paid on the acreage covered by this Lease and included in the pooled unit from the date of first production from the pooled unit, whether or not the land covered by this Lease was included in the pooled unit at the date of first production or thereafter. Royalties on such portion of the production from off-premise well or wells so allocated to this Lease shall be handled, computed and paid in accordance with the terms and provisions of this Lease, just as though such production were had from on-premise well or wells on the portion or portions of this Lease so included in such unit. Lessee agrees to reasonably develop and protect from drainage any unit created hereunder, to the same extent as Lessee is obligated under the terms and provisions of this Lease as to the acreage covered hereby. Lessee shall not be liable to any party for reduction of the acreage content of any unit from loss or failure of title or from any other cause beyond Lessee's control, nor shall Lessee be obligated to make any retroactive apportionment of royalty on sums paid on production in the event of any such reduction in acreage content. It is expressly understood and provided that the pooling permitted under this Lease is limited to the pooling of gas and gas condensate. Lessee shall not have the right to pool any of the oil or casinghead gas in, or under the Leased Premises; and any attempt to pool oil or casinghead gas shall have no force or effect whatever. Whenever the entire production of gas and condensate from any such gas pooled unit shall have terminated and all gas wells thereon have been plugged and abandoned, such unit may be terminated by Lessee by written instrument evidencing such termination filed for record.

F.  If this Lease now covers separate tracts, no pooling, unitization or communitization of mineral or royalty interests as between any such separate tracts is intended or shall be implied or result from the inclusion of such separate tracts within this Lease, and the rule of non-apportionment shall be applicable to this Lease and to all lands covered by this Lease; but Lessee shall nevertheless have the right to pool Lessor's interest in any separate tract or tracts, as provided in this Section 6, with consequent allocation of production as herein provided. The inclusion of Lessor's interest in any separate tract within this Lease shall not constitute an offer on the part of Lessor to any party who may now or hereafter have an ownership interest in the minerals or royalties in any such separate tract to pool, unitize or communitize any such interest with other interests covered by this Lease, and with respect to Lessor's interests in said lands, or in any separate tract, and any other party's interest in said lands, or in any separate tract, such interests shall remain separate ownerships with neither party having any rights, interests or ownership whatsoever in the rights, interests or ownership of the other. Any attempt by an owner of any mineral or royalty interest under a separate tract, now or hereafter, to ratify, adopt or confirm this Lease, or any provision herein contained, by any means and thereby effect a pooling, unitization or communitization of any separate tract covered by this Lease with any other interests shall by such action specifically ratify, adopt and confirm the entire contents of this Subparagraph 6.F. and such attempt to effect a pooling, unitization or communitization shall be ineffective, null and void for all purposes. As used in this Subparagraph 6.F. the words "separate tract" mean any tract with mineral or royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the lands covered by this Lease.

d36 16 69  40

G. If a well is classified as a horizontal well (whether oil or gas) under the Rules and Regulations of the Railroad Commission of Texas then in effect, then the maximum size of the production unit shall not exceed in area 640 acres, plus a tolerance of ten percent (10%) thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling or already drilled, units thereafter may conform in size with those prescribed or permitted by governmental regulations.

H. Notwithstanding anything contained in this Paragraph 6. to the contrary, Lessee shall have the right or power to pool or combine the acreage covered by this Lease with the adjacent real property to the south of the Leased Premises owned by Gary L. Otto described as 430 acres, more or less, out of the J.V. Massey Survey No. 147, Abstract No. 746, La Salle County, Texas.

7. **Cessation of Production.**

If, during the primary term and prior to the discovery of oil or gas on said Land, Lessee shall drill a dry hole thereon, or if, after the discovery of oil or gas during the primary term the production shall cease during the said term from any cause, no operations are necessary in order to keep this Lease in force during the remainder of the primary term.

8. **Partial Termination Units for Production.**

A. If at the expiration of the primary term Lessee is not engaged in the actual drilling of a well on the Leased Premises or if Lessee shall have completed or abandoned a well on the Leased Premises within the ninety (90) day period prior to the expiration of the primary term, then if Lessee is not engaged in the actual drilling of a well on the Leased Premises at the expiration of ninety (90) days after the date of completion or abandonment of such well, whichever event shall be applicable, this Lease shall then terminate as to all the acreage covered hereby, SAVE and EXCEPT, as follows:

(1) As to each well situated on the Leased Premises producing or capable of producing oil in paying quantities or being reworked and classified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, and producing from any interval between the surface of the land and the depth of 10,000 feet below the surface, together with 40 acres around each such well, in the shape hereinafter provided. Each such oil well and the 40 acre tract surrounding same shall constitute and is hereby defined for all purposes of this Lease as a "shallow oil unit".

(2) As to each well situated on the Leased Premises producing or capable of producing oil in paying quantities or being reworked and classified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, and producing from any interval greater than 10,000 feet below the surface of the land, together with 80 acres around each such well, in the shape hereinafter provided. Each such oil well and the 80 acre tract surrounding same shall constitute and is here defined for all purposes of this Lease as a "deep oil unit".

(3) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well royalty having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, and producing from any interval between the surface of the land and the depth of 6,000 feet below the

dse 17 G3 40

mm of

157

surface, together with 160 acres sur'ounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit under the provisions of Section 6 hereof. Each such gas well and the tract surrounding same, as herein prescribed, shall constitute and be referred to as "shallow gas unit".

(4)     As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well royalty having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, and producing from any interval between the depth of 6,000 feet below the surface of the land and the depth of 8,500 feet below the surface, together with 320 acres surrounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit under the provisions of Section 6 hereof. Each such gas well and the tract surrounding same, as herein prescribed, shall constitute and be referred to as "intermediate gas unit".

(5)     As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well royalty having been paid thereon) or being reworked, and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, and producing from any interval greater than 8,500 feet below the surface of the land together with 640 acres, plus ten (10%) percent tolerance, surrounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit under the provisions of Section 6 hereof. Each gas well and the tract surrounding same, as herein prescribed, shall constitute and be referred to as "deep gas unit".

(6)     As to each horizontal well situated on said lands producing oil or gas in paying quantities (if a gas well, a well capable of producing gas in paying quantities with all shut-in payments having been paid thereon), together with the number of acres prescribed or permitted by field or statewide rules of the Railroad Commission of Texas to be assigned to such well for drilling or operating at a regular location or for obtaining the maximum allowable therefrom, but in no event greater than 640 acres, plus a tolerance of ten (10%) percent thereof, or as may thereafter be permitted by governmental regulations.

Each such tract around each such well shall be in as nearly a square or rectangular shape as practicable within the configuration of the outer boundaries of the Leased Premises.

B.     If at the expiration of the primary term or at any time within the ninety (90) day period prior to the expiration of the primary term, Lessee is then engaged in the actual drilling or reworking of a well on the Leased Premises or if Lessee shall have completed or abandoned a well on the Leased Premises within the ninety (90) day period prior to the expiration of the primary term, then if Lessee is engaged in the actual drilling or reworking of a well on the Leased Premises at the expiration of ninety (90) days after the later of completion or abandonment of such well, whichever event shall be applicable, this Lease shall not terminate so long as Lessee shall pursue the drilling or reworking of such well with reasonable diligence to completion or abandonment and so long as Lessee shall commence the actual drilling of additional and successive wells on the Leased Premises at the following intervals: (i) not more than one hundred twenty (120) days shall elapse following completion of one well on the Leased Premises, as a producer or dry hole, and commencement of actual drilling of the next well on the Leased Premises, if the last previous well on the Leased Premises has been drilled to a depth not more than 11,000 feet below the surface; and (ii) not more

dae 18 G3   40

mmL

158

than one hundred eighty (180) days shall elapse following completion of one well on the Leased Premises, as a producer or dry hole, and commencement of actual drilling of the next well on the Leased Premises, if the last previous well on the Leased Premises has been drilled to a depth greater than 11,000 feet below the surface. If and when Lessee shall fail to commence the actual drilling of any such wells above provided at the intervals above provided (or within the extended time as may be provided in Subparagraph E., below), then notwithstanding any other terms and provisions of this Lease to the contrary, it is expressly provided that this Lease shall then terminate promptly upon such failure as to all the acreage covered hereby, SAVE and EXCEPT as to the shallow oil units, deep oil units, shallow gas units, intermediate gas units and deep gas units and horizontal units, us above provided, and this Lease shall also terminate in depth, as provided in Subparagraph K., below.

C.      The actual drilling of a well as such words "actual drilling" are used in this Lease, shall be considered to be commenced when there have been erected on the Leased Premises at the location for such well, a derrick, a rig and machinery capable of drilling to a depth sufficient to test a prospective oil or gas horizon on the Leased Premises, and when such well shall be "spudded-in" and rotating under power. Whenever the provisions of this Lease refer to "commence" or "commencement" of a well, it is intended to mean the commencement of the actual drilling of such well. For purposes hereof, the date of completion of a well shall be twenty (20) days following the last to occur of (i) perforation of the production casing and/or liner, (ii) completion of all artificial stimulation such as acid treatment, fracing or swabbing, and (iii) completion of all other "completion operations" that a reasonable operator would use and employ in a good faith effort to obtain production from such well; provided, however, if thirty (30) days shall elapse between the cessation of any such completion operation and the resumption thereof or the commencement of a new completion operation, the well shall be deemed to have been completed at the expiration of said thirty (30) day period. The date of abandonment of a dry hole shall be the date indicated on the Railroad Commission of Texas Plugging Report for such well or ten (10) days after the release of the rig from such location after testing, whichever is earlier. "Reworking operations" as that term is used in this Lease shall mean reentry into a well previously completed as a producer, and actual work in the hole, in a good and workmanlike manner and prosecuted with reasonable diligence.

D.      Each well drilled under the provisions of this Section 8 after production is discovered on the Leased Premises shall be drilled with reasonable diligence and in a good and workmanlike manner in a bona fide attempt to produce oil or gas therefrom.

E.      It is further provided that if Lessee shall, in the conduct of drilling operations hereunder after the expiration of the primary term, commence the actual drilling of any next succeeding well within less than the time interval specified for same in the provisions of Subparagraph B., above, and thus speeds up the development of the Leased Premises, Lessee shall have the credit in time for such accelerated development and Lessee may subsequently in the conduct of drilling operations take advantage of such credit in time on a cumulative basis, and thus extend the time for the commencement of the actual drilling of any subsequent well or wells required to be drilled under the terms of this Section 8 in order to prevent a termination of this Lease in accordance with the terms and provisions hereof and the limitation provisions hereof shall be extended accordingly. Lessee shall notify Lessor within thirty (30) days after the occurence thereof, in writing, of the date of commencement of the actual drilling of each well and also of the time credit claimed by Lessee, if any, in connection with each succeeding well. If Lessee shall fail to so notify Lessor as above provided, Lessee shall not be entitled to any credit in time for accelerated development as provided herein. The foregoing provisions with respect to accumulation of time assumes that only one well will be drilled at

dEE 19 GS   40

**Re:** Cause No. 12-06-00122-CVL; Swift Energy Operating, LLC vs. Patricia Jo Kardell et al.; In the 218th District Court, La Salle County, Texas

## EXECUTED DIVISION ORDERS (SWIFT ENERGY PRODUCTION)

**Division Order**  Date: December 16, 2011

| | | |
|---|---|---|
| Lola Mae Minson Akers | Decimal Interest | .01250000 ($\frac{1}{2}$ x 1/5 x 1/8) |
| Pamela Boss | Decimal Interest | .00312500 ($\frac{1}{2}$ x 1/4 x 1/5 x 1/8) |
| Dean Edward Burkett (Life Estate) | Decimal Interest | .00208334 (1/3 x 1/4 x 1/5 x 1/8) |
| Brian Hunter | Decimal Interest | .00208333 (1/3 x 1/4 x 1/5 x 1/8) |
| Jenny May Woodall Lawrence | Decimal Interest | .00078125 (1/8 x 1/4 x 1/5 x 1/8) |
| Malydalyn Jones Mitchell | Decimal Interest | .00625000 (1/4 x 1/5 x 1/8) |
| Lourene Yvonne Woodall Vance | Decimal Interest | .00078125 (1/8 x 1/4 x 1/5 x 1/8) |
| Sharon L. Williams | Decimal Interest | .00312500 ($\frac{1}{2}$ x 1/4 x 1/5 x 1/8) |
| Francis Madison Woodall | Decimal Interest | .00156250 (1/4 x 1/4 x 1/5 x 1/8) |
| Johnny Lee Woodall | Decimal Interest | .00078125 (1/8 x 1/4 x 1/5 x 1/8) |

**Transfer Order / Division of Interest Schedule**  Date: August 13, 2012

Jenny M. Lawrence  Decimal Interest  .00078125
(Transferor: Patricia Elma Childress Ward Cogovan)

Jenny M. Lawrence  Decimal Interest  .00078125
(Transferor: Brandy Cannon fka Brandy Yvonne Childress)

**Stipulation of Non-Participating Royalty Interest**

Brian Hunter  1/3 of 1/4 of 1/5 of 1/8

# DIVISION ORDER

Receive

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Date: December 16, 2011

**Land Administration**
Effective Date: First Production
(October 1, 2011)

Property Number: 421018835
Property Name: Snowden EF 1H
Operator: Swift Energy Operating, LLC
County and State: La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486 Dimmit County, Texas

Owner Name: Lola Mae Minson Akers
407 Tutt Ave.
Taft, TX 78390

Owner Number: 14253
Type of Interest: NPRI
Decimal Interest: .01250000
(1/2 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _Lola M Akers_

Owner Address: _409 TUTT AVE_
_TAFT, TEXAS 78390_

DEC 29 2011
Land Department

Owner Tax ID/SS No. _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_

Owner Home Phone: _361-528-3372_    Owner Work Phone: _____

Owner Email: _____

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

Akers Lola M

# DIVISION ORDER

## Received

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Date: December 16, 2011

Property Number: 421018835    Land Administration    Effective Date: First Production
Property Name: Snowden EF 1H                           (October 1, 2011)
Operator: Swift Energy Operating, LLC
County and State: La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres of land, more or less, our of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Owner Name: Pamela Boss
4189 Summit Way
Marietta, GA 30066

Owner Number: 14255
Type of Interest: NPRI
Decimal Interest: .00312500
(1/2 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating. LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address; including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest. unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _Pamela Boss_

Owner Address: _4189 Summit Way_
_Marietta GA 30066_

Owner Tax ID/SS No: _455 80 0442_

Owner Home Phone: _770 591 2941_     Owner Work Phone: _____

Owner Email: _pambuss2@comcast.net_

_Boss, Pamela_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

162

# DIVISION ORDER

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Date: December 16, 2011.
Land Administration

| | |
|---|---|
| Property Number: | 421018835 |
| Property Name: | Snowden EF 1H |
| Operator: | Swift Energy Operating, LLC |
| County and State: | La Salle and Dimmit Counties, Texas |
| Property Description: | 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas |

Effective Date: First Production
(October 1, 2011)

Owner Name: Dean Edward Burkett (Life Estate)
4400 Blue Ridge
Belton, TX 76513

Owner Number: 14257
Type of Interest: NPRI
Decimal Interest: .00208334
(1/3 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _W. Dean E. Burkett_

Owner Address: _4400 BLUE Ridge Dr_
_Belton, Tx 76513_

Owner Tax ID/SS No. _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_

Owner Home Phone _254-935-9970_  Owner Work Phone: _N/A_

Owner Email: _bburkett61@yahoo.com_ CELL: _254-771-0773_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

BURKETT, Dean Edward



# SWIFT ENERGY OPERATING, LLC
### AUTHORIZATION FOR ELECTRONIC FUNDS TRANSFER PAYMENT

Received

Land Administration

Dear Interest Owner:

Swift Energy Operating, LLC is pleased to offer electronic deposit. This will provide you with the option of having your payments deposited directly into your bank. The processing of this application may take up to thirty (30) days.

To ensure the security of your payments, Swift Energy will be utilizing the Automated Clearing House (ACH) system. To be certain we are equally placed at no disadvantage due to mail delivery time and bank-clearing time, the ACH credit in available funds will be received into your account three (3) business days after the check would have been placed in the mail. Credits due on a non-business day will be received the next business day.

Payment detail will be furnished by US Mail in the same format as now being received with your check.

## Direct Deposit Enrollment Form

1. Identify this form as a: ☒ NEW APPLICATION   ☐ CHANGE   ☐ CANCELLATION

2. 
Dean E Burkett
Owner Name

_____
Owner Number

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
Tax ID No / Social Security No.

254-935-9970
Phone Number

4400 Blue Ridge Dr.
Street Address or P.O. Box

Belton TX 76513
City       State      Zip Code

Belton, TX 76513

bburkett-61@ynbaa.com
Email

☐ Check box if you wish to change the address currently on file with the address listed above.

3. Please provide the correct ABA/routing number and account number for your financial institution.

1st Convenience Bank   111906271   414272328
Financial Institution Name   ABA/Routing # for ACH   Account #

☒ Checking
☐ Savings

4. Sign authorization and date form below:

I authorize Swift Energy Operating, LLC and the financial institution listed on the information provided to electronically deposit my payment to the account specified. This authority will remain in effect until I have filed a new authorization. I understand that I can change my account or financial institution arrangement simply by filing a new authorization. If you are signing on behalf of a corporation, partnership, trust, etc., include your title as signing authority.

*If a joint account, signatures for both parties are required.*

Signature: _Dean E Burkett_        Signature: _Betty Burkett_

Print Name: DEAN E BURKETT        Print Name: BETTY BURKETT

Date: 12-21-2011        Date: 12-21-2011

5. Mail completed enrollment form to: → SWIFT ENERGY OPERATING, LLC, 16825 Northchase Dr. Suite 400, Houston, TX 77060
→ Attention: Owner Relations Department

## PLEASE ATTACH A VOIDED CHECK FOR THE ACCOUNT TO WHICH PAYMENTS WILL BE DEPOSITED

Questions concerning Direct Deposit Form - Please call Swift Energy Owner Relations Department 281-874-2606 or email to owners@swiftenergy.com.

164

# DIVISION ORDER

To:  Swift Energy Operating, LLC
     16825 Northchase Drive, Suite 400
     Houston, TX 77060

Date: December 16, 2011

Property Number:    421018835
Property Name:      Snowden EF 1H
Operator:           Swift Energy Operating, LLC
County and State:   La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Effective Date: First Production
(October 1, 2011)

Owner Name: Brian Hunter
            9910 E. 99th Street
            Tulsa, OK 74133

Owner Number:       14259
Type of Interest:   NPRI
Decimal Interest:   .00208333
                    (1/3 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _____    **Received**

Owner Address: 9910 E 99th St

Owner Tax ID/SS No. 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                **Land Administra....**

Owner Home Phone: 918-978-3658    Owner Work Phone: 1-918-355-3699

Owner Email: bhunter@tcabc.com

Hunter, Brian

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

# DIVISION ORDER
## Received

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

AUG 2 7 2012

Date: December 16, 2011

Property Number: 421018835 **Land Administration**
Property Name: Snowden EF 1H
Operator: Swift Energy Operating, LLC
County and State: La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Effective Date: First Production
(October 1, 2011)

Owner Name: Jenny May Woodall Lawrence
248 County Road 648
Dayton, TX 77535

Owner Number: 14262
Type of Interest: NPRI
Decimal Interest: .00078125
(1/8 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: *Jenny M. Lawrence*

Owner Address: *248 County Road 648*
*Dayton, TX 77535*

Owner Tax ID/SS No. *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*

Owner Home Phone *936-258-9694*   Owner Work Phone: *N/A*

Owner Email: *sallyberetta@gmail.com*
*8-23-12*   *Lawrence, Jenny M.*

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

166

# DIVISION ORDER

Received

**Date:** December 16, 2011

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Land Administration

| | |
|---|---|
| Property Number: | 42101B835 |
| Property Name: | Snowden EF 1H |
| Operator: | Swift Energy Operating, LLC |
| County and State: | La Salle and Dimmit Counties, Texas |

**Effective Date:** First Production
(October 1, 2011)

Property Description: 2.137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

| Owner Name: Malydalyn Jones Mitchell | Owner Number: | 14254 |
|---|---|---|
| 113 County Road 1112 | Type of Interest: | NPRI |
| Pearsall, TX 78061 | Decimal Interest: | .00625000 |
| | | (1/4 x 1/5 x 1/8) |

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _Malydalyn Jones Mitchell_

Owner Address: _113 CR 1112_
_Pearsall, Texas 78061_

Owner Tax ID/SS No. _446 - 38 - 0812_

Owner Home Phone: _830 - 334 - 4353_    Owner Work Phone: _NONE_

Owner Email: _NONE_

_Mitchell, Malydalyn Jones_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

# DIVISION ORDER

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

**Received**

Date: December 16, 2011

Land Administration

Effective Date: First Production
(October 1, 2011)

| | |
|---|---|
| Property Number: | 421018835 |
| Property Name: | Snowden EF 1H |
| Operator: | Swift Energy Operating, LLC |
| County and State: | La Salle and Dimmit Counties, Texas |
| Property Description: | 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas. |

Owner Name: Lourene Yvonne Woodall Vance
16369 County Road 1113
Flint, TX 75762

Owner Number: 14261
Type of Interest: NPRI
Decimal Interest: .00078125
(1/8 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: _Lourene Yvonne Woodall Vance_

Owner Address: _16369 CR 1113_
_Flint TX 75762_

Owner Tax ID/SS No. _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_

Owner Home Phone: _903-581-0733_    Owner Work Phone: _NA_

Owner Email: _lulurvance1230@earthlink.net_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

Vance Lourene Yvonne Woodall

# DIVISION ORDER

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

**Received**

Date: December 16, 2011

Property Number: 421018835
Property Name: Snowden EF 1H **Land Administration**
Operator: Swift Energy Operating, LLC
County and State: La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres of land, more or less, out of the T. T. R. R Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Effective Date: First Production
(October 1, 2011)

Owner Name: Sharon L. Williams
5105 Mountain Spring Trail
Fort Worth, TX 76123

Owner Number: 14256
Type of Interest: NPRI
Decimal Interest: .00312500
(1/2 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located

Owner Signature: _Sharon L (Williams)_

Owner Address: _5105 Mountain Spring Trail_
_Fort Worth, TX 76123_

Owner Tax ID/SS No. _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_

Owner Home Phone: _817-370-1744_ Owner Work Phone _817-791-7568_ (C)

Owner Email: _Sharon7w@yahoo.com_

_Williams, Sharon L_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

# DIVISION ORDER

## Received

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Date: December 16, 2011

| | | **Land Administration** | |
|---|---|---|---|
| Property Number: | 421018835 | Effective Date: First Production | |
| Property Name: | Snowden EF 1H | (October 1, 2011) | |
| Operator: | Swift Energy Operating, LLC | | |
| County and State: | La Salle and Dimmit Counties, Texas | | |

Property Description: 2,137.979 aces of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Owner Name: Francis Madison Woodall
12545 FM 2088
Pittsburg, TX 75686

Owner Number: 14260
Type of Interest: NPRI
Decimal Interest: .00156250
(1/4 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: *Francis Madison Woodall*

Owner Address: 12545 FM 2088
Pittsburg, TX 75686

Owner Tax ID/SS No: 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

Owner Home Phone: 903-725-7448    Owner Work Phone: 903-243-1007

Owner Email: fwoodall@etex.net

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

Woodall Francis M.

# DIVISION ORDER

## Received

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

Date: December 16, 2011

Property Number: 421018835  Land Administration
Property Name: Snowden EF 1H
Operator: Swift Energy Operating, LLC
County and State: La Salle and Dimmit Counties, Texas
Property Description: 2,137.979 acres, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

Effective Date: First Production
(October 1, 2011)

Owner Name: Johnny Lee Woodall
427 East Ransom Road, Space #144
Aransas Pass, TX 78336

Owner Number: 14263
Type of Interest: NPRI
Decimal Interest: .00078125
(1/8 x 1/4 x 1/5 x 1/8)

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

This Division Order does not amend any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas

In addition to the terms and conditions of this Division Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

Owner Signature: *Johnny Lee Woodall*

Owner Address: *427 E Ransom Rd #144*
*Aransas Pass Tx 78336*

Owner Tax ID/SS No. *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*

Owner Home Phone: *361-701-5598*     Owner Work Phone: _____

Owner FAX #: _____

*1-9-2012*

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% withholding and will not be refundable by Swift.

Woodall, Johnny Lee

# TRANSFER ORDER

Received

AUG 2 7 2012

Land Administration

To:  Swift Energy Operating, LLC
     16825 Northchase Drive, Suite 400
     Houston, TX 77060

Date:  August 13, 2012

Effective Date: Next Settlement

| | |
|---|---|
| Property Name: | Snowden EF 1H |
| Property Number: | 421018835 |
| Operator: | Swift Energy Operating, LLC |
| County and State: | La Salle County, Texas |
| Property Description: | 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas |

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

All future payments shall be made to the Transferee(s) including adjustments to payments made to the Transferor(s) prior to the effective date provided for herein of such change, transfer or difference. The Transferee so hereby assume(s) responsibility for accounting to the Transferor(s) for any such adjustments. *or ratify it*

This Transfer Order does not amend/any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Transfer Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

TRANSFEREE:                    TRANSFEROR:

Owner Signature: _Jenny M. Lawrence_
              Jenny M. Lawrence

Owner Address: 248 County Road 648
              Newton, TX 77535

Patricia Elma Childress Ward Cogovan

Owner Tax ID/SS No.  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

Owner Day Time Phone:  936-258-9634

8-23-12

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% tax withholding and will not be refundable by Swift.

DIVISION OF INTEREST SCHEDULE

ATTACHED HERETO AND MADE A PART OF THAT
CERTAIN TRANSFER ORDER COVERING
PRODUCTION FROM THE
SNOWDEN EF 1H WELL
IN LA SALLE COUNTY, TEXAS

| OWNER NUMBER | OWNER NAME | DECIMAL INTEREST | TYPE INTEREST |
|---|---|---|---|
| TRANSFEREE: | | | |
| 14262 | Jenny M. Lawrence<br>248 County Road 648<br>Dayton, TX 77535 | .00078125 | RI |

Transferred in accordance that certain Mineral Deed and Royalty Transfer, dated April 2, 2012, by and between Patricia Elma Childress Ward Cogovan, as Grantor, and Jenny M. Lawrence, as Grantee, recorded in La Salle and Dimmit Counties, Texas.

# TRANSFER ORDER

## Received

To: Swift Energy Operating, LLC
16825 Northchase Drive, Suite 400
Houston, TX 77060

AUG 2 7 2012

Date: August 13, 2012

**Land Administration**

Effective Date: Next Settlement

Property Name: Snowden EF 1H
Property Number: 421018835
Operator: Swift Energy Operating, LLC
County and State: La Salle County, Texas
Property Description: 2,137.979 acres of land, more or less, out of the T. T. R. R. Company Survey No. 137, Abstract No. 762; the John H. Gibson Survey No. 143, Abstract No. 728; the J. V. Massey Survey No. 147, Abstract No. 746; and the Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas

The undersigned certifies it is the owner of the decimal interest in production or proceeds as set out on the Division of Interest Schedule attached hereto and made a part hereof.

Swift Energy Operating, LLC ("Swift") shall be notified, in writing, of any change in ownership, decimal interest, or payment address, including changes of interest contingent on payment of money or expiration of time. All such changes shall be effective the first day of the month following receipt of such notice which shall include documents satisfactorily evidencing such change.

Swift is authorized to withhold payment without interest, unless otherwise required by applicable statute, pending resolution of a title dispute or adverse claims asserted regarding the interest in production claimed herein by the undersigned. The undersigned agrees to indemnify and hold Swift harmless from all liability resulting from payments made to the owner in accordance with such division of interest including but not limited to attorney fees or judgments in connection with any suit that affects the undersigned's interest to which Swift is made a party. The undersigned shall notify Swift in writing of any lawsuit affecting the undersigned's interest.

Swift may accrue proceeds until the total amount equals $100.00 or more. Checks will be issued monthly and revenue will be accrued and paid whenever a minimum of $100 is reached, or annually, whichever may occur first. Payments of less than $10 will be held until production ceases or until the owner changes.

All future payments shall be made to the Transferee(s) including adjustments to payments made to the Transferor(s) prior to the effective date provided for herein of such change, transfer or difference. The Transferee so hereby assume(s) responsibility for accounting to the Transferor(s) for any such adjustments. *or ratify it*

This Transfer Order does not amend/any lease or operating agreement between the undersigned and the lessee or operator or any other contracts for the purchase of oil or gas.

In addition to the terms and conditions of this Transfer Order, the undersigned and Swift may have certain statutory rights under the laws of the state in which the property is located.

TRANSFEREE:

TRANSFEROR:

Owner Signature: _Jenny M. Lawrence_
Jenny M. Lawrence

Brandy Cannon f/k/a Brandy Yvonne Childress

Owner Address: _248 County Road 648_
_Dayton, TX 77535_

Shawnna Renae Childress

Owner Tax ID/SS No. _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_

Samuel Kenny Childress VI Ward

Owner Day Time Phone: _936-258-9634_

_8-23-12_

Federal Law requires you to furnish your Social Security or Taxpayer Identification Number. Failure to comply will result in 28% tax withholding and will not be refundable by Swift.

## DIVISION OF INTEREST SCHEDULE

### ATTACHED HERETO AND MADE A PART OF THAT
### CERTAIN TRANSFER ORDER COVERING
### PRODUCTION FROM THE
### SNOWDEN EF 1H WELL
### IN LA SALLE COUNTY, TEXAS

| OWNER NUMBER | OWNER NAME | DECIMAL INTEREST | TYPE INTEREST |
|---|---|---|---|
| TRANSFEREE: | | | |
| 14262 | Jenny M. Lawrence<br>248 County Road 648<br>Dayton, TX 77535 | .00078125 | RI |

Interest formerly credited to the Estate of Samuel Kenny Childress V, Owner 14265. Transferred in accordance those certain Mineral Deed and Royalty Transfers, by and between Brandy Cannon et al, as Grantors and the heirs to the Estate of Samuel Kenny Childress V, and Jenny M. Lawrence, as Grantee. recorded in La Salle County, Texas.



NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

### STIPULATION OF NON-PARTICIPATING ROYALTY INTEREST

THE STATE OF TEXAS §
§
COUNTIES OF DIMMIT §
AND LASALLE §

This Stipulation of Non-Participating Royalty Interest is entered into by and between the undersigned parties who collectively own non-participating royalty interests in the oil, gas and other minerals that may be produced from the following-described lands in Dimmit and LaSalle Counties, Texas (hereinafter referred to as the "Lands"):

> "2,137.979 acres, more or less, out of the T. T. R. R. Co. Survey No. 137, Abstract No. 762, John H. Gibson Survey No. 143, Abstract No. 728, J. V. Massey Survey No. 147, Abstract No. 746, Wm. Clary Survey No. 138, Abstract No. 1609, La Salle County, Texas, and the Wm. Clary Survey No. 143, Abstract No. 1486, Dimmit County, Texas, being all of that certain called 2,751.6 acres described in Deed dated September 28, 1945, from Green Martin, et ux to Mrs. Mabel M. Snowden, recorded in Volume D-4, Page 53, Deed Records of La Salle County, Texas, LESS AND EXCEPT that certain 640.1 acres described in Warranty Deed dated January 11, 1984, from Mabel M. Snowden, et al to Seafirst Commercial Corporation, recorded in Volume 257, Page 332 of the Deed Records of La Salle County, Texas, and being more particularly described by metes and bounds on EXHIBIT A, attached hereto and made a part hereof for all purposes."

> 640.689 acres more or less, and being composed of the following approximate acreages: 4.90 acres our to the Tyler Tap Railroad Co. Survey 137, Abstract 762, 4.84 acres out of the J. H. Gibson Survey 143, Abstract 728, 436.85 acres out of the J. V. Massey Survey 147, Abstract 746 and 193.51 acres out of the A. Salinas Survey 148, Abstract 1344 and further described in that certain Warranty Deed dated October 15, 1990, from Al Guevara Plumbing Co. Inc as Grantor, and Gary L. Otto, James A. Otto, and Raymond M. Otto as Grantee, recorded of record in Volume 323 Page 357 in the Deed Records of LaSalle County, Texas, and being more particularly described by metes and bounds on EXHIBIT B, attached hereto and made a part hereof for all purposes."

WHEREAS, through a series of conveyances or through inheritance, the undersigned parties, have acquired non-participating royalty interests in the oil, gas and other minerals that may be produced from the Lands; and

WHEREAS, some uncertainty exist as to the quantum of royalty interest conveyed by Mabel M. Snowden in that certain Non-Participating Mineral Deed recorded in Volume K-4, Page 311 of the Deed Records of LaSalle County, Texas, and it being the desire of the undersigned parties to clarify their ownership in the royalties from the production of the oil, gas and other minerals in and under the Lands.

NOW THEREFORE, the undersigned parties hereby stipulate and agree that their non-participating royalty interest in the production of the oil, gas and other minerals in and under the Lands, as between themselves, is as follows:

received 3/27/12
Snowden

| Owner | Non-Participating Royalty Interest |
|---|---|
| Edwin V. Acker, Jr., as to a life estate Remainder to: Edwin Scott Acker and Shella Acker Reinke. 1300 FM 624, Tilden, TX 78072 | 1/4 of 1/5 of 1/8 |
| Edwin V. Acker, Jr. 1300 FM 624, Tilden, TX 78072 | 1/4 of 1/5 of 1/8 |
| Emmett Adolph Acker, as to a life estate Remainder to Elaine Acker and Steven Acker. 1301 FM 624, Tilden, TX 78072 | 1/4 of 1/5 of 1/8 |
| Emmett Adolph Acker | 1/4 of 1/5 of 1/8 |
| Bonnie Lee Skidmore f/k/a Bonnie Lee Adams 124 CR 7712, Divine, TX 78016 | 1/2 of 1/5 of 1/8 |
| Lola Mae Minson Akers 407 Tutt Avenue, Taft, TX 78390 | 1/2 of 1/5 of 1/8 |
| Malydalyn Jones Mitchell 113 CR 1112, Pearsall, TX 78061 | 1/4 of 1/5 of 1/8 |
| Pamela Boss 4189 Summit Way, Marietta, GA 30066 | 1/2 of 1/4 of 1/5 of 1/8 |
| Sharon L. Williams 5105 Mountain Spring Trail FT. Worth, TX 76123 | 1/2 of 1/4 of 1/5 of 1/8 |
| Dean Edward Burkett, life estate Remainder to Dee Ann Wilson 4400 Blue Ridge, Belton, TX 76513 | 1/3 of 1/4 of 1/5 of 1/8 |
| Daniel Wilson 2400 Greenbrier Dr. #A Manhatten, KS 66502 | 1/3 of 1/4 of 1/5 of 1/8 |
| Brian Hunter 9910 E.99th Street, Tulsa, OK 74133 | 1/3 of 1/4 of 1/5 of 1/8 |
| Francis Madison Woodall 12545 FM 2088, Pittsburg, TX 75686 | 1/4 of 1/4 of 1/5 of 1/8 |
| Lourene Yvonne Woodall Vance 16369 County Road 1113 Flint, TX 75762 | 1/3 of 1/4 of 1/5 of 1/8 |
| Jenny May Woodall Lawrence 248 County Road 648 Dayton, TX 77535 | 1/8 of 1/4 of 1/5 of 1/8 |
| Johnny Lee Woodall 427 East Ransom Road, Space #144 Aransas Pass, TX 78336 | 1/8 of 1/4 of 1/5 of 1/8 |
| Caron Marie Corum 136 Memory Trail San Antonio, TX 78232 | 1/8 of 1/4 of 1/5 of 1/8 |

2

Estate of Kenny Childress, IV, deceased     1/8 of 1/4 of 1/5 of 1/8

Patricia Elma Childress Ward     1/8 of 1/4 of 1/5 of 1/8
731 Gordon Street, Eden, NC 27288

TO EFFECTUATE THE PURPOSE OF THIS AGREEMENT, for good and valuable consideration, including, but not limited to, the terms and provisions of this Stipulation of Non-Participating Royalty Interest, the receipt and sufficiency of which is hereby acknowledged, each of the undersigned parties hereby grant, bargain, sell and convey unto each of the other undersigned parties a sufficient share of his/her non-participating royalty interest in the production of the oil, gas and other minerals in and under the Lands which he/she now owns, or is now claiming, so as to establish the respective ownership in the royalties from the production of the oil, gas and other minerals in and under the Lands as set forth above.

This instrument affects the undersigned parties' interests in the oil, gas and other minerals in and under the Lands and does not cover or affect ownership of the surface of the Lands, or any portion thereof. This instrument shall be binding upon the undersigned parties, their respective heirs, devisees, personal representatives, successors and assigns. This instrument may be executed in multiple counterparts and each counterpart shall be deemed to be an original instrument.

This instrument may be executed in multiple counterparts, which all together shall be considered to be one instrument binding upon the parties executing a counterpart regardless of whether or not any other party named as a signatory executes a counterpart.

EXECUTED on this 21 day of March, 2012, but effective for all purposes as of December 1, 2009.

3

Edwin V. Acker, Jr.

Brian Hunter

Emmett Adolph Acker

Francis Madison Woodall

Bonnie Lee Skidmore
a/k/a Bonnie Lee Adams

Lourene Yvonne Woodall Vance

Lola Mae Minson Akers

Jenny May Woodall Lawrence

Malydalyn Jones Mitchell

Johnny Lee Woodall

Pamela Boss

Caron Marie Corum

Sheron L. Williams

Estate of Kenny Childress, IV,
Deceased

Dean Edward Burkett

Patricia Elma Childress Ward

Daniel Wilson

4

ACKNOWLEDGEMENT

STATE OF _Oklahoma_ §
COUNTY OF _Tulsa_ §

The foregoing instrument was acknowledged before me, the undersigned Notary Public, by Brian Hunter, this _21st_ day of _March_ , 2012.

SEAL

Notary Public, State of _Oklahoma_

My Commission Expires: _10-03-15_

14

| | | |
|---|---|---|
| JULIA AUTHELIA WINSLOW; | X | IN THE DISTRICT COURT |
| BONNIE ADAMS; NORMAN AKERS; | X | |
| MARTIN SNOWDEN; MICKEY | X | |
| SNOWDEN; MAXINE BURKETT; | X | |
| YVONNE CAMPOS AND | X | |
| LOUISE J. BURT | X | |
| | | |
| V. | X | 343RD JUDICIAL DISTRICT |
| | | |
| EDWIN V. ACKER, EDWIN V. | X | |
| ACKER, JR., INDIVIDUALLY | X | |
| AND ADMINISTRATOR OF THE | X | |
| JOHNNIE LORENE ACKER TRUST, | X | |
| AND EMMETT A. ACKER, | X | |
| ADMINISTRATOR OF THE | X | |
| JOHNNIE LORENE ACKER TRUST | X | McMULLEN COUNTY, TEXAS |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Edwin V. Acker, Edwin V. Acker, Jr., Individually, and Edwin V. Acker, Jr., and Emmett A. Acker as Independent Co-Executors and Trustees under the Will of Johnnie Lorene Acker, Deceased, and respectfully move for summary judgment upon their counterclaim for declaratory judgment, and grounds for such Motion would show:

I.

This Motion is based upon the pleadings, affidavits and exhibits on file herein or attached hereto.

II.

Except as to the amount of attorney fees and interests to which Movants are entitled, there are no genuine issues of material fact in dispute and Defendants are entitled to Judgment as a matter of law.

III.

The sole issues presented for determination are whether:

A. Johnnie Lorene Acker and the Defendants, or any one or more of them, breached any fiduciary duty owing to the Plaintiffs by reason of the execution by Johnnie Lorene Acker of the four oil and gas leases mentioned in Plaintiffs' Petition and in Defendants' Counterclaim and by the acceptance of overriding royalty interests in the four leases as a part of the consideration for the execution thereof.

Filed at 1:55 o'clock P M

terest created by the two overriding royalty interest assignments, hereinafter described; or, as the Plaintiffs contend, the Plaintiffs are the owners of an undivided four-fifths (4/5ths) in such overriding royalty interest.

Resolution of these issues, depend upon the construction of various documents pertaining to the partition of the Estate of J.E. Murphy, Deceased, hereinafter mentioned and described.

Johnnie Lorene Acker was one of the five children of J.E. Murphy, Deceased, and in the partition of his estate, there was awarded and set apart to Johnnie Lorene Acker two tracts of land in McMullen County, Texas, aggregating 1200 acres by Partition Deed from her sisters, Edna Mae Jones, Mabel Mullen Snowden and Julia Authelia Ackers (who is now Julia Authelia Winslow, a Plaintiff herein), and her brother, Emmett Granvel Murphy, dated October 27, 1948, and recorded in Volume 43, Page 218 of the Deed Records of McMullen County, Texas, a certified copy of this Partition Deed is attached hereto as Exhibit "A". The Partition Deed provides in part as follows:

"Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above-described lands are hereby conveyed or are intended or affected by this instrument except as hereinafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas and other minerals, in, on, and under all of the above-described lands in the same undivided proportion that said parties now own and hold said oil, gas and other minerals together with the right to ingress and egress at all times for the purposes of mining, drilling and exploring said lands for oil, gas and other minerals and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Johnnie Lorene Acker, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas and mineral leases so executed by her, except that she shall reserve in each oil, gas and mineral lease so executed by her, a base one-eighth (1/8) royalty interest for the benefit of herself and the other four children

Mullen County, Texas, were awarded and set apart to Edna Mae Jones in Partition Deed from her sisters and brother, dated October 21, 1948, and recorded in Volume 43, Page 221, Deed Records of McMullen County, Texas, a certified copy of which Deed is attached hereto as Exhibit "B"; certain lands in LaSalle County, Texas, were awarded and set apart to Julia Authelia Ackers (now Julia Authelia Winslow) in Partition Deed from her sisters and brother dated October 23, 1948, and recorded in Volume K-4, Page 313, Deed Records of LaSalle County, Texas, a certified copy of which Deed is attached hereto as Exhibit "C"; and certain lands in McMullen and Duval Counties, Texas, were awarded and set apart to Emmett Granvel Murphy in Partition Deed from his sisters, dated October 21, 1948, and recorded in Volume 44, Page 30, Deed Records of McMullen County, Texas, a copy of which Deed is attached hereto as Exhibit "D". Each of the three Partition Deeds contain the identical provision contained in the Partition Deed to Johnnie Lorene Acker, quoted above. Mabel M. Snowden had previously acquired lands in LaSalle and DeWitt Counties, Texas, as her part of her father's estate by Deed dated September 28, 1945, and recorded in Volume D-4, Page 53, Deed Records of LaSalle County, Texas. The conveyance to Mabel M. Snowden included the oil, gas and mineral estate in the lands therein described, and by Deed dated October 27, 1948, and recorded in Volume K-4, Page 311 of the Deed Records of LaSalle County, Texas, Mabel M. Snowden conveyed to her sisters, Edna Mae Jones, Johnnie Lorene Acker, Julia Authelia Ackers, and to her brother, Emmett Granvel Murphy, in equal shares, an undivided four-fifths (4/5ths) interest in and to all the oil, gas and other minerals acquired by her by the Deed of September 28, 1945. A copy of the October 27, 1948, Deed is attached hereto as Exhibit "E". The conveyance was limited by the following provision:

"It is further agreed that Grantees shall have no in-

shall not be necessary for the Grantees to join in any such lease or leases so made; that Grantees shall receive under such lease or leases four-fifths (4/5ths) (the same being one-fifth (1/5th) to each Grantee) part of all the oil, gas and other minerals taken and saved under any such lease or leases and he or she shall receive the same out of the royalty provided for in such lease or leases, but Grantees shall have no part in the annual rentals paid to keep such lease or leases in force until drilling is begun."

The five deeds referred to above clearly express the intent of the parties thereto for the owners of the surface estate of lands covered by the respective Deeds to receive all of the benefits derived from leasing such owners' land, save and except only four-fifths (4/5ths) of a base one-eighth (1/8th) royalty, including, but not limited to, such benefits as bonuses, oil payments, rentals and royalties over and above four-fifths (4/5ths) of one-eighth (1/8th).

IV.

To further support the construction of the five deeds as set forth in Paragraph III above, Edna Mae Jones, Johnnie Lorene Acker, Mabel Mullen Snowden, Julia Authelia Ackers and Virginia Gertrude Akers Murphy (the surviving wife of Emmett Granvel Murphy, Deceased) entered into a Declaration and Agreement, dated December 9, 1953, and recorded in Volume X-4, Page 350, Deed Records of LaSalle County, Texas, and thereby confirmed their intention with respect to the rights of the surface owner and the sharing of royalties under any lease executed by the surface owner. A certified copy of this Agreement is attached hereto as Exhibit "F". The Declaration and Agreement states:

"NOW, THEREFORE, for and in consideration of the benefits running form one to the other, and in order to clarify each deed executed dividing the Estate of J.E. Murphy, Deceased, we, Edna Mae Jones, joined pro forma by her husband Jimmie Jones, Johnnie Lorene Acker, joined pro forma by her husband, E.V. Acker, Mabel Mullen Snowden, joined pro forma by her husband, J.G. Snowden, Julia Authelia Ackers, an adult feme sole, and Virginia Gertrude Akers Murphy, an adult feme sole, and sole devisee under the Will of Emmett Granvel Murphy, Deceased, do hereby execute this instrument and hereby declare, that in making the division of the property in the Estate of J.E. Murphy, Deceased, it was the inten-

to receive all bonuses and rentals on leases that might thereafter be made by the party to whom said surface was conveyed by Special Warranty Deed, provided, however, that the Lessor in said oil, gas and mineral lease, so executed by him or her, should reserve, in each oil, gas and mineral leases so executed, a basic one-eighth (1/8th) royalty interest (if all royalty interest was owned by J.E. Murphy at the time of his death, then a full 1/8th royalty would be reserved; otherwise a proportion of 1/8th reserved) for the benefit of the Lessor and the other children of J.E. Murphy, deceased, and those claiming under said children or child; and this is particularly true as to the land received by Edna Mae Jones in McMullen County; the land received by Johnnie Lorene Acker in McMullen County; the lands received by Julia Authelia Ackers in LaSalle County; and the land received by Emmett Granvel Murphy in McMullen and Duval Counties, Texas, all of which division was Special Warranty Deeds to said Emmett Granvel Murphy, the Deed of Emmett Granvel Murphy being dated October 21, 1948, and recorded in Volume 70, Pages 527-531 of Duval County Deed Records, reference to which is here made for all purposes, and the other deeds being executed on or about the same date, being recorded in the respective counties where the land is located, and reference to each of which is here made for all purposes."

Such Agreement expressly states that the surface owner is to reserve in each oil, gas and mineral lease executed by the surface owner, a basic one-eighth (1/8th) royalty for the benefit of the surface owner and the other children of J.E. Murphy, and those claiming under such children. Plaintiffs, Julia Authelia Winslow and Mabel Mullen Snowden are parties to the five deeds described in Paragraph III above and are parties to the Declaration and Agreement, and the remaining Plaintiffs each claim under one of the five deeds and under the Declaration and Agreement, and all of the Plaintiffs are bound by the terms of such documents.

V.

Pursuant to the authority granted to her under the terms of the Partition Deed, Johnnie Lorene Acker executed four oil and gas leases, each covering a portion of the lands described in the Partition Deed to her, each lease being to Murphy H. Baxter, as Lessee, said leases being described as follows:

1.  Oil and gas lease covering depths from the surface of the ground down to 7,000 feet on 532.00 acres in the J.E. Murphy Survey, A-1181, Section 480,

of the South 520.00 acres of the J.E. Murphy Survey, A-1181, Section 480, McMullen County, Texas, and being recorded in Volume 187, Page 187 of the Deed Records of McMullen County, Texas.

3.  Oil and gas lease covering 166.00 acres, being all of the Southwest Quarter (SW/4) of the Calvin P. Wright Survey No. 128, A-1155, McMullen County, Texas, and being recorded in Volume 187, Page 183 of the Deed Records of McMullen County, Texas.

4.  Oil and gas lease covering 25.37 acres, being excess acreage as surveyed in the J.E. Murphy Survey, A-1181, Section 480, McMullen County, Texas, and being recorded in Volume 187, Page 179 of the Deed Records of McMullen County, Texas.

A certified copy of each lease is attached hereto as Exhibits "G" through "J", respectively.

As a part of the bonus consideration for the execution and delivery of said leases, Murphy H. Baxter assigned to Johnnie Lorene Acker and husband, Edwin V. Acker, a five and one-half percent (5-1/2%) overriding royalty in and to the four leases by Assignment dated March 24, 1981, and recorded in Volume 188, Page 265, Deed Records of McMullen County, Texas. A certified copy of such Assignment being attached hereto as Exhibit "K". In consideration of services rendered by Emmett V. Acker, Jr., in the negotiation of the four leases, Murphy H. Baxter assigned to Edwin V. Acker, Jr., a two and one-half percent (2-1/2%) overriding royalty interest in each of the four leases by Assignment of overriding royalty interest dated March 24, 1981, and recorded in Volume 188, Page 263 of the Deed Records of McMullen County, Texas, a copy of which Assignment is attached hereto as Exhibit "L". Johnnie Lorene Acker died April 8, 1983, and her interest in the overriding royalty interest passed to her sons, Edwin V. Acker, Jr., and Emmett A. Acker, as Independent Co-Executors and Trustees under her Will, a certified copy of which Will and Order Admitting same to probate is attached hereto as Exhibits "M" and "N", respectively.

VI.

The Partition Deed to Johnnie Lorene Acker is not ambiguous

Partition Deed on such terms as she may desire, "except that she shall reserve in each oil, gas and mineral lease so executed by her, a base one-eighth (1/8th) royalty interest for the benefit of herself and the other four children of J.E. Murphy, Deceased, grantors herein, in the same proportion they now own same." Each lease so executed by Johnnie Lorene Acker did reserve a base one-eighth (1/8th) royalty as required under the terms of the Partition Deed. Johnnie Lorene Acker, therefore, fulfilled any duty which she may have owed to the Plaintiffs herein.

## VII.

The Partition Deed to Johnnie Lorene Acker also provides, as a matter of law, that she was entitled to receive the bonus consideration and oil payments paid under the terms of any lease so executed by her. As judicially admitted by Plaintiffs in their Original Petition, the overriding royalty interests in question were granted as a part the bonus consideration for the execution of the oil and gas leases, and under the express provisions of the Partition Deed the Plaintiffs are not entitled to participate therein.

## VIII.

On the basis of the foregoing, it is established as a matter of law, that neither Johnnie Lorene Acker nor the Defendants, or any one or more of them breached any fiduciary duty owing to the Plaintiffs, and that the Defendants are entitled to receive the overriding royalty interests in question and hereinabove described.

WHEREFORE premises considered, Defendants pray that this Motion for Summary Judgment be set down for hearing and that upon a final hearing hereof Judgment be entered declaring that neither Johnnie Lorene Acker, nor the Defendants or any one or more of them breached any fiduciary duty owing to the Plaintiffs, and

terest hereinabove described.

Respectfully Submitted,

SCHNEIDER & McWILLIAMS, P.C.
P.O. Drawer 550
George West, Texas  78022
Telephone: (512) 449-1501

By: _____
J.R. Schneider
Bar Card No. 17788000

Attorneys for Defendants

## Certificate of Service

The undersigned hereby certifies that on the 9th day of September, 1986, a copy of the foregoing Motion for Summary Judgment was transmitted by certified mail, return receipt requested, to each of the following attorneys and/or parties of record in this cause:

Mr. T. Kellis Dibrell
Dibrell, Dotson, Dibrell & Dibrell
515 Busby
San Antonio, Texas 78209
(Attorney for Julia Authelia Winslow, Bonnie Adams, Norman Akers, Martin Snowden, Mickey Snowden, Maxine Burkell, Yvonne Campos and Louise J. Burt)

Mr. Fred R. Granberry
Villita Square Professional Building
112 Villita
San Antonio, Texas 78205
(Attorney for Tommy Ragsdale)

Mr. William E. Black
Lynch, Chappell, Allday & Alsup
900 Littlefield Building
Austin, Texas 78701-3638
(Attorney for Mesa Pipeline Company)

Ms. Patricia Kardell
66 Crestline
Pleasanton, Texas 78064

Ms. Mary Van Blaricum
P.O. Box 787
Pleasanton, Texas 78064

Ms. Madalyn Brents
Post Office Box 343
Pearsall, Texas 78061

_____
J.R. Schneider

THE STATE OF TEXAS |

COUNTY OF MONTAGUE |  BEFORE ME, the undersigned, a Notary Public in and for said County, Texas, on this day personally appeared U.A.Randolph and Vannie Lee Randolph, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Vannie Lee Randolph, wife of the said U.A.Randolph, having been examined by me priv'ly and apart from her husband, and having the same fully explained to her, she, the said Vannie Lee Randolph acknowledged such instrument to be her act and deed, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 16 day of September A.D. 1948.

(SEAL)

Wanda Ruth Richardson
Notary Public in and for Montague County,
Texas.

THE STATE OF TEXAS |

COUNTY OF BEXAR  X  BEFORE ME, the undersigned, a Notary Public, in and for said County, Texas, on this day personally appeared Fred F. Morse and Reta C. Morse, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Reta C. Morse, wife if the said Fred F. Morse, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Reta C. Morse acknowledged such instrument to be her act and deed and declared that she willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 18 day of September, A.D. 1948.

(SEAL)

J.V.Bowndt
Notary Public in and for Bexar County,
Texas.

FILED FOR RECORD THIS 1 DAY OF OCTOBER, A.D. 1948, AT 11 O'CLOCK A.M.
AND DULY RECORDED THIS 15 DAY OF OCTOBER, A.D. 1948, AT 10 O'CLOCK A.M.

REX C QUINN, COUNTY CLERK,
BY _Gladys Wheeler_ DEPUTY.       MCMULLEN COUNTY, TEXAS.

: : : : : : : : : : : : : : :

FILE NO. 4976

THE STATE OF TEXAS
COUNTY OF MCMULLEN

KNOW ALL MEN BY THESE PRESENTS:

That we, Edna Mae Jones, joined pro forma by her husband, Jimmie Jones, Mabel Mullen Snowden, joined pro forma by her husband, J. O. Snowden, Julia Anthelia Akers, joined pro forma by her husband, W. F. Akers, and Emmett Granvel Murphy, four of the children of J. E. Murphy, deceased, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, to us cash in hand paid by Johnie Lorene Acker, receipt of which is hereby acknowledged, have GRANTED, SOLD, AND CONVEYED, and by these presents do GRANT, SELL AND CONVEY, unto Johnie Lorene Acker, the only other child of J. E. Murphy, Deceased, of Thurton County, Texas,

TRACT NO. 1: also Sixteen Sixty (1660) acres of land being the north portion of School Survey No. 470 made by virtue of Certificate No. 1777 issued to D. W. Moyers for 1280 acres, said whole tract having been sold to the said J. E. Murphy by the Commissioner of General Land Office of the State of Texas under sale date April 26, 1906, and notice of award No. 3222 dated May 23, 1906, being the same land described as the third tract in a deed from J. E. Murphy and wife, May Murphy, to John W. Womack, dated January 29, 1909, and filed for record on February 19, 1909, and recorded in Volume M, page 172 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description.

SECOND TRACT: Two Hundred Forty (240) acres of land, the same being West 1/2 of the Northwest 1/4 of School Section No. 128, made by vi issued to Adams, Beaty, & Moulton for 640 acres and being the same No. 128 described in the deed from J. E. Murphy and wife, May Murphy January 29, 1909, filed for record on February 19, 1909, and recorde the Deed Records of McMullen County, Texas, to which deed and record reference is here made; and it is also the same 240 acres out of School Section No. 128 described in a partition deed between J. E. Murphy and L. C. Black dated October 26, 1907, filed for record January 25, 1908, and recorded in Volume M, Page 504 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description of same.

The two above described tracts of land are also described in a sheriff's deed from W. T. Holland to J. E. Murphy, dated June 2, 1914, filed June 30, 1914, and recorded in Volume R on pages 553-564 of the Deed Records of McMullen County, Texas, and reference is here also made to this deed for a description of this land.

TO HAVE AND TO HOLD the surface estate of the above described premises, together with all and singular the rights, hereditaments, and appurtenances thereunto in any wise belonging, unto the said Johnie Lorene Acker, as her separate individual property, her heirs and assigns forever and we do hereby bind ourselves, our heirs, executors, administrators, successors, and assigns, to warrant and forever defend all and singular the surface estate of the said premises unto the said Johnie Lorene Acker, her heirs, assigns, and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described lands are hereby conveyed or are intended or affected by this instrument except as hereinafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described lands in the same undivided proportion that said parties now own and hold said oil, gas, and other minerals together with the right of ingress and egress at all times for the purposes of mining, drilling, and exploring said lands for oil, gas, and other minerals, and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Johnie Lorene Acker, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property,

The rights and privileges herein granted to the grantee herein shall not only be for her benefit, but shall be for the benefit of her heirs, executors, administrators, and assigns, and shall be a covenant running with the surface of the land above described.

Provided further that the payment of Five Hundred Fifty Dollars ($550.00) from Cox & Hammonds or the driller of Cox & Hammonds' well, for water used off of Section 410 above described shall go one-half (1/2) to Edna Mae Jones, as her separate property, and one-half (1/2) to Johnie Lorene Acker, as her separate property, and also any other water that is sold off of wells number one and number two on Section 410 shall go 1/2 to Edna Mae Jones, as her separate property, and the other 1/2 to Johnie Lorene Acker, as her separate property, and this shall continue so long as either Edna Mae Jones or Johnie Lorene Acker live unless the said Johnie Lorene Acker decides to sell said land on which said wells are located and has a buyer and she has entered into a contract to sell same, in which event the said Edna Mae Jones shall appoint an appraiser and the said Johnie Lorene Acker shall appoint an appraiser, and the two appraisers appointed shall in turn appoint a third appraiser, and they shall appraise the value of the interest of Edna Mae Jones in said water rights herein reserved and granted to her, and the said Johnie Lorene Acker shall pay said Edna Mae Jones for the appraised value, and the finding of the appraisers shall be final and there shall be no appeal therefrom, and when same is paid to the said Edna Mae Jones she shall quit-claim all her right, title, and interest in and to said water rights herein reserved to her.

It is agreed and understood that on the death of both Edna Mae Jones and Johnie Lorene Acker the water right herein reserved shall terminate, but until the death of both of them the benefits herein set forth shall be binding on their heirs, executors, administrators, and assigns.

It is further understood and agreed, anything to the contrary notwithstanding, that Johnie Lorene Acker is to have the use of water out of said wells and the right to sell water from said wells, but when she sells the said water she shall pay to Edna Mae Jones, as her separate property, one-half (1/2) of whatever she gets for same.

Executed this the 21st day of October, 1948.

Edna Mae Jones

Jimmie Jones

Mabel Mullen Snowden

J. G. Snowden

Julia Anthelia Akers

W. F. Akers

Emmett Granvel Murphy

THE STATE OF TEXAS

COUNTY OF DUVAL

Before me, the undersigned authority, a Notary Public in and for Duval County, Texas, on this day personally appeared Jimmie Jones and Edna Mae Jones, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Edna Mae Jones, wife of the said Jimmie Jones, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Edna Mae

THE STATE OF TEXAS

COUNTY OF LaSalle

Before me, the undersigned authority, ~~xxxxxxxxxxxxxxx~~ in and for La Salle County, Texas, on this day personally appeared J. G. Snowden and Mabel Mullen Snowden, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the said J. G. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)
　　　　　　　　　　　　　　　Mrs. A. U. Knaggs
　　　　　　　　　　　　　　　County Clerk in and for LaSalle County, Texas.

THE STATE OF TEXAS

COUNTY OF LASALLE

Before me, the undersigned authority, ~~xxxxxxxxxxxxxxx~~ in and for LaSalle County, Texas, on this day personally appeared W. F. Akers, and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W. F. Akers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)
　　　　　　　　　　　　　　　Mrs. A. U. Knaggs
　　　　　　　　　　　　　　　County Clerk in and for LaSalle County, Texas.

THE STATE OF TEXAS

COUNTY OF LASALLE

Before me, the undersigned authority, ~~xxxxxxxxxxxxxxx~~ in and for LaSalle County, Texas, on this day personally appeared Emmett Granvel Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)
　　　　　　　　　　　　　　　Mrs. A. U. Knaggs
　　　　　　　　　　　　　　　County Clerk in and for LaSalle County, Texas.

FILED FOR RECORD THIS 27 DAY OF OCT. A. D. 1948 AT 4 O'CLOCK P.M.

Before me, the undersigned authority, xxxxbxxxxbxxkkx in and for La Salle County, Texas, on this day personally appeared J. O. Snowdon and Mabel Mullen Snowdon, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowdon, wife of the said J. O. Snowdon, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowdon, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk, in and for LaSalle County, Texas.

THE STATE OF TEXAS
COUNTY OF LASALLE

Before me, the undersigned authority, xxxxxxxxxxBxxxkkx in and for LaSalle County, Texas, on this day personally appeared W. F. Akers, and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W. F. Akers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk in and for LaSalle County, Texas.

THE STATE OF TEXAS
COUNTY OF LASALLE

Before me, the undersigned authority, xxxxxxxxxxBxxkkx in and for LaSalle County, Texas, on this day personally appeared Emmett Granvol Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the 27 day of October, A. D. 1948.

(SEAL)

Mrs. A. U. Knaggs
County Clerk in and for LaSalle County, Texas.

FILED FOR RECORD THIS 27 DAY OF OCT. A. D. 1948 AT 4 O'CLOCK P.M.
AND DULY RECORDED THIS 27 DAY OF OCT. A. D. 1948 AT 5:30 O'CLOCK P.M.

_Gladys Wheeler_ DEPUTY.

ROY T. SMITH, CLERK COUNTY COURT.
McMULLEN COURT, TEXAS.

::::::::::::::::::
DEED NO. 4077

THE STATE OF TEXAS
COUNTY OF McMULLEN

KNOW ALL MEN BY THESE PRESENTS:

deceased, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, to us paid in hand paid by Edna Mae Jones, receipt of which is hereby acknowledged, have GRANTED, SOLD, AND CONVEYED, and by these presents do GRANT, SELL, and CONVEY, unto Edna Mae Jones, the only other child of J. E. Murray, Deceased, of Duval County, Texas, as her separate individual property, the following described real estate, together with all improvements thereon, situated in McMullen County, Texas, subject to the mineral reservation hereinafter mention, said property being more particularly described as follows, to-wit:

| Abstract No. | Survey No. | Certificate No. | Patent No. | Original Grantee | acres |
|---|---|---|---|---|---|
| 54 | 121 | 732 | 296 | A B & M | 640 |
| 57 | 123 | 994 | 294 | A B & M | 640 |

Being the same surveys No.121 and No. 123 described in a partion deed between J. E. Murphy and L. G. Black, dated October, 26, 1907, filed January 25, 1908, and recorded in Volume M, page 504 of the Deed Records of McMullen County, Texas, to which deed and record reference is here made for a full and complete description of the land herein conveyed.

TO HAVE AND TO HOLD the surface estate of the above described premises, together with all and singular the rights, hereditaments, and appurtenances thereunto in any wise belonging, unto the said Edna Mae Jones, as her separate individual property, her heirs and assigns forever; and we do hereby bind ourselves, our heirs, executors, administrators, successors, and assigns, to warrant and forever defend all and singular the surface estate of the said premises unto the said Edna Mae Jones, her heirs, assigns, and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described lands are hereby conveyed or are intended or affected by this instrument except as hereafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described lands in the same undivided proportion that said parties now own and hold said oil, gas, and other minerals together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said lands for oil, gas, and other minerals, and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Edna Mae Jones, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas and mineral leases so executed by her, except that she shall reserve in each oil, gas and mineral lease so executed by her, a base one-eighth (1/8) royalty interest for the benefit of herself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own same.

The rights and privileges herein granted to the grantee herein shall not only be for her benefit, but shall be for the benefit of her heirs, executors, administrators, and assigns, and shall be a covenant running with the surface of the land above described.

tion therein expressed, and the said Johnie Lorene Acker, wife of the said E.V. Acker, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Johnie Lorene Acker, acknowledged such instrument to be her act and deed and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of October, A.D. 1948.

(SEAL)     Geo. W. Ward, Notary Public in and for Duval County, Texas.

THE STATE OF TEXAS      |

COUNTY OF La Salle      | BEFORE ME, the undersigned authority, xxxxxxxxxxxxxxx in and for La Salle County, Texas, on this day personally appeared J.C. Snowden and Mabel Mullen Snowden his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mabel Mullen Snowden, wife of the said J.C. Snowden, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mabel Mullen Snowden, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October, A.D. 1948.

(SEAL)     Mrs. A.U. Knaggs, County Clerk in and for La Salle County, Texas.

THE STATE OF TEXAS      |

COUNTY OF LA SALLE      | BEFORE ME, the undersigned authority, xxxxxxxxxxxxxxx in and for La Salle County, Texas, on this day personally appeared W.F. Akers and Julia Authelia Akers, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Julia Authelia Akers, wife of the said W.F. Akers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Julia Authelia Akers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 27 day of October A.D. 1948.

(SEAL)     Mrs A.U. Knaggs, County Clerk in and for La Salle County, Texas.

THE STATE OF TEXAS |

COUNTY OF Duval      | BEFORE ME, the undersigned authority, a Notary Public in and for Duval County, Texas, on this day personally appeared Emmett Granvel Murphy, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of October, A.D. 1948.

(SEAL)     Geo. W. Ward, Notary Public in and for Duval County, Texas.

FILED FOR RECORD THIS 27th DAY OF OCTOBER, A.D. 1948, AT 4:00 O'CLOCK P.M.

AND DULY RECORDED THIS 28th DAY OF OCTOBER A.D. 1948, AT 9:00 O'CLOCK A.M.

By _____ Deputy.                     Rex C. Quinn, County Clerk
                                                    McMullen County, Texas

::::::::::

Edna Mae Jones, et al

To: Warranty Deed

Julia Authella Akers

THE STATE OF TEXAS:

COUNTY OF LA SALLE:                    KNOW ALL MEN BY THESE PRESENTS:

That we, Edna Mae Jones, joined pro forma by her husband, Jimmie Jones; Johnie joined pro forma by her husband, E. V. Acker; Mabel Mullen Snowden, joined pro forma by husband, J. G. Snowden, and Emmett Granvel Murphy, four of the five children of J. deceased, for and in consideration of the sum of TEN DOLLARS ($10.00), and other g able consideration to us cash in hand paid by Julia Authella Akers, receipt of whi

196

Q-3061
S-48979

acknowledged, have GRANTED, SOLD and CONVEYED, and by these presents do GRANT, SELL and CONVEY unto Julia Authelia Akers, the only other child of J. E. Murphy, deceased, of La Salle County, Texas, as her separate individual property, the surface estate of the following described real estate, together with all improvements thereon, situated in La Salle County, Texas, to-wit:

Nine hundred (900) acres of land in La Salle County, Texas, on which Julia Authelia Akers and her husband, W. F. Akers, now live, being fully described as ten (10) separate tracts of land in a deed from A. G. Salmon, et ux, to J. E. Murphy, dated July 24, 1946, and recorded in Volume E-4, on pages 540 et seq., of the Deed Records of La Salle County, Texas, to which deed and record reference is here made for a full and complete description of same.

TO HAVE AND TO HOLD, the surface estate of the above described premises, together with all and singular the rights, hereditaments and appurtenances thereunto in anywise belonging, unto the said Julia Authelia Akers, as her separate individual property, her heirs and assigns forever. And we do hereby bind ourselves, our heirs, executors, administrators, successors and assigns, to warrant and forever defend all and singular the surface estate of the said premises unto the said Julia Authelia Akers, her heirs, assigns, and successors, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under us, but not otherwise.

Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described land are hereby conveyed or are intended or affected by this instrument except as hereinafter provide and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described land in the same undivided proportion that said parties now own and hold said oil, gas and other minerals together with the right of ingress and egress at all times for the purpose of mining, drill

ing, and exploring said lands for oil, gas, and other minerals, and removing the same therefrom and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas, and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Julia Authelia Akers, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas, and mineral leases so executed by her, except that she shall reserve in each oil, gas, and mineral lease so executed by her, a base one-eighth (1/8) royalty interest for the benefit of herself and the other four children of J. E. Murphy, Deceased, grantors herein, in the same proportion they now own same.

The rights and privileges herein granted to the grantee herein shall not only be for her benefit, but shall be for the benefit of her heirs, executors, administrators, and assigns, and shall be a covenant running with the surface of the land described.

EXECUTED this the 21st day of October, 1948.

Mabel Mullen Snowden
Mabel Mullen Snowden

J. G. Snowden
J. G. Snowden

Emmett Granvel Murphy
Emmett Granvel Murphy

Edna Mae Jones
Edna Mae Jones

Jimmie Jones
Jimmie Jones

Johnie Lorene Acker
Johnie Lorene Acker

E. V. Acker
E. V. Acker

THE STATE OF TEXAS:

COUNTY OF DUVAL     :

BEFORE ME, the undersigned authority, on this day personally appeared Jimmy Jones and Edna